## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 16-CR-10343-ADB |
| v. | ) | LEAVE TO FILE GRANTED |
| MICHAEL L. BABICH, et al., | ) | |

_____

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS INDICTMENT

ANDREW E. LELLING
United States Attorney

K. NATHANIEL YEAGER
DAVID J. D'ADDIO
MARK T. QUINLIVAN
Assistant U.S. Attorneys

John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
nathaniel.yeager@usdoj.gov
david.daddio@usdoj.gov
mark.quinlivan@usdoj.gov

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... 1

LEGAL STANDARDS ............................................................................ 3

ARGUMENT ......................................................................................... 5

I.  DEFENDANTS' MOTION TO DISMISS COUNT ONE SHOULD BE DENIED.......... 5

    A.  The RICO Statute and the Supreme Court's Decision in *Salinas* ............................ 5

    B.  Count One is Not Facially Insufficient ................................................. 7

    C.  The Indictment Adequately Pleads an "Enterprise" ............................... 9

        1.  The Indictment adequately pleads the *Boyle* structural features ......................................................... 9

        2.  Defendants' assertion that Count One pleads an improper "hub and spoke" structure is meritless ....................... 11

        3.  Defendants' challenge to the Indictment's illicit diversion allegations also is insubstantial ........................... 23

    D.  The Indictment Adequately Pleads a "Pattern of Racketeering Activity" .................................................................. 24

II. DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND THREE SHOULD BE DENIED ................................................ 31

    A.  Statutory Background and Legal Principles .......................................... 31

    B.  The Indictment Adequately Pleads Mail and Wire Fraud Conspiracies .............................................................. 32

III. DEFENDANTS' MOTION TO DISMISS COUNT FOUR SHOULD BE DENIED ..... 33

    A.  Statutory Definition ................................................................. 33

    B.  The Indictment is Sufficiently Specific and Properly Alleges Overt Acts in Furtherance of the Conspiracy Charged in Count Four............................ 34

    C.  The Indictment Alleges the Requisite *Mens Rea* ................................. 35

D.      Providing Free Administrative Services To Induce Practitioners to Prescribe Subsys Can Constitute a Violation of the Anti-Kickback Statute ............................................................................................................ 38

CONCLUSION ............................................................................................................ 42

CERTIFICATE OF SERVICE ..................................................................................... 42

<u>**PRELIMINARY STATEMENT**</u>

Defendants Michael Babich, Alec Burlakoff, Michael Gurry, Richard Simon, Sunrise Lee, Joseph Rowan, and John Kapoor (collectively, the "Defendants") have moved to dismiss the First Superseding Indictment (the "FSI" or "Indictment") on the ground that all four counts in the Indictment fail to plead a federal crime. Defendants' motion should be denied.

Defendants contend that Count One—which charges them with conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(d)—should be dismissed because that count lacks the specificity that the Constitution requires, fails to plead a RICO "enterprise," and fails to plead a RICO "pattern of racketeering activity." None of those arguments is correct. Defendants' facial challenge to the sufficiency of Count One fails because the Indictment, taken as a whole, satisfies the requirements of Fed. R. Crim. P. 7(c)(1). Defendants' contention that Count One fails to plead a RICO enterprise because it alleges, at most, a "hub and spoke" structure is misplaced because Congress replaced the "hub and spoke" limitation on conspiratorial liability when it enacted the statutory RICO enterprise, and because, even accepting the premise of Defendants' argument, it is well-settled that the question whether an indictment alleges a single conspiracy or multiple conspiracies is a question of fact for the jury.

Defendants' contention that the Indictment does not properly plead a pattern of racketeering activity also is misguided, as it is based on the mistaken premise that the Indictment must describe each element of the racketeering acts that are alleged to comprise the racketeering pattern. But the government is not required to charge the racketeering acts underlying the RICO conspiracy as separate offenses or to describe those acts with the particularity necessary for separate charges. Rather, it is sufficient to allege that Defendants agreed that at least two racketeering acts would be committed by a member of the conspiracy conducting the affairs of the

1

enterprise, and cite to the specific federal or state statutory provisions that would qualify as RICO racketeering activity, which the Indictment does in this case. The conclusion that the government need not describe the elements of the offenses alleged to form the pattern of racketeering activity is consistent with the general principle that when an indictment charges a defendant with conspiring to commit an offense, it is unnecessary to allege all the elements essential to the commission of the offense that is the object of the conspiracy.

Nor is there any merit to Defendants' contention that Counts Two and Three, which charge them with mail and wire fraud conspiracy, should be dismissed. The allegations of the Indictment, which track the language of the relevant statutes and describe the nature of the fraud that is alleged, are sufficient to apprise Defendants of the charged offenses. Defendants' assertion that the Indictment alleges two distinct fraud schemes also fails because that question, once again, is one of fact that is reserved for the jury.

Finally, Defendants' motion to dismiss Count Four, which charges them with conspiracy to violate the Anti-Kickback Statute, should be denied because the Indictment sufficiently alleges an overt act in furtherance of the conspiracy as well as the requisite *mens rea*, and because there is no merit to their assertion that providing administrative support to practitioners as alleged in the Indictment cannot, as a matter of law, constitute a violation of the Anti-Kickback Statute.

Defendants, to be sure, assert in their supporting Memorandum of Law ("Mem.") that the Indictment is "unprecedented, and unfounded"; that it rests on a "wildly over-expansive" application of the RICO statute; that the allegations in the Indictment are "inflammatory," "incendiary," and "ugly"; and that the Court should reject the "prosecutorial overreach" that supposedly pervades this case. But this hyperbole adds nothing to the substance of their legal arguments, which are unsound. Defendants' motion should be denied.

## LEGAL STANDARDS

Under the Constitution, a criminal defendant cannot "be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," U.S. Const. amend. V, and he or she has "the right * * * to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. Consistent with these commands, Rule 7(c)(1) of the Federal Rules of Criminal Procedure states that an indictment must provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). As the Supreme Court has stated, "the Federal Rules 'were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure.'" *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (quoting *United States v. Debrow*, 346 U.S. 374, 376 (1953)). Thus, "[w]hile detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* (internal citation omitted, quoting Fed. R. Crim. P. 7(c)(1)).

Hence, and as the First Circuit has recently stated, "[a]n indictment need not say much to satisfy these requirements—it need only outline 'the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense.'" *United States v. Stepanets*, 879 F.3d 369, 372 (1st Cir. 2018) (quoting *United States v. Guerrier*, 669 F.3d 1, 3 (1st Cir. 2011)). While there is no prescribed formula, the First Circuit has stated that "[a]n indictment that tracks the language of the underlying statute generally suffices to meet this standard; provided, however, that the excerpted statutory language sets out all of the elements of the offense without material uncertainty." *United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010); *see also United States v. Wells*, 766 F.2d 12, 22 (1st Cir.

1985) ("Viewed in its entirety, an indictment is sufficient if it describes all of the elements of the charged offense using the words of the relevant criminal statute.").  In other words, the statutory language may be used in the indictment to describe the offense, "'but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'"  *Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)).

When considering a motion to dismiss in a criminal case, a court accepts the factual allegations in the indictment as true.  *See, e.g., Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952) ("This case is here to review the granting of a motion to dismiss the indictment. It should not be necessary to mention the familiar rule that, at this stage of the case, the allegations of the indictment must be taken as true."); *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) ("When a defendant seeks dismissal of an indictment, courts take the facts alleged in the indictment as true, mindful that 'the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.'") (quoting *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)).  This is so because, among other reasons, "[t]he government need not recite all of its evidence in the indictment."  *United States v. Innamorati*, 996 F.2d 456, 477 (1st Cir. 1993). Courts entertaining a motion to dismiss an indictment consequently must not inquire into the sufficiency of the evidence underlying the indictment—for when "a defendant seeks dismissal of the indictment, the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense."  *Savarese*, 686 F.3d at 7.

<u>**ARGUMENT**</u>

**I.    DEFENDANTS' MOTION TO DISMISS COUNT ONE SHOULD BE DENIED.**

Defendants contend (Mem. at 12-19) that Count One of the Indictment should be dismissed because it is facially insufficient, fails to plead a RICO "enterprise," and fails to plead a RICO "pattern of racketeering activity."  Those points are not well taken.

**A.    <u>The RICO Statute and the Supreme Court's Decision in *Salinas*</u>.**

Count One of the Indictment charges Defendants with conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(d).  (FSI ¶¶242-47).  Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. §1962(d). The Indictment alleges that Defendants conspired to violate §1962(c), which provides "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. §1962(c).  The substantive offense under §1962(c) has three predominate elements:  "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity."  *Salinas v. United States*, 552 U.S. 52, 62 (1997).

The RICO statute defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. §1961(4).  The definition of an enterprise is "broad" and "expansive," and, as the text of the statute makes clear, it encompasses not just formal or business-like entities, but "'any * * * group of individuals associated in fact.'"  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting §1961(4)).  An association-in-fact enterprise thus

includes any "group of persons associated together for a common purpose of engaging in a course of conduct." *Id*. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). An association-in-fact enterprise requires "three structural features": (1) "a purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*.

The RICO statute defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. §1961(5). The term "racketeering activity" is defined to include dozens of crimes under federal and state law. 18 U.S.C. §1961(1).

In the Supreme Court's seminal decision in *Salinas*—which is not mentioned in Defendants' memorandum—the Court stated that the "relevant statutory phrase in §1962(d) is 'to conspire,'" and this means that "[a] conspiracy may exist even if a conspirator does not commit or facilitate each and every part of a substantive offense." 522 U.S. at 63. As the Court explained, "[i]t is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Id.* at 65. Thus, the Court held, it "makes no difference that the substantive offense under §1962(c) requires two or more predicate acts," because "[t]he interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Id*. The Court thereby resolved a circuit split on whether §1962(d) required that "the defendant must himself commit or agree to commit two or more predicate acts," and thereby abrogated in relevant part *United States v. Winter*, 663 F.2d 1120 (1st Cir. 1981), in which the First

Circuit had answered that question in the affirmative.  *See United States v. Bulger*, 816 F.3d 137, 150 n.16 (1st Cir.) (noting that *Winter* had been abrogated in relevant part by *Salinas*), *cert. denied*, 137 S. Ct. 247 (2016).  The Court thus held that even if the defendant in that case did not accept or agree to accept two bribes, "there was ample evidence that he conspired to violate subsection (c)" because a co-conspirator "committed at least two acts of racketeering activity when he accepted numerous bribes and [the defendant] knew about and agreed to facilitate the scheme," and "[t]his is sufficient to support a conviction under §1962(d)."  *Id.* at 66.[1]

The Court in *Salinas* additionally noted that unlike the general federal conspiracy statute, 18 U.S.C. §371, which requires that at least one of the conspirators have committed an act to effect the object of the conspiracy, "there is no requirement of some overt act or specific act" in §1962(d).  522 U.S. at 63.  Thus, the Court stated, "[t]he RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense in §371."  *Id.*

## B.  <u>Count One is Not Facially Insufficient.</u>

Defendants first contend (Mem. at 13-15) that Count One is facially insufficient because, "[s]panning two cursory pages, Count 1 does little more than recite the elements of a RICO

---

[1] The government notes that in *United States v. Ramirez-Rivera*, 800 F.3d 1 (1st Cir. 2015), *cert. denied*, 137 S. Ct. 908, 137 S. Ct. 917 (2016), the First Circuit quoted a pre-*Salinas* decision for the proposition that in a prosecution charging RICO conspiracy, the government must prove, *inter alia*, that the defendant participated in the affairs of the enterprise "through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses."  *Id.* at 18 (quoting *United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997)).  (*Shifman* was decided on August 19, 1997; *Salinas* was decided on December 2, 1997).  *Shifman*, in turn, quoted an even earlier decision for this proposition.  124 F.3d at 35 (quoting *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1558 (1st Cir. 1994)).  As *Salinas* makes clear, the government is not required to prove in a RICO conspiracy prosecution that a defendant himself committed or agreed to commit the two or more predicate acts requisite to the underlying offense.  552 U.S. at 65-66; *see also United States v. Cianci*, 378 F.3d 71, 90 (1st Cir. 2004) (RICO conspiracy "does not require proof that a defendant 'himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under §1962(c)'") (quoting *Salinas*, 522 U.S. at 63).

conspiracy charge," and "[t]hose generalized assertions" fail to apprise them with reasonable certainty of the nature of the accusation against them. This contention is easily dispatched.

Count One expressly incorporates by reference paragraphs 1 through 241 of the Indictment. (FSI ¶242). Rule 7(c)(1) provides, as relevant here, that "[a] count may incorporate by reference an allegation in another count." Fed. R. Crim. P. 7(c)(1). Although this language does not explicitly authorize incorporation of language contained in introductory paragraphs of an indictment, the Fourth Circuit has found this to be a distinction without a difference: "[W]e see no valid reason why the same result should not follow when the artifice or scheme is clearly stated in the introductory parts of the indictment and thereafter incorporated by reference in the subsequent counts." *United States v. Vanderpool*, 528 F.2d 1205, 1206 (4th Cir.1975) (per curiam). The Second Circuit has similarly held that where, as here, an indictment contains introductory paragraphs, those paragraphs are considered part of the numbered counts that follow. *See United States v. McGuire*, 381 F.2d 306, 318-19 (2d Cir. 1967) ("[I]ntroductory paragraphs not part of another count and specifically referring to the counts involved are considered part of the numbered counts following them.").

These decisions are consistent with the overarching principle that "in seeing whether an indictment is up to snuff, a court must reject arguments that embrace technical niceties at the expense of common sense." *Stepanets*, 879 F.3d at 372 (citing *United States v. Mubayyid*, 658 F.3d 35, 69-70 (1st Cir. 2011); 1 Charles Alan Wright & Andrew D. Leipold, *Federal Practice and Procedure* §123 at 522-23 (4th ed. 2008)). Rather, the First Circuit has said that it "subscribe[s] to the view that a court should examine an indictment as a whole and should refrain from reading it in a hypertechnical manner." *United States v. Fermin Castillo*, 829 F.2d 1194, 1197 (1st Cir. 1987) (internal quotation omitted). Thus, for example, an indictment must be "read

to include facts which are necessarily implied by the specific allegations made." *United States v. Barbato*, 471 F.2d 918, 921 (1st Cir. 1973).

Defendants' contention that Count One is facially insufficient consequently is unavailing, as that count incorporates by reference the detailed allegations in paragraphs 1 through 241 that describe the Defendants, the co-conspirator practitioners and co-conspirator pharmacies, and the nature of the scheme, and provides numerous examples of how the scheme operated. (FSI ¶¶1-242).

### C. The Indictment Adequately Pleads an "Enterprise."

Defendants contend (Mem. at 15-20) that the Indictment does not properly plead a RICO enterprise because it (1) fails to plead the structural features required by *Boyle*; (2) describes, at most a "hub-and-spoke" structure; and (3) fails to adequately allege the illicit distribution of controlled substances. Those claims also lack merit.[2]

#### 1. The Indictment adequately pleads the *Boyle* structural features.

Defendants contend (Mem. at 15-16) that Count One fails to plead any of the three structural features of an enterprise identified in *Boyle* because it "identifies the alleged associates by category only and then states, in circular fashion, that the purpose of their 'association-in-fact'

---

[2] The government notes that in the wake of *Salinas*, two courts of appeals have held that the existence of an enterprise is not an element of a RICO conspiracy charge. *See United States v. Harris*, 695 F.3d 1125, 1133 (10th Cir. 2012) ("[T]he existence of an enterprise is not an element of §1962(d) conspiracy to commit a substantive RICO violation."); *United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011) ("*Salinas* counsels that the establishment of an enterprise is not an element of the RICO conspiracy offense."); *see also Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001) (holding that *Salinas*'s broad reasoning applies with equal force as to other elements of the §1962(c) offense). Although the First Circuit has not specifically considered this question, it has continued to consider whether the government has proven the existence of an enterprise in RICO conspiracy cases that post-date *Salinas*. *See Cianci*, 304 F.3d at 81-82. The Court need not consider this question here, as Count One adequately pleads an enterprise for the reason discussed below.

enterprise was to 'achiev[e] the objectives of the enterprise," and because it "contains no description at all of what relationships the alleged associates shared or how their coordinated activities were coordinated over time to permit them to achieve their (unspecified) purpose." As with Defendants' facial insufficiency challenge, this contention fails to appreciate that paragraphs 1 through 241 of the Indictment were expressly incorporated into Count One. Taken together with the specific allegations in Count One, the Indictment sufficiently pleads the three *Boyle* structural features.

First, the Indictment alleges that the members of the enterprise associated for "a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 563. Count One describes the racketeering enterprise as consisting of Defendants, the co-conspirator practitioners, the co-conspirator pharmacies, and other persons and entities known and unknown to the Grand Jury, who constituted an association-in-fact. (FSI ¶243). Count One further alleges that "the enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." (FS1 ¶ 243). Count One incorporates all of the preceding paragraphs, which allege that Defendants and their co-conspirators sought to profit through the illicit sale of Subsys by "bribing practitioners and pharmacies, subverting the reporting requirements of the DEA, [and] providing false and misleading information, including false diagnoses and medical history to insurers." (FSI ¶¶13, 18, 242-43). These allegations are sufficient to establish the enterprise's common purpose.

Second, the Indictment alleges "relationships among those associated with the enterprise." *Boyle*, 556 U.S. at 946. The Indictment details each of the roles of Defendants in Insys Therapeutics Inc. (identified in the Indictment as "the Company") during the alleged scheme, describes the roles of the co-conspirator practitioners and the co-conspirator pharmacies, and

summarizes how they conspired to coordinate and engage in criminal activity with one another. (FSI ¶¶1-119). The Indictment goes on to provide multiple examples of this coordinated activity amongst the members of the enterprise. (FSI ¶¶120-249). These allegations are sufficient to demonstrate that the enterprise had an ongoing organization.

Third, the Indictment alleges "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. The Indictment alleges that the conspiracy began from in or about June 2012 and lasted until in or around December 2015, and that Defendants, being persons employed by and associated with the enterprise, knowingly conspired with one another and others to conduct and participate, directly and indirectly, in the conduct of such enterprise through a pattern of racketeering activity. (FSI ¶¶13-14, 47, 252). This time frame was more than sufficient to demonstrate longevity. *See, e.g., United States v. Eiland*, 738 F.3d 338, 360 (D.C. Cir. 2013) (based on testimony that co-conspirator was dealing drugs with defendants between 2000 and 2002, holding that "enterprise continued for a period 'sufficient to permit the []' associates to pursue the enterprise's purpose'") (quoting *Boyle*, 556 U.S. at 946); *United States v. Chavez*, 2018 WL 339140, at *4 (N.D. Cal. Jan. 9, 2018) (indictment that alleged that conspiracy began in 2009 and continued through 2011 sufficiently established *Boyle* longevity) (citing *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (en banc)).

### 2. Defendants' assertion that Count One pleads an improper "hub and spoke" structure is meritless.

Defendants next contend (Mem. at 16-18) that Count One should be dismissed because allegations of the Indictment "*at most* set forth a 'hub-and-spoke' structure—with Defendants occupying the hub and various doctors and pharmacies the spokes—with no common rim linking the individual spokes together," and a "hub and spoke" structure does not amount to a RICO association-in-fact enterprise. This argument fails on multiple levels.

**a.** As a threshold matter, Defendants' argument is misplaced because Congress supplanted the "hub and spoke" limitation on conspiratorial liability when it enacted the RICO statute. The concept of a "hub and spoke" conspiracy derives from *Kotteakos v. United States*, 328 U.S. 750 (1946). There, the Supreme Court described a conspiracy in which the two petitioners had transacted business with a co-defendant, Simon Brown, related to National Housing Act loans. *Id.* at 754. Several other defendants also had transacted business with Brown related to National Housing Act loans, the Court noted, but "no connection was shown between them and petitioners, other than that Brown had been the instrument in each instance for obtaining the loans." *Id.* This pattern "was that of separate spokes meeting at a common center," the Court noted, but "without the rim of the wheel to enclose the spokes." *Id.* at 755. In these circumstances, the Court held that the proof "admittedly made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment." *Id.*

By contrast, in *Blumenthal v. United States*, 332 U.S. 539 (1947), the indictment charged a single conspiracy to sell whiskey at prices above the ceiling set by the Office of Price Administration, and the owner of the whiskey, through a series of middlemen, had devised an intricate scheme to conceal the true amount he was charging for the whiskey. Although some of the middlemen had no contact with each other and did not know the identity of the owner, the Court explained that "[a]ll knew of and joined in the overriding scheme":

> All intended to aid the owner, whether Francisco or another, to sell the whiskey unlawfully, though the two groups of defendants differed on the proof in knowledge and belief concerning the owner's identity. All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan. He thus became a party to it and not merely to the integrating agreement with Weiss and Goldsmith.

*Id.* at 559. The Court concluded that "in every practical sense the unique facts of this case reveal a single conspiracy of which the several agreements were essential and integral steps." *Id.* *Blumenthal* introduced the concept of a "chain" conspiracy," in which "all the participants" are "'parties to the larger common plan.'" *United States v. Saro*, 24 F.3d 283, 289 (D.C. Cir. 1994) (quoting *Blumenthal*, 332 U.S. at 558).

When it enacted the RICO statute in 1970, however, Congress "intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate 'wheel' and 'chain' rationales with a new statutory concept: the enterprise." *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978). As the Fifth Circuit explained at length in its decision in *Elliott*:

> To achieve this result, Congress acted against the backdrop of hornbook conspiracy law. Under the general federal conspiracy statute, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes.
>
> In the context of organized crime, this principle inhibited mass prosecutions because a single agreement or "common objective" cannot be inferred from the commission of highly diverse crimes by apparently unrelated individuals. RICO helps to eliminate this problem by creating a substantive offense which ties together these diverse parties and crimes. Thus, the object of a RICO conspiracy is to violate a substantive RICO provision here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity. The gravamen of the conspiracy charge in this case is not that each defendant agreed to commit arson, to steal goods from interstate commerce, to obstruct justice, and to sell narcotics; rather, it is that each agreed to participate, directly and indirectly, in the affairs of the enterprise by committing two or more predicate crimes. Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs. To find a single conspiracy, we still must look for agreement on an overall objective. What Congress did was

to define that objective through the substantive provisions of the
Act.

*Id.* at 902-03 (internal citation and footnote omitted).

Consequently, and as the Fifth Circuit held in rejecting a claim analogous to that raised by Defendants here, the "reliance on cases distinguishing single and multiple conspiracies under the 'wheel' and 'chain' notions of conspiracy, is misplaced, since RICO replaces the conceptual devices of 'wheels' and 'chains' with the 'enterprise.'" *United States v. Stratton*, 649 F.2d 1066, 1074 n.10 (5th Cir. 1981) (citing *Elliott*, 571 F.2d at 902). Rather, "as long as 'each crime was intended to further the enterprise's affairs,' and as long as the enterprise properly comprises a pattern of racketeering activity, a single conspiracy is charged under RICO." *Id.*; *accord United States v. Friedman*, 854 F.2d 535, 562-63 (2d Cir. 1988) ("A RICO conspiracy is thus by definition broader than an ordinary conspiracy to commit a discrete crime such as bribery. So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they do not conspire directly with each other does not convert the single agreement to conduct the affairs of an enterprise through a pattern of racketeering activity into multiple conspiracies.") (internal quotation omitted); *United States v. Tille*, 729 F.2d 615, 619 & n.1 (9th Cir. 1984) (stating that "Congress in enacting RICO expanded traditional conspiracy law by specifying a new objective from which the lawfulness of a conspiracy may be established: violation of a substantive provision of RICO," and noting that "[i]n *Elliott*, the court explained that one purpose of RICO was to escape the limitations inherent in wheel and chain conspiracies by creating a new concept, enterprise conspiracy") (citing *Elliott*, 571 F.2d at 902-03).

Notably, the First Circuit has cited *Elliott* with approval for the proposition that RICO enables the government to cast a "wider net" than was possible under traditional conspiracy principles. *See United States v. Tashjian*, 660 F.2d 829, 834 (1st Cir. 1981) ("The breadth of the

alleged conspiracy does not in itself evidence an impermissible prosecutorial objective, but rather simply reflects the fact that RICO enables the Government to cast a wider net than was possible under traditional conspiracy principles.") (citing *Elliott*, 571 F.2d at 902-03); *United States v. Turkette*, 656 F.2d 5, 8 (1st Cir. 1981) ("RICO permits the Government to cast a wider net than it could under traditional conspiracy principles.") (citing *Elliott*, 571 F.2d at 902). Those decisions strongly suggest that the First Circuit is in agreement that RICO supplanted the "hub and spoke" limitation on conspiratorial liability with the enactment of the statutory "enterprise."[3]

Defendants' assertion that the government has improperly pled a so-called "hub and spoke" enterprise thus fails, as there is no "hub and spoke" limitation on the enterprise element of the RICO statute. To be sure, Defendants point to a Third Circuit civil RICO decision and several district court civil RICO decisions—including decisions from Courts in this District—in which courts have held that a "rimless" "hub and spoke" structure does not amount to a RICO association-in-fact enterprise. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374-75 (3d Cir. 2010); *Ezell v. Lexington Ins. Co.*, 286 F. Supp. 3d 292, 298-99 (D. Mass. 2017); *Gov't Employees Ins. Co. v. Analgesic Healthcare*, 2017 WL 1164496, at *2 (D. Mass. March 28, 2017); *In re Lupron Marketing & Sales Practices Litig.*, 295 F. Supp. 2d 148, 173-74 (D. Mass. 2003). But the decisions in *Tashjian* and *Turkette*—which cite *Elliott* with approval for the proposition that RICO enables the Government to cast a "wider net" than was possible under traditional conspiracy

---

[3] In *United States v. Portela*, 167 F.3d 687 (1st Cir. 1999), the First Circuit cited *Kotteakos* with the parenthetical: "(finding a 'hub-and-spoke' enterprise to comprise multiple conspiracies)." 167 F.3d at 697. The First Circuit plainly was not talking about a RICO enterprise, however, as *Kotteakos* was decided in 1946, almost a quarter century before RICO was enacted in 1970. *See* Racketeer Influenced and Corrupt Organizations Act, Pub. L. No. 91-452, Title IX, 84 Stat. 941 (Oct. 15, 1970). *Portela* also was not a RICO conspiracy case, but rather a drug conspiracy case under 21 U.S.C. §846. *Portela* thus does not suggest that the First Circuit has analyzed the RICO enterprise element under the "hub and spoke" concept applicable to traditional conspiracies.

principles—strongly suggest that the First Circuit is in agreement that RICO replaced the "hub and spoke" limitation on conspiratorial liability with the enactment of the statutory RICO enterprise.

      **b.**      The conclusion that RICO supplanted the "hub and spoke" limitation on conspiratorial liability by enacting the statutory enterprise finds additional support in *Boyle*. There, and as noted, the Supreme Court held that an association-in-fact enterprise requires only "three structural features": (1) "a purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946. The Court did not identify any other additional limitations on an association-in-fact enterprise, including the "hub and spoke" rationale. To the contrary, the Court listed a number of structural elements that the government need *not* prove to establish an enterprise:

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 948. The Court further noted the "breadth of the 'enterprise' concept in RICO is highlighted by comparing the statute with other federal statutes that target organized criminal groups," such as 18 U.S.C. §1955(b), which defines an "illegal gambling business" as one that "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business,"

and 21 U.S.C. §848(c), which defines a "continuing criminal enterprise" as involving more than five persons who act in concert and requiring an "organizer," supervisor, or other manager. *Id.* at 949. By contrast, the Court stated, "Congress included no such requirements in RICO." *Id.*

*Boyle* thus is consistent with and underscores *Elliott*'s conclusion that when the RICO statute was enacted, Congress replaced the "hub and spoke" limitation on conspiratorial liability with the statutory "enterprise."

    **c.**    Even if the Court were to assume *arguendo* that the "hub and spoke" limitation on conspiratorial liability applies to the enterprise element of RICO, Defendants' motion to dismiss Count One must still be denied because the question whether that count alleges a single conspiracy or multiple conspiracies is one of fact for the jury. As *Kotteakos* makes clear, the question whether a conspiracy has a "hub and spoke" structure is just another way of asking whether a single conspiracy or multiple conspiracies have been alleged or proven. As the Supreme Court held in that case, because the conspiratorial pattern was "of separate spokes meeting at a common center" but "without the rim of the wheel to enclose the spokes," proof "admittedly made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment." 328 U.S. at 755.

The First Circuit has repeatedly made clear, however, that "[w]hether a single conspiracy or a multiple conspiracy exists is, of course, a question of fact for the jury." *United States v. Licausi*, 167 F.3d 36, 45 (1st Cir. 1999); *accord United States v. Bedini*, 861 F.3d 10, 14 (1st Cir.), *cert. denied*, 136 S. Ct. 416 (2017); *United States v. Villarman-Oviedo*, 325 F.3d 1, 12 (1st Cir. 2003); *Portela*, 167 F.3d at 696; *United States v. Wihbey*, 75 F.3d 761, 774 (1st Cir. 1996); *United States v. Sepulveda*, 15 F. Supp. 2d 1161, 1190-91 (1st Cir. 1993); *United States v. Mena-Robles*, 4 F.3d 1026, 2033 (1st Cir. 1993); *United States v. David*, 940 F.2d 722, 732 (1st Cir. 1991);

*United States v. Drougas*, 748 F.2d 8, 17 (1st Cir. 1985). Count One therefore is not subject to

dismissal on the ground that it assertedly alleges a "hub and spoke" structure. As Judge Wolf

reasoned in denying a motion to dismiss a RICO count raising a similar claim:

> Defendants' Motion to Dismiss Count 1 because it pleads multiple
> RICO conspiracies (Issue I.n) is DENIED. Paragraph 2 alleges a
> single RICO conspiracy. The question of whether a single
> conspiracy existed is one of fact for the jury. The government is not
> required to produce all of its evidence before trial, and there is no
> criminal counterpart of a civil motion for summary judgment.
> Therefore, like the earlier issues, the question of whether the
> government is able to prove a single RICO conspiracy must be
> reserved for trial.

*United States v. Salemme*, 1997 WL 37530, at *2 (D. Mass. Jan. 13, 1997) (internal citations

omitted).

Just so here. Count One of the Indictment on its face alleges a single RICO enterprise (FSI

¶¶242-47), and the question whether the government is able to prove a single enterprise will be a

question of fact for the jury to decide at trial. *See, e.g., United States v. Ohle*, 678 F. Supp. 2d 215,

222 (S.D.N.Y. 2010) ("If the Indictment on its face sufficiently alleges a single conspiracy, the

question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the

jury."); *United States v. Wright*, 2012 WL 3778986, at *6 (E.D. Tenn. June 19, 2012) (denying

motion to dismiss indictment for same reason, and noting that "[a]ll of the cases cited by the

parties, as well as others reviewed by the Court, raise the issue of single vs multiple conspiracies

by asking whether a fatal variance occurred between the allegations in the indictment and the proof

at trial or by evaluating the sufficiency of the evidence"), *report and recommendation adopted by*

2012 WL 3778982 (E.D. Tenn. Aug. 30, 2012); *United States v. Berlin*, 707 F. Supp. 832, 837

(E.D. Va. 1989) ("[I]f the indictment as drawn would permit the government to prove a set of facts

that would support a finding of one conspiracy, then the indictment is proper and the decision as to how many conspiracies existed is for the jury.").

Indeed, Defendants do not point to a single criminal case in which a district court has dismissed a RICO conspiracy charge on the ground that the indictment improperly alleged a "hub and spoke" structure. Instead, Defendants rely (Mem. at 17-18) on two civil RICO cases—*In re Lupron Marketing* and *Ezell*—in which courts in this District have held that plaintiffs had not alleged an actionable RICO enterprise because they had failed to plead facts suggesting collaboration or the "unifying rim" of "hub-and-spoke" structure. *See Ezell*, 286 F. Supp. 3d at 298-99; *In re Lupron Marketing*, 295 F. Supp. 2d at 173-74. The reliance on *civil* RICO cases to support a motion to dismiss a *criminal* RICO indictment, however, is inappropriate. To be sure, Defendants are correct (Mem. at 16 n.10) that the First Circuit has stated that "it is appropriate to rely on civil RICO precedent when analyzing criminal RICO liability" because "[t]he standard is the same for both criminal and civil RICO violations." *Shifman*, 124 F.3d at 35 n.1. But unlike the standards for RICO *liability*, which are the same, the standards regarding pretrial dismissal of an indictment under Rule 7(c)(1) differ markedly from those that apply to the dismissal of a civil RICO complaint under Fed. R. Civ. P. 12(b). As Judge Mazzone has explained, unlike with a civil RICO complaint, "there are endemic safeguards in the criminal system against baseless RICO charges, namely the filters of the grand jury and the prosecutor's office" which to a large degree "ensure that criminal RICO charges have some reasonable factual foundation," and, thus, "where a criminal RICO count is properly pled in the indictment, as here, there is generally no basis for this court to explore further the sufficiency of the evidence that underlies that count." *United States v. Mavroules*, 819 F. Supp. 1109, 1110 n.1 (D. Mass. 1993); *see also id.* at 1118 (Report and Recommendation of M.J. Collings) ("I do not find the reasoning of [civil RICO] cases to be

applicable to a criminal indictment charging a RICO offense. The difference between the two situations is marked. An indictment charging a RICO offense cannot be returned unless a Grand Jury has found probable cause to believe that the defendant has committed the offense and the United States Attorney concurs in the indictment. In a civil case, all that is needed to bring a RICO claim against another party is to file and serve a complaint."); *Salemme*, 1997 WL 37530, at *2 (in denying motion to dismiss RICO count on ground that it alleged multiple conspiracies, stating that "there is no criminal counterpart of a civil motion for summary judgment").

Hence, and as the en banc Tenth Circuit has stated, the reliance in the criminal context upon cases concerning the sufficiency of civil complaints "is like comparing apples with oranges" because "[t]he underlying processes are structurally different," inasmuch as "[t]he criminal proceeding is monitored from its inception by a district judge (or a magistrate) and a grand jury, to satisfy the probable cause requirements, among other things." *United States v. Staggs*, 881 F.2d 1527, 1532 n.6 (10th Cir. 1989) (en banc). *In re Lupron Marketing* and *Ezell* consequently do not support Defendants' contention that this Court can dismiss Count One on the ground that it alleges a "hub and spoke" structure.

      **d.** Finally, even assuming *arguendo* that RICO did not supplant the "hub and spoke" limitation on conspiratorial liability, and even assuming further that the question whether Count One alleges a "hub and spoke" structure is not reserved for the jury, Defendants' motion to dismiss that count still does not succeed.

In evaluating whether a single conspiracy existed, the First Circuit has said that "courts consider the totality of the circumstances, paying particular heed to factors such as the existence of a common goal, evidence of interdependence among the participants, and the degree to which their roles overlap." *United States v. Niemi*, 579 F.3d 123, 127 (1st Cir. 2009) (citing *United States*

*v. Fenton*, 367 F.3d 14, 19 (1st Cir.2004)).  In this case, the Indictment alleges a single enterprise in at least three ways.  First, the Indictment alleges "actual awareness" of participation by different co-conspirators.  *Cf. United States v. Ulbrecht*, 31 F. Supp. 3d 540, 553 (S.D.N.Y. 2014) (single conspiracy may be established when co-conspirators have "[a]ctual awareness of the participation of others").  For example, the Indictment alleges that "[i]n some cases, the co-conspirator practitioners were owners of the pharmacy filling prescriptions for * * * [Subsys].  This meant that the co-conspirator practitioner stood to profit, not just from bribes and kickbacks paid [] for writing the * * * prescription, but also from filling each prescription * * *."  (FSI ¶92a).  The Indictment alleges, for example, that Practitioner #1 and Practitioner #2 were part of the same practice and together co-owned co-conspirator Pharmacy #2.  (FSI ¶¶9b, 121).  The Indictment further alleges that, after becoming concerned about the efforts of a competitor in Alabama, Defendant Kapoor and others traveled to Mobile and agreed to pay bribes associated with Pharmacy #2 to Practitioner #1 and Practitioner #2.   (FSI ¶¶131-137).  Similarly, the Indictment alleges that Practitioner #4 owned co-conspirator Pharmacy #4, and in a conversation with Defendant Simon, Practitioner #4 explicitly connected more prescriptions that the Company could "handle," with both speaker program bribes and his ability to sell schedule II narcotics at his pharmacy.  (FSI ¶¶9d, 165).

Moreover, the Indictment alleges that "[e]even if the co-conspirator practitioner did not hold an interest in the co-conspirator pharmacy, using a trusted local pharmacist eliminated the risk that the pharmacy would report to the DEA unusual, excessive, or unnecessary prescribing activity by a co-conspirator practitioner."   (FSI ¶¶2, 9b).  Thereafter, the Indictment alleges that co-conspirator Pharmacy # 3 accounted for 50% of Subsys sales in Michigan, and that while other stores were conservative in dispensing schedule II drugs, Pharmacy #3 had a "working relationship" with Practitioner # 3 and could "ID other pain targets * * *."  (FSI ¶¶9b, 158).

Second, the Indictment alleges that the success of the scheme depended upon interdependence. *Cf. Niemi*, 579 F.3d at 127 ("Interdependence may be shown where one participant knows that his own success depends on the continued existence and health of the drug distribution organization as a whole."). In this case, the Indictment not only describes interdependence amongst Defendants and their co-conspirators; it explicitly alleges that the scheme would not work without that interdependence.

The Indictment alleges, for example, that demand for drugs like Subsys was driven in part by practitioners (FSI ¶32), and as such, that the Defendants targeted and bribed practitioners. (FSI ¶¶48-75). The Indictment describes the significance of bribed practitioners to the success of the scheme. For example, the Indictment quotes from an email, sent to several Defendants, in which defendant Burlakoff remarked on the dependent relationship the group held with high prescribing co-conspirators, "[l]ets make some money, and stop playing BS games trying to manage rookies. It's the [Practitioner #3s] of the world that *keep us in business*, lets [sic] get a few more and the rest ... of this job is a 'joke.'" (FSI ¶ 156) (emphasis added). Likewise, the Indictment alleges that:

> In July 2013, a sales rep in New Jersey emailed KAPOOR, then the Executive Chairman of the Board of Directors, directly, complaining about another email in which the Company V.P. of Sales, BURLAKOFF, stated that the top ten sales reps were "*carrying the company*." The rep asked KAPOOR, "but how much speaker money is being thrown at the Doctors?" After discussing the success of other sales reps with "UNCAPPED" speaker programs, the sales rep complained to KAPOOR that, "[n]obody has offered my Doctors unlimited speaker programs to put me in the top ten (I think I'm at #11 or #12 this week)." The sales rep asked, "Does the speaker money grow on a special speaker money tree?"

(FSI ¶63) (emphasis added).

Third, in addition to explaining how the success of the conspiracy depended upon the success of bribing practitioners, the Indictment also describes how the co-conspirators understood

that bribes would cause the necessary participation of others in the scheme. Specifically, the Indictment alleges while bribing doctors and others to write prescriptions outside the ordinary course of practice expanded the market, an increase of prescriptions meant nothing unless Insurers were willing to pay for the drug. (FSI ¶93). The Indictment alleges that the enterprise reacted to this concern by using fraud to ensure payment from insurers. (FSI ¶¶93-119). Likewise, the Indictment alleges that the success of the scheme created the risk that "unusual, excessive, or unnecessary prescribing activity" by co-conspirator practitioners would be reported to the DEA. (FSI ¶92b). As a result, the Indictment alleges that the enterprise endeavored in several different ways to control distribution of the drug. (FSI ¶¶92-93). Each of these endeavors was dependent upon the other.

In sum, for this reason as well, Defendants' motion to dismiss Count One on the ground that it alleges a "hub and spoke" structure and therefore fails to plead an enterprise should be denied.

### 3. Defendants' challenge to the Indictment's illicit diversion allegations also is insubstantial.

In somewhat contradictory fashion to their claim that Count One fails to allege a "common pattern," Defendants acknowledge (Mem. at 18) that the Indictment "appears to ascribe a similar scheme to Defendants and their alleged co-conspirators: the 'diver[sion] of Sybsys' from 'legitimate medical distribution to illicit, commercial drug distribution.'" Defendants contend (Mem. at 18-20), however, that those allegations fail to plead a RICO enterprise for two reasons: (1) commonality of motive or similarity of goals and methods does not suffice to show that an enterprise existed; and (2) the actual conduct alleged in the Indictment does not involve the illicit distribution of Subsys by Defendants and their co-conspirators.

These arguments also can be easily dispatched. To begin with, the "common purpose" alleged in the Indictment includes but is not limited to the illicit distribution of Subsys, as has been discussed above. There consequently is no basis to dismiss Count One even if Defendants' challenge to the Indictment's illicit diversion allegations were accepted, as it would not defeat the conclusion that an enterprise has been alleged. Nor should that challenge be accepted, as Defendants once again rely on *civil* RICO cases in pressing this argument and, as shown above, those cases have no bearing on the altogether question whether a *criminal* RICO indictment should be dismissed under Rule 7(c)(1). *See Staggs*, 881 F.2d at 1532 n.6; *Mavroules*, 819 F. Supp. at 1110 n.1, 1118; *Salemme*, 1997 WL 37530, at *2. Rather, and as noted, when "a defendant seeks dismissal of the indictment, the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." *Savarese*, 686 F.3d at 7; *see also Guerrier*, 669 F.3d at 4 (noting that courts "routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations"). Because that is precisely what Defendants are attempting to do here, this challenge to Count One also should be rebuffed.

###     D.     The Indictment Adequately Pleads a "Pattern of Racketeering Activity."

Defendants contend (Mem. at 20-39) that the Indictment does not properly plead a "pattern of racketeering activity" because Count One does not describe each of the elements of the federal and state crimes that are alleged to form the racketeering pattern. Defendants (Mem. at 21) acknowledge that Count One alleges that the pattern of racketeering activity consisted of multiple acts indictable under specified federal and state laws that qualify as RICO racketeering activity. Relying on *Ocasio v. United States*, 136 S. Ct. 1423 (2016), however, Defendants argue (Mem. at

21) that this is insufficient because "[i]n no case does the Indictment plead an agreement to commit each of the elements of the alleged offense." This argument fails at every turn.

1. As *Salinas* makes clear, an indictment charging a RICO conspiracy "does not require proof that a defendant 'himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under §1962(c).'" *Cianci*, 378 F.3d at 90 (quoting *Salinas*, 522 U.S. at 63). Rather, a defendant "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65. In other words, "[t]he essence of a RICO conspiracy is not an agreement to commit predicate crimes but an agreement to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering." *United States v. Zemek*, 634 F.2d 1159, 1170 n.15 (9th Cir. 1980).

The government consequently is not required to charge the racketeering acts underlying a RICO conspiracy as separate offenses or to describe those acts with the particularity necessary for separate charges. To the contrary, in *United States v. Glecier*, 923 F.2d 496 (1991), the Seventh Circuit held that proof of a RICO conspiracy "centers on the act of agreement, which makes unnecessary—and in many cases impossible—the identification in the indictment of specific predicate acts that have come to fruition." *Id*. at 501. The indictment in *Glecier* charged the defendant (a county-court judge) with conspiracy to engage in "multiple acts of bribery prohibited by specified provisions of the Illinois criminal code," and the Seventh Circuit held that this language adequately identified the racketeering pattern at issue and rejected the notion that the indictment needed to further "specify [the] individual predicate acts of racketeering" by, for example, "listing the specific bribes by date and/or case name." *Id*. at 499-501. The Second Circuit has likewise held that because a RICO conspiracy charge "need not specify the predicate

or racketeering acts that the defendants agreed would be committed, it is sufficient to allege and prove that the defendants agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity." *Applins*, 637 F.3d at 81 (internal citations omitted); *see also United States v. Phillips*, 874 F.2d 123, 129-30 (3d Cir. 1989) (holding that where RICO conspiracy count generally identified racketeering acts as acts of bribery and extortion, the government "can rely on any act of bribery and extortion, so long as that act occurred within the time frame of the conspiracy and was established by proof[] at the trial").

Hence, because it is not necessary to allege or prove the specific predicate acts that support a RICO conspiracy charge, courts have uniformly rejected claims that the pattern of racketeering activity alleged in an indictment must specify the elements of the crimes that constitute the pattern. *See, e.g., United States v. Villareal-Heredia*, 2013 WL 3179515, at *1 (S.D. Cal. June 20, 2013) ("The Court concludes that the Second Superseding Indictment alleged the essential racketeering conspiracy elements. There is no requirement that the indictment allege each of the elements of the state and federal law violations that constitute the predicate offenses."); *United States v. Weaver*, 2010 WL 1633319, at *2 (S.D. W.Va. April 20, 2010) ("The indictment need not, however, address each constituent aspect of an enterprise that must be proven as if it were a discrete element of the offense, the elements (loosely speaking) of an enterprise are not elements of RICO or VICAR. The same principle applies to the racketeering activity element of RICO and the predicate claims of violence element of VICAR. Therefore, the elements of the predicate acts need not be specifically alleged in the indictment.") (internal citations omitted); *United States v. Boyd*, 309 F. Supp. 2d 908, 915 (S.D. Tex. 2004) (in denying motion to dismiss RICO counts that alleged that pattern of racketeering included violations of the Interstate Transportation in Aid of Racketeering Act ("ITAR"), stating that "[b]ecause there is no requirement that an indictment

allege both the essential elements of the ITAR statute and each element of the underlying state offense comprising the 'unlawful activity' element of the ITAR offense, the court concludes that the ITAR allegations in the Indictment have been adequately pleaded").

Rather, courts have held that the government need only "allege specific crimes or types of crimes that the conspiracy agreed to commit and that would constitute a 'pattern of racketeering activity' if carried out." *United States v. Dimora*, 829 F. Supp. 2d 574, 586 (S.D. Ohio 2011) (citing *Applins*, 637 F.3d at 81, and *Glecier*, 923 F.2d at 500); *see also United States v. Gilmore*, 2017 WL 9516566, at *2 (W.D.N.C. July 20, 2017) ("[T]o secure a conviction for RICO conspiracy, the Government is not required to prove, or even allege, the actual completion of a single racketeering act by the defendant or any other member of the conspiracy. The Government need only prove that the co-conspirators 'agree[d] to pursue the same criminal objective,' regardless of whether that objective was ever initiated or completed. To that end, the Government may allege the types of crimes that constitute the pattern of racketeering activity without alleging specific racketeering acts.") (quoting *Salinas*, 522 U.S. at 63; other internal citation omitted); *United States v. Ledbetter*, 2015 WL 5117979, at *5 (S.D. Ohio Sept. 1, 2015) ("This Court follows suit in holding that an indictment under §1962(d) need not allege the 'specific predicate acts' that the defendant agreed someone would commit. Instead, the indictment need only allege 'that the defendant[] agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity.'") (quoting *Dimora*, 829 F. Supp. 2d at 586).

Judged against the proper legal standard, the Indictment easily satisfies the requirements of Rule 7(c)(1). Count One alleges that the pattern of racketeering activity consisted of multiple acts indictable under the following statutes:

- mail fraud, including honest services mail fraud, in violation of 18 U.S.C. §§1341 and 1346;

- wire fraud, including honest services wire fraud, in violation of 18 U.S.C. §§1343 and 1346;

- interstate and foreign travel or transportation in aid of racketeering, in violation of 18 U.S.C. §1952;

- multiple offenses involving the distribution of controlled substances, in violation of 21 U.S.C. §§841 and 846;

- multiple acts involving bribery in violation of Connecticut General Statutes Annotated §53a-160 (commercial bribery); Florida Statutes Annotated §838.16 (commercial bribery); Revised Statutes Annotated of New Hampshire §638.7 (commercial bribery); and Vernon's Texas Statutes and Code Annotated §32-43 (commercial bribery).

(FSI ¶246). The Indictment further alleges that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise. (FSI ¶247). This was more than sufficient to plead a pattern of racketeering activity.

2. Contrary to Defendants' argument, *Ocasio* does not suggest otherwise. In that case, the Supreme Court held that a defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he reached an agreement with the owner of the property in question to obtain that property under color of official right. 136 S. Ct. at 1429-36. In reaching this conclusion, the Supreme Court stated that "[i]n order to establish the existence of a conspiracy to violate the Hobbs Act, the Government has no obligation to demonstrate that each conspirator agreed personally to commit—or was even capable of committing—the substantive offense of Hobbs Act extortion." *Id.* at 1432. Instead, the Court explained, "[i]t is sufficient to prove that the conspirators agreed that the underlying crime be committed by a member of the conspiracy who was capable of committing it. In other words, each conspirator must have specifically intended that some conspirator commit each element of the substantive offense." *Id.*

Defendants' reliance on *Ocasio* is misplaced for two reasons. First, the Supreme Court was not construing §1962(d) in *Ocasio*, but rather the general federal conspiracy statute, 18 U.S.C. §371. In *Salinas*, as noted, the Supreme Court said that §1962(d) "is even more comprehensive than the general conspiracy offense in §371." 522 U.S. at 63.

Second, the question in *Ocasio* was not what must be pled in an indictment to satisfy the requirements of Rule 7(c)(1), but rather what the government needed to prove at trial to convict a defendant for conspiracy to commit Hobbs Act extortion. Those questions, of course, are altogether different. *See, e.g.*, *Turkette*, 656 F.2d at 8 (defendant's reliance on two Fifth Circuit decisions, including *Elliott*, was misplaced because "[i]n each of those cases the court found that the evidence was not sufficient to sustain a conviction on the RICO conspiracy count as to one of the defendants," and neither decision "suggest[s] any grounds for holding this indictment legally invalid"); *United States v. Carillo*, 229 F.3d 177, 183 (2d Cir. 2000) ("[T]he proposition that the indictment need not *recite* all elements of the state law offense constituting a racketeering act does not, without further explanation, lead to the conclusion that the government is excused from *proving* those elements.") (emphasis in original); *United States v. Stierhoff*, 500 F. Supp. 2d 55, 61 (D.R.I. 2007) ("Defendant's argument is flawed because it fails to distinguish between what the government must allege in an indictment and *what it must prove at trial*. Defendant is correct in asserting that the government must prove at trial that he voluntarily and intentionally violated a known legal duty; Defendant, however, points this Court to *no* authority that requires the government to allege every component of the willfulness requirement in an indictment.") (emphasis in original), *aff'd*, 549 F.3d 19 (1st Cir. 2008).

For both these reasons, *Ocasio* does not support Defendants' claim that Count One should be dismissed because it fails to plead a pattern of racketeering activity.

**3.** The conclusion that an indictment charging a RICO conspiracy need not specify the elements of the offenses that are alleged to form the pattern of racketeering activity is consistent with longstanding principles of conspiracy law. As the Supreme Court long ago stated:

> It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, or to state such object with the detail which would be required in an indictment for committing the substantive offense.

*Wong Tai v. United States*, 273 U.S. 77, 81 (1927) (internal citations omitted).

The First Circuit thus has stated that in an indictment for conspiring to commit an offense, "the conspiracy is the gist of the crime, and it is therefore unnecessary to allege all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. Eirby*, 262 F.3d 31, 38 (1st Cir. 2001) (citing *Wong Tai*, 273 U.S. at 81, and *United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993)); *see also United States v. Campbell Hardware, Inc.*, 470 F. Supp. 430, 433 (D. Mass. 1979) ("It is well settled that an indictment which charges a conspiracy to commit an offense, as opposed to charging the substantive offense itself, need not allege the elements of the substantive offense with the same technical precision."). The only exception the First Circuit has identified is an indictment charging mail fraud conspiracy, as the court held that "a mail fraud conspiracy depends so crucially on the underlying fraud that the fraud also must be specified in the applicable count." *Yefsky*, 994 F.2d at 893. But the First Circuit subsequently cited *Yefsky* in *Eirby* in reaffirming the general principle that it is unnecessary to allege all the elements essential to the commission of the offense which is the object of the conspiracy in a conspiracy indictment, *see* 262 F.3d at 23, which makes clear that *Yefsky* is the exception rather than the rule.

## II. DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND THREE SHOULD BE DENIED.

Defendants contend (Mem. at 40-42) that Counts Two and Three, which charge that they conspired to commit mail fraud and wire fraud, should be dismissed because they lack specificity and, conversely, because they appear to allege two distinct fraud schemes. Those claims also are unavailing.

### A. Statutory Background and Legal Principles

The statute criminalizing mail and wire fraud conspiracy provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. §1349. The mail fraud statute provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * for the purpose of executing such scheme or artifice or attempting so to do * * * knowingly causes to be delivered by mail * * * any * * * matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. §1341. The wire fraud statute contains similar language, and provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire * * * communication in interstate * * * commerce, any writings * * * for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. §1343. As the Supreme Court has noted, "The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here." *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1988).

**B.** **The Indictment Adequately Pleads Mail and Wire Fraud Conspiracies**.

Defendants assert (Mem. at 40) that Counts Two and Three do not provide the specificity that Rule 7(c)(1) and the Constitution demand. They are wrong. Count Two, which incorporated paragraphs 1 through 241 of the Indictment (FSI ¶248), alleges that Defendants:

> did knowingly conspire with one another to commit mail fraud in violation of 18 U.S.C. §§1341 and 1346, that is, having devised and intending to devise a scheme and artifice to defraud patients ofhonest services and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud, placed and caused to be placed in any post office and authorized depository for mail matter a matter and thing, to wit, checks and payments, to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited a matter and thing, to wit, checks and payments, to be sent and delivered by a private and commercial interstate carrier.
>
> All in violation of Title 18, United States Code, Section 1349.

(FSI ¶249). Count Three, which also incorporates paragraphs 1 through 241 of the Indictment (FSI ¶250), alleges that Defendants:

> did knowingly conspire to commit wire fraud in violation of 18 U.S.C. §§1343, and 1346, that is, having devised and intending to devise a scheme and artifice to defraud patients of honest services and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, to wit: telephone communications, email, and facsimile communications.
>
> All in violation of Title 18, United States Code, Section 1349.

(FSI ¶251). These allegations, which track the language of the relevant statutes and describe the nature of the fraud that is alleged, are sufficient to apprise Defendants of the charged offenses.

Defendants also argue (Mem. at 40-42) that the Indictment improperly "appears to allege two distinct fraud schemes: one that purportedly used bribes to deprive patients of the honest services of their physicians, and another that allegedly relied on misrepresentations to defraud insurance companies." But both counts charge a single conspiracy (FSI ¶¶248-49 (mail fraud conspiracy); ¶¶250-51 (wire fraud conspiracy)), and, as set forth above, the First Circuit has repeatedly held that the issue of whether a single conspiracy or multiple conspiracies have been alleged is a question of fact for the jury. *See Bedini*, 861 F.3d at 14; *Villarman-Oviedo*, 325 F.3d at 12; *Licausi*, 167 F.3d at 45; *Portela*, 167 F.3d at 696; *Wihbey*, 75 F.3d at 774; *Sepulveda*, 15 F. Supp. 2d at 1190-91; *Mena-Robles*, 4 F.3d at 1033; *David*, 940 F.2d at 732; *Drougas*, 748 F.2d at 17; *see also Salemme*, 1997 WL 37530, at *2.

## III. DEFENDANTS' MOTION TO DISMISS COUNT FOUR SHOULD BE DENIED.

Defendants lastly contend (Mem. at 42-48) that Count Four, which alleges that they conspired to violate the Anti-Kickback Statute should be dismissed for three reasons: (1) the Indictment is not sufficiently specific and fails to allege an overt act in furtherance of the conspiracy; (2) the Indictment does not allege the requisite *mens rea* for conspiracy; and (3) providing administrative support to practitioners as alleged in the Indictment cannot, as a matter of law, constitute a violation of the Anti-Kickback Statute. Each of these claims is without merit.

### A. <u>Statutory Definition</u>

The Indictment charges that Defendants, in violation of 18 U.S.C. §371, conspired to violate §1320a-7b(b)(2). (FSI ¶252-53). That paragraph of the Anti-Kickback Statute provides:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> \* \* \*

**(B)** to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. §1320-7b(b)(2).

### B. The Indictment is Sufficiently Specific and Properly Alleges Overt Acts in Furtherance of the Conspiracy Charged in Count Four.

Relying on *United States v. Tomasetta*, 429 F.2d 978 (1st Cir. 1970), Defendants contend (Mem. at 42) that dismissal of Count Four is appropriate because the absence of specificity leaves them unable to know what allegations the Grand Jury deemed adequate. While the indictment in *Tomasetta* was in fact dismissed, the First Circuit's decision was explicitly narrowed by the Court's holding that, "what is a fair description of a crime for purposes of permitting an adequate defense necessarily varies with the nature of the offense and the peculiarities of defending against the kind of charge involved." *Id.* at 979; *see United States v. Kenney*, 2016 WL 7045700, at *2 (D. Mass. Dec. 2, 2016) (distinguishing *Tomasetta*).

Unlike *Tomasetta*, in which the defendant was accused of "making threats by unstated means to an unnamed person on a particular day in a city of moderate size," 429 F.2d at 979, the Indictment here alleges multiple overt acts that are sufficient to satisfy the pleading requirements for a conspiracy charge under 18 U.S.C. §371, and to further establish venue in the District of Massachusetts. Count Four re-alleges and incorporates by reference paragraphs 1 through 241 of the Indictment. (FSI ¶252). In those paragraphs, the Indictment describes how Defendants used both the Company's Speaker Program and various forms of administrative support as bribes and kickbacks designed to cause practitioners to prescribe Subsys. (*See, e.g.*, FSI ¶¶48-73). The Indictment describes several different forms of bribes stemming from the Speaker Program and

alleges that "Sham Speaker Program events occurred at restaurants within the District of Massachusetts and elsewhere, and functioned as bribes in the form of free dinners with friends." (FSI ¶65b). The Indictment then enumerates additional specific examples of the bribes and kickbacks provided to ten practitioners. For example, the Indictment alleges that many of the Speaker Program events led or attended by Practitioner #7 and Practitioner #8 were sham events that were mere social gatherings also attended by the friends and office staff of the respective practitioner. (FSI ¶¶206, 215). As discussed in the Government's Opposition to Defendants' Motion for a Bill of Particulars (Dkt. No. 329), Defendants were provided discovery at the time of arraignment that included the testimony of a Company sales employee who scheduled and attended sham speaking programs in Massachusetts for both Practitioner #7 and Practitioner #8. Receipts for these dinners, as well as Company "sign-in" forms were marked as exhibits, reviewed by the witness during her testimony, and provided to Defendants in discovery. Standing alone, the allegations in the Indictment serve both to allege one or more overt acts in furtherance of the charged conspiracy to violate the Anti-Kickback Statute, and to further establish venue in the District of Massachusetts as to Count Four. For reasons discussed in the Government's Opposition to Defendants' Bill of Particulars, the Indictment and discovery together provide more than sufficient particularity with respect to establishing venue in the District of Massachusetts as to Count Four.

### C.   The Indictment Alleges the Requisite *Mens Rea*.

Defendants contend (Mem. at 44-46) that Count Four does not adequately allege that they knowingly and willfully entered a conspiracy to violate the Anti-Kickback Statute. That, too, is incorrect.

Count Four alleges that each of the Defendants "knowingly conspired" to "knowingly and willfully pay remuneration * * * that is, kickbacks and bribes, from the Company, to induce physicians and other health care professionals" to write "prescriptions for the Fentanyl Spray," *i.e*., Subsys. (FSI ¶253). The charge therefore makes clear that *each* of the seven Defendants agreed to willfully violate the Anti-Kickback Statute and expressly incorporates the requisite *mens rea* as to each charged Defendant. The Indictment further makes clear that Defendants understood that various types of payments made through the Speaker Program were bribes and kickbacks expressly intended to induce health care providers to prescribe Subsys. (*E.g.*, FSI ¶65 ("Honoraria paid to speakers were the most common form of bribes and kickbacks paid to co-conspirator practitioners in order to induce those co-conspirator practitioners to issue more prescriptions for the Fentanyl Spray outside the usual course of their professional practice and to change the dosages and volumes prescribed.")). The Indictment also establishes that in addition to using honoraria as bribes, Defendants Kapoor, Babich, Burlakoff, Simon, Lee, and Rowan used other forms of bribes and kickbacks associated with the Speaker program, including food and drink provided at sham speaking events. (FSI ¶65 (describing sham events that were merely "social gatherings at high-priced restaurants that involved no education and no presentation"; events that repeatedly involved the "same attendees, who were often friends of the co-conspirator practitioners"; and events that "did not have attendees who were licensed to prescribe the Fentanyl spray" or that had "no attendees at all.")). The Indictment alleges that the Defendants provided these bribes and kickbacks for the purpose of inducing practitioners to prescribe Subsys. (FSI ¶66 ("In return for bribes and kickbacks, co-conspirator practitioners were expected to prescribe the Fentanyl Spray to their patients)).

The Indictment further alleges that those practitioners who were high-volume prescribers of Subsys were provided with administrative support by staff that the Company employed and compensated. (FSI ¶¶71-72). All seven Defendants required sales reps and other Company-employed support staff to assist practitioners with filling out and faxing prior authorization paperwork and other documentation. (FSI ¶¶71-72). The Indictment alleges that "[t]he defendants used this, and other administrative support * * * as a bribe and kickback to compensate co-conspirator practitioners for writing Fentanyl Spray prescriptions." (FSI ¶72).

Whether defendants knew that bribing doctors to prescribe Subsys in the manner alleged in the Indictment was unlawful is an issue for trial, not for litigation in a motion to dismiss. *See*, *e.g., United States v. Stewart,* 744 F.3d 17, 21 (1st Cir. 2014) ("The indictment's allegations are assumed to be true, and 'courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations.'") (quoting *Guerrier*, 669 F.3d at 3-4)

Defendants nonetheless contend (Mem. at 54) that the Indictment must allege not only "which Defendants possessed the specific intent necessary to establish participation in the conspiracy" (for the reasons noted above, it does), but also "how that intent manifested in particularized facts connecting particular alleged bribes to particular healthcare practitioners and pharmacists." What defendants seek goes far beyond what Rule 7(c)(1) requires. "At the indictment stage the government need not 'show,' but merely must allege, the required elements." *Stewart*, 744 F.3d at 21; *see also United States v. Tarvers*, 833 F.2d 1068, 1075 (1st Cir. 1987) ("[A] conspiracy charge under §371 is sufficient as long as it (1) charges that there was an agreement, (2) describes the unlawful acts toward which the agreement was directed, and (3)

charges that the defendants committed an overt act in furtherance of the agreement."). The government has done so here.

Lastly, the general proposition that some speaker programs involving payment of honoraria are lawful and fall within the safe harbor provisions of the Anti-Kickback Statute is of little relevance here, given the specific allegations in the Indictment regarding Defendants' operation of the Speaker Program at issue. As Judge Woodlock has noted, if a speaker series "was really meant to compensate doctors for prescribing [a company's] drugs, then the series would quickly fall out of the personal services safe harbor." *United States ex rel. Booker v. Pfizer*, 188 F. Supp. 3d 122, 134 (D. Mass. 2016), *aff'd*, 847 F.3d 52 (1st Cir. 2017). Such is the case here, and *Pfizer* serves only to illustrate the distinction between a lawful speaker program and the type of speaker program alleged in the Indictment.[4]

### D. Providing Free Administrative Services To Induce Practitioners to Prescribe Subsys Can Constitute an Anti-Kickback Violation of the Statute.

Defendants contend (Mem. at 47-48) that providing administrative support to practitioners as alleged in the Indictment cannot, as a matter of law, constitute a violation of the Anti-Kickback Statute. This argument is flawed for several reasons, beginning with the misplaced premise that providing free administrative services for high-prescribing practitioners is somehow "integral" to

---

[4] For example, Defendants approvingly cite (Mem. at 45) Judge Woodlock's observation that it was "unremarkable" and "expected" that a for-profit pharmaceutical company would track its return on investment for paying physicians for participating in a speaker series. Judge Woodlock made clear, however, that Pfizer "did not track the prescriptions written by *speakers*, but rather the prescriptions written by *attendees*," and found that this fact "directly refutes any accusation that the series was a sham meant to compensate prescribing speakers rather than pitch to prescribing attendees." *Pfizer*, 188 F. Supp. 3d at 134 (emphasis added). Here, in contrast, the Indictment alleges that Defendants tracked the prescriptions of the prescribing speakers, and that in many instances, the speaking programs had no attendees who could prescribe Subsys. This is just one of the many facts alleged in the Indictment that distinguish the Speaker Program at issue from legitimate programs that fall within the safe harbor provisions of the Anti-Kickback Statute.

the product the Company offered. As described below, the Office of Inspector General, Department of Health and Human Services ("OIG") advisory opinions that Defendants cite offer no support for this proposition. To the contrary, such guidance makes clear that free administrative services, when offered for the purpose of inducing prescriptions, can constitute a violation of the Anti-Kickback Statute.

Defendants rely primarily on a 2011 OIG Advisory Opinion relating to a vaccine manufacturer's free provision of administrative, back-office services to prescribing physicians and insurers. OIG Advisory Opinion 11-07, at 1 (available at 2011 WL 4526110). The services reviewed by OIG related exclusively to a vaccine designed to immunize infants and toddlers against pneumococcal bacterial infections. *Id.* at 2-3. The vaccine was administered in either four or five doses, depending on circumstances, and the vaccine maker proposed offering a free vaccine reminder service, alerting parents of children who received some but not all of the required doses to check in with their physician. *Id.*

In its opinion, OIG affirmed that its "position on the provision of free or below-market goods or services to actual or potential referral sources is longstanding and clear: such arrangements are suspect and may violate the anti-kickback statute, depending on the circumstances." *Id.* at 7. Moreover, OIG recognized that free administrative support, such as the vaccine reminder program, "could have independent value" to the health care providers and insurers because such services "could replace actions the [providers and insurers] might otherwise take, and consequently defray expenses the [providers and insurers] might otherwise incur." *Id.*

Whether the free goods or services have "independent value" to the recipient is the touchstone of the analysis. *See United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 68 (D. Mass. 2011). Thus, in another advisory opinion, OIG has expressly stated that

depending on the facts and circumstances, "[o]btaining pre-authorization from insurers is an administrative service with potential value to physicians" and that providing such a service could constitute a violation of the Anti-Kickback Statute. OIG Advisory Opinion No. 10-13, at 4-5 (available at 2010 WL 3483531) ("When a party in a position to benefit from referrals provides free administrative services to an existing or potential referral source, there is a risk that at least one purpose of providing the services is to influence referrals.").[5] Such is the case here. The Indictment expressly alleges that the Defendants provided high-prescribing medical practitioners with administrative support "as a bribe and kickback to compensate co-conspirator practitioners for writing Fentanyl Spray prescriptions." (FSI ¶72). The Defendants thus are incorrect (Mem. at 47) when they claim that "no existing legal authority supports the proposition" that such free services could constitute improper remuneration under the Anti-Kickback Statute.

It is true, as Defendants note (Mem. at 47), that "OIG consistently has distinguished between free items and services that are integrally related to the offering provider or supplier's services and those that are not." OIG Advisory Opinion 11-07, at 7. The guidance makes clear however, that free "integral" goods and services are ones that have no substantial value independent of the goods or services sold.[6] The OIG cites by way of example: a "free computer

---

[5] That Advisory Opinion went on to explain that the free pre-authorization services could have independent value to a physician regardless of how the insurer allocates responsibility for obtaining pre-authorization. OIG Advisory Opinion 10-13, at 4-5. Ultimately, OIG concluded, based on a detailed analysis of the program at issue, that the pre-authorization services were appropriate, where, among other things, the program was available to all physicians regardless of the volume of referrals, the program would operate transparently (with personnel identifying themselves and their true employer along with the nature of the pre-authorization program), and there was little opportunity to influence referrals. *Id.* at 5-6.

[6] The OIG determined the vaccine reminder program did not violate the Anti-Kickback Statute because, among other reasons, it was "narrowly tailored and operate[d] transparently"; the vaccine maker had "little opportunity to influence referrals" because the only recipients of the reminders were the parents and guardians of children who were already prescribed the vaccine;

provided to a physician by a laboratory would have no independent value to the physician if the computer could be used only, for example, to print out test results produced by the laboratory"; in contrast, a free personal computer that could print lab results and perform other functions would have independent value. OIG Advisory Opinion 11-07, at 7. This example, cited in multiple OIG guidance opinions, is drawn from OIG's preamble to its safe harbor regulations, in which it further explained, "it appears that the computer has no independent value apart from the service that is being provided and that the *purpose of the free computer is not to induce an act prohibited by the statute*. Rather, the computer is part of a *package of services provided at a price that can be accurately reported to the [federal health care] programs*." Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35952, 35978 (emphasis added). Here, in contrast, the Indictment alleges that Defendants singled out particular high-volume prescribers and provided them with free administrative support (and sometimes hired their friends and family) specifically as a bribe and a kickback to compensate them for prescribing Subsys. Thus, leaving aside whether OIG's guidance is relevant to the Court's interpretation of a criminal statute, the guidance provides no support for the proposition defendants must show in order to have Count Four dismissed—that the allegations are deficient as a matter of law. The allegations are sufficient, and Defendants' motion to dismiss Court Four should be denied.

---

the program did not target any particular referral sources and was available for free "without regard to any health insurer's or health care entity's overall volume or value of expected or past referrals"; and the program was "unlikely to result in overutilization" of the vaccine, as administration of the vaccine was considered "the standard of care and [was] universally recommended except where contra-indicated." OIG Advisory Opinion 11-07, at 8.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Defendants' motion to dismiss.

Date:   June 22, 2018                    Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Mark T. Quinlivan*
        K. NATHANIEL YEAGER
        DAVID J. D'ADDIO
        MARK T. QUINLIVAN
        Assistant U.S. Attorneys

        John Joseph Moakley U.S. Courthouse
        One Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
        (617) 748-3100
        nathaniel.yeager@usdoj.gov
        david.daddio@usdoj.gov
        mark.quinlivan@usdoj.gov

## CERTIFICATE OF SERVICE

I, Mark T. Quinlivan, hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the defendants.

By:     */s/ Mark T. Quinlivan*
        MARK T. QUINLIVAN