UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

***************************

UNITED STATES OF AMERICA,
        Plaintiff

vs.                                Case No. 1:16-cr-10343-ADB

MICHAEL L. BABICH ET AL,
        Defendants

***************************


TRANSCRIPT OF FINAL STATUS CONFERENCE
BEFORE THE HONORABLE JENNIFER C. BOAL
AT BOSTON, MASSACHUSETTS
ON DECEMBER 6, 2018


APPEARANCES:

For the Plaintiff:
K. Nathaniel Yeager, Assistant United States Attorney
Fred M. Wyshak, Jr., Assistant United States Attorney
David G. Lazarus, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3100

For Defendant Michael Babich:
William H. Kettlewell, Esquire
Hogan Lovells, LLP
100 High Street, 20th Floor
Boston, Massachusetts 02110
617-371-1005


Transcriber:  Karen M. Aveyard,
             Approved Federal Court Transcriber

-----------------------------------------------------
**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**k.aveyard@comcast.net**

APPEARANCES (continued):

For Defendant Joseph Rowan:
Michael Kendall, Esquire
White & Case, LLP
75 State Street
Boston, Massachusetts 02109
617-979-9310

For Defendant Richard Simon:
Patrick J. O'Toole, Jr., Esquire
Steven A. Tyrrell, Esquire *(Telephonically)*
Weil Gotshal & Manges, LLP
2001 M Street NW, Suite 600
Washington, DC 20036
202-682-7213

For Defendant Michael Gurry:
Megan A. Siddal, Esquire
Demeo, LLP
200 State Street
Boston, Massachusetts 02109
617-263-2600

For Defendant John Kapoor:
Kosta S. Stojilkovic, Esquire
Beth Wilkinson, Esquire
Wilkinson Walsh Eskovitz
2001 M Street NW
Washington, DC 20036
202-847-4000

Aaron M. Katz, Esquire
Ropes & Gray, LLP
800 Boylston Street
Boston, Massachusetts 02199
617-951-7117

For Defendant Sunrise Lee:
Peter C. Horstmann, Esquire
450 Lexington Street, Suite 101
Newton, Massachusetts 02466
617-723-1980

For Defendant Alec Burlakoff:
George W. Vein, Esquire
Donnelly Conroy & Gelhaar, LLP
260 Franklin Street
Boston, Massachusetts 02110
617-720-2880

1                      P R O C E E D I N G S

2

3          THE CLERK:  Today is December 6, 2018.  We're on the

4    record in the matter of the United States versus Babich et al,

5    Case No. 16-cr-10343.

6          Will counsel please identify themselves for the

7    record.

8          MR. LAZARUS:  Good afternoon, your Honor.  David

9    Lazarus, Nat Yeager and Fred Wyshak on behalf of the United

10   States.

11         THE COURT:  Good afternoon.

12         MR. KETTLEWELL:  Good afternoon, your Honor.  William

13   Kettlewell for Michael Babich.

14         MS. SIDDAL:  Good afternoon, your Honor.  Megan Siddal

15   for Mike Gurry.

16         MR. KENDALL:  Good afternoon, your Honor.  Mike

17   Kendall for Joe Rowan.

18         MR. HORSTMANN:  Good afternoon, your Honor.  Pete

19   Horstmann for Sunrise Lee.

20         MR. O'TOOLE:  Good afternoon, your Honor.  Patrick

21   O'Toole for Rich Simon, and Steve Tyrrell is on the phone as

22   well.

23         MS. WILKINSON:  Good afternoon, your Honor.  Beth

24   Wilkinson for Dr. Kapoor.

25         MR. KATZ:  Good afternoon, your Honor.  Aaron Katz for

1    Dr. Kapoor.

2          MR. STOJILKOVIC:  And good afternoon, your Honor.

3    Kosta Stojilkovic, also for Dr. Kapoor.

4          THE COURT:  Good afternoon, everyone, and we have some

5    folks on the phone as well.

6          MR. TYRELL:  Yes.  Good afternoon, your Honor.  Steven

7    Tyrell on behalf of Rich Simon.

8          THE COURT:  I will ask, again, the folks in the room

9    to stay seated and to pull the microphones toward them, and

10   that's the way that we've found is the best for folks on the

11   phone to hear what is going on in the courtroom.

12         So it is Dr. Kapoor's motion, so I will hear from you

13   all first.

14         MR. STOJILKOVIC:  Thank you, your Honor.

15         I want to begin at the following place.  When we had a

16   conversation with the Government about this issue, most

17   recently just two days ago, they suggested that what we're

18   doing here may be obstructive conduct, and I want to

19   respectfully note that it is not.  It is not obstruction of

20   justice.  It is our system of justice to be able to brief these

21   issues to seek the guidance from the Court, and to get a ruling

22   as to where the Government's investigative powers extend and

23   where they do not.

24         I also want to make one thing clear, which my partner,

25   Alex Walsh, made clear nine months ago when she spoke to the

1    Government for the first time about this issue, we have every

2    intent to abide by the Court's decision, that is when this

3    issue is adjudicated, if we are required to turn over the

4    materials, we will turn them over.  In the meantime, they are

5    in our custody and there is no danger of anything happening to

6    them.  I hope likewise that the Government will abide by the

7    Court's decision if it goes the other way.  But I want to put

8    that out because I really don't think that is a fair

9    characterization of what is happening here.

10           Now, with --

11           MR. WYSHAK:  Just so the record is clear, your

12   Honor --

13           THE COURT:  No, Mr. Wyshak.  I'll hear from you when

14   defense counsel is done.

15           MR. WYSHAK:  Okay.

16           MR. STOJILKOVIC:  Your Honor, I want to just say a

17   little bit about the history of this issue.  We briefed it and

18   tried to make it clear, but it does have a history and we at

19   least view that as relevant to the determination of the issue

20   before the Court.  The Government filed a HIPAA subpoena on

21   EJ Financial in 2016, and that is a financial company

22   associated with Dr. Kapoor, and a separate law firm, Paul

23   Weiss, made a sizeable production in response to that subpoena.

24   It did not, however, produce the documents in question here.

25           THE COURT:  I am aware of the procedural history here.

1    If there's something in particular about that history, I'm

2    happy to hear it from you.

3            MR. STOJILKOVIC:  Okay.  I just make two points then.

4    One, at that time the Government, or, you know, when the

5    Government raised this issue with EJF counsel and with us for

6    the first time, the Government's position seemed to be that

7    these were EJF's records.  Then the Government, in serving the

8    subpoena, seemed to take the position that they were

9    Dr. Kapoor's records.  Now, in response, they take the position

10   that they're INSYS's records.

11           Our position has been, throughout this time, that

12   these are Dr. Kapoor's records, and that is based on the fact,

13   and I want one fact to be clear, this is -- there's some

14   suggestion in the Government's brief, and I think a lot of

15   their cases are distinguishable because this suggestion is

16   simply not true, this is not a circumstance where Dr. Kapoor or

17   anyone went into INSYS, squirreled documents away, and ran off

18   with them and put them somewhere.  That is a very different

19   scenario, and that's how the Government tries to distinguish

20   the Grand Jury case from the Second Circuit.

21           But that is not what happened here.  The undisputed

22   testimony which all sides rely upon in briefing this issue is

23   that these documents were always in his home and they were part

24   of other documents related to other ventures and things that he

25   is involved in, and they have never been at INSYS.  That is --

1      and for the vast majority of the time, he was not an INSYS

2      employee.  He was the chairman of the board and its main

3      stockholder.

4              In terms of the legal argument, I have four or five

5      points that I want to emphasize.  One, I think factually, the

6      subpoena runs against the defendant.  I don't think you can

7      read it any other way.  It is a subpoena to Dr. John Kapoor for

8      his, quote, personal notes, and his, quote, handwritten notes.

9      True, it seeks those notes relating to subjects of INSYS,

10     SUBSYS and selling opioids, but despite that this is not a

11     subpoena to INSYS or to John Kapoor in his capacity of

12     custodian of records for INSYS.  So it's a subpoena that runs

13     afoul of the Harrington case, which is cited with approval in

14     the Justice Manual, and that alone should be sufficient to

15     grant a protective order as against the HIPAA subpoena.

16             I think it's also clear from the Government's response

17     that they're seeking this for use for trial.  I think we can,

18     you know, give up the pretense that there's some other reason

19     the Government wants this, because they want -- they think

20     these documents will somehow benefit them at trial.

21             I want to address now the INSYS declaration.  That, I

22     think, is the heart of the Government's response, and really

23     what they're relying upon.  They submit a declaration from an

24     IT professional at INSYS who says that to the extent these

25     documents are about INSYS, they belong to INSYS and not to

1   Dr. Kapoor.  It also indicates that if INSYS had these

2   documents, it would produce them to the Government.

3        What I want to point out in response to that, number

4   one, INSYS has not sought these documents from Dr. Kapoor.

5   This is not a case between INSYS and Dr. Kapoor about recovery

6   of records.  Two, again, these are not things that were removed

7   from INSYS, nor did INSYS at the time of any -- you know, at

8   the time prior to its separation from Dr. Kapoor, say hey,

9   Dr. Kapoor, turn over any personal or handwritten notes that

10  might have anything to do with the company.

11       I would also note, I think it's a fair observation,

12  and I'm not going here beyond anything that's been reported in

13  the press, that there is a resolution in principle between

14  INSYS and the Government.  I think it's fair to describe INSYS

15  currently in a -- if the Government asks them to jump, their

16  response will be how high posture.  But, ultimately, I don't

17  think that -- I submit that the INSYS declaration doesn't

18  address the issue here.  The question here is who is in

19  possession, custody and control of the documents, and it has

20  always been Dr. Kapoor.

21       I would point the Court to the cases discussed, in

22  particular on Page 6 of our reply brief, that state very

23  clearly that Dr. Kapoor is not a custodian of records for

24  INSYS.  The fact that he was formerly the chairman of the

25  board, and for one single month of the subpoena period formerly

1  an employee of the company, does not make him a custodian of

2  records.  Such former employees have been protected by courts

3  from turning over records in these circumstances, and the

4  exceptions to that, such as that cited in the sur-reply that

5  was filed within the hour, are really exceptions that go to

6  people who take and remove records in an attempt to avoid the

7  company turning them over.  That, I think in fairness, one

8  might discuss under the obstruction rubric.  This is not that

9  and that's why the cases favor us.

10         I also want to note we do believe the production

11  privilege applies here.  The Government ways well, these could

12  be used for authentication.  The Cadden case, Page 12 of our

13  reply, says that authentication is a testimonial act.

14         The final point I would end with, your Honor, two

15  parts to it, there's a lot of discussion here about a Rule 17

16  subpoena.  We're not currently facing that.  We have laid out

17  the reasons why, under U.S. v. Nixon, we don't think the

18  Government is entitled to one.  I submit that those reasons are

19  persuasive and, first and foremost, because of the lack of

20  diligence.  The Government has had -- let me step back.  The

21  Government has immense tools, and there was a time and place

22  where the Government could have obtained these documents.  I

23  don't think anyone disputes that.  They chose not to take those

24  actions at those times.  They've known about them for 18

25  months.  They've let it -- it's been an on and off -- on

1    again-off again issue for them and that has consequences under

2    the law.  The Government, on the diligence point, didn't

3    grapple with our cases in its response, but did in the

4    sur-reply that was just filed, saying that the cases we cite

5    are about post-trial Rule 17 subpoenas.

6            So, your Honor, again, I've only had the sur-reply for

7    about an hour, but to the extent it is helpful, there are

8    plenty of cases that reach the same outcome pretrial, I would

9    direct the Court to U.S. v. El-Amin, 2013 Westlaw 3865079.

10   That's a case that collects a number of cases at Pages 5 to 6,

11   many of which are pretrial protection from a subpoena such as

12   this.  Also, U.S. v. Farmer, 2015 Westlaw 1471965.  That's a

13   2015 case.  These cases discuss Nixon, they discuss other

14   published cases.  I just wanted to point a couple recent ones

15   for the state of the law.

16           Your Honor, the lack of diligence point is relevant

17   here.  We are in the midst of trial preparation.  These are and

18   have always been Dr. Kapoor's documents, whether or not they

19   relate to INSYS, and we believe that certainly entitles us the

20   protection from the HIPAA subpoena.  We would ask the Court to

21   also grant the protective order more broadly.  At the very

22   minimum, if not that, then require the Government to try to

23   seek a Rule 17 subpoena and we can join issue on that if need

24   be.

25           THE COURT:  Let me ask you a very mundane question

1   given some of the allegations in briefing this case.

2        What is your position with respect to whether my

3   ruling would be dispositive or nondispositive, and obviously

4   that might affect the standard of review for any appeal that

5   any of you might take from my ruling?

6        MR. STOJILKOVIC:  Your Honor, I have not specifically

7   studied the issue, but in fairness I do think that we would

8   evaluate, depending on the order and how it comes out and what

9   its bounds are, would evaluate potentially an appeal to Judge

10  Burroughs.

11       THE COURT:  Alright.  Mr. Wyshak, you wanted to say

12  something?

13       MR. WYSHAK:  I'll defer to Mr. Yeager.

14       MR. YEAGER:  Thank you.

15       Your Honor, we --

16       THE COURT:  And if you wouldn't mind addressing that

17  question first as well.

18       MR. YEAGER:  So the question regarding --

19       THE COURT:  Whether this would be a dispositive --

20  excuse me -- or nondispositive decision.

21       MR. YEAGER:  So I think we say in our memorandum that

22  we cite caselaw, I think, in our sur-reply, but you're testing

23  my memory, your Honor, about the Trial Court has the final say.

24  So let's take a look at the caselaw, your Honor, before I

25  answer that question, but I can do that before the end of the

1    day.

2         Your Honor, this isn't a difficult situation, and, you

3    know, the first thing is that we think very strongly that the

4    Phibbs case and Harrington case justify the HIPAA subpoena in

5    this case, that no plain language indicates that a subpoena

6    such as a HIPAA subpoena is relevant when it doesn't target the

7    defendant.  We're not targeting the defendant, we're targeting

8    property of INSYS Therapeutics.

9         You know, there has been some discussion of 404(b)

10   amongst the parties.  Your Honor may not know this, you may, we

11   had a number of Motions in Limine that were due yesterday, and

12   we met to confer and we discussed one of the Government's

13   Motions in Limine dealing with 404(b), and the prospect of John

14   Kapoor's conduct relative to this information came up, not the

15   prospect of defense counsel's behavior.  You know, I think we

16   had every right to rely upon those cases and to use those cases

17   to issue the subpoena.  I think that our conduct is clearly

18   justified by Phibbs and Harrington.

19        I will point out that Rule 17 is something that's

20   available and we're capable of filing a Rule 17.

21        THE COURT:  Why didn't you do so in this instance?

22        MR. YEAGER:  So let me explain that.  Well, first of

23   all, let me go back to the Grand Jury, your Honor.  I'm happy

24   to answer that question.  I, very clearly, could have pursued

25   this while the matter was before the Grand Jury and I dropped

1    the ball on that, and the information you've been given from

2    defense counsel is accurate.  I agree that I could have used

3    the Grand Jury to look further into this and I didn't.  But

4    that's not where the conversation ends.  At the end when we

5    tried to find out where the documents were and counsel

6    indicated they had moved, we decided that ultimately we would

7    try to use Rule 17.  As we look at Rule 17, there are multiple

8    requirements, one of which is the second element, as counsel

9    points out, that we've got to exhaust all other possibilities.

10          Now, there are a couple of possibilities that we could

11   have exhausted that I can think of.  One is a HIPAA subpoena,

12   and based on Phibbs and Harrington, we had every right to do

13   that.  We needed to do that even (inaudible) Rule 17.  The

14   other is a search warrant and it's justified by law.  There are

15   those among us that would have preferred to do (inaudible), but

16   we took the less draconian route here.  We attempted to seek

17   out documents that are not in dispute, really, and we chose to

18   issue a subpoena that's justified by caselaw.

19          So --

20          THE COURT:  If I understand the Government's argument

21   that the documents in question actually belong to INSYS, why

22   not seek them through INSYS?

23          MR. YEAGER:  We did seek them through INSYS, your

24   Honor.  That's one thing I want to clarify.  We issued -- you

25   know, when counsel talks about due diligence here, and I want

1    to address diligence quite a bit, this is not the first HIPAA

2    subpoena that we have issued.  It is the third.  The first two

3    were to EJ Financial and INSYS Therapeutics, and --

4         THE COURT:  And my understanding is there was no

5    Motion to Compel on the basis of those subpoenas.

6         MR. YEAGER:  There was not a Motion to Compel.  So I

7    suppose that that's another avenue we could have taken, but

8    that would have been a Motion to Compel or a Motion for

9    Contempt from the Government.

10        But in terms of that, your Honor, we're back right

11   where we are no matter what, and it's still justified by

12   caselaw as a possibility.  We --

13        THE COURT:  So my understanding is the subpoena seeks

14   records from May 2012 to December 2015.

15        MR. YEAGER:  Yes.

16        THE COURT:  It appears that Dr. Kapoor was only an

17   employee of INSYS for about a month's time period in there,

18   from November to December.  During the rest of the targeted

19   period, he served in various capacities on the board.

20        Isn't there a legal distinction between someone who is

21   an employee and someone who is on the board and the right of

22   the corporation to say that those are the corporation's

23   documents?

24        MR. YEAGER:  In terms of his responsibilities, he

25   became the CEO of the company for a period of time.  He was the

1    chairman of the board; he was the owner of the company.  I

2    don't know the legal distinction your Honor is referring to.

3    If I could have --

4         THE COURT:  So, for example, and this goes to the

5    affidavit, alright, in other healthcare fraud cases when

6    there's been an issue, and it's not limited to healthcare fraud

7    cases, but there was one before me where an issue came up about

8    who owned e-mails and who could waive attorney-client

9    privilege.  In that case and in other types of cases where this

10   is an issue over who owns the e-mails, I am provided with

11   corporate manuals that clearly specify what the corporation

12   owns, including e-mail and the individuals who have access to

13   the e-mail system; expectation of privacy with respect to the

14   e-mails.  I get documents signed by employees that indicate

15   their knowledge of the e-mail system and the rules for the

16   corporation, and essentially who owns the e-mails.  I don't

17   have any of that here.  I have a declaration from someone who

18   is titled the Director of Technical Operations.  I don't know

19   what that means.  It sounds to me he oversees their IT

20   operations.

21        Is that right?

22        MR. YEAGER:  I believe he does oversee their IT

23   operations.

24        THE COURT:  Okay.  Why does he have the authority to

25   make pronouncements as to -- to make, essentially, legal

1    pronouncements as to who has rights over e-mails?

2         MR. YEAGER:  Well, we asked the company for a

3    declaration and the company provided us with a declaration from

4    an employee who is currently employed by the company, your

5    Honor.  I can't speak to the authority.  All I can say is that

6    corporate counsel at INSYS, as well as outside counsel,

7    approved the affidavit and sent that to us.

8         I can say this though, if I could go back for one

9    second in terms of what you have.  I believe you have the

10    entire transcript of Ms. Oquendo's (PHONETIC) testimony; is

11    that correct?

12         If you don't --

13         THE COURT:  I believe that's correct, but she's -- if

14    I understand correctly, she is not an employee of INSYS.

15         MR. YEAGER:  But she's testifying regarding the

16    day-to-day activities of John Kapoor, and specifically --

17         THE COURT:  Right, but I was presented with an

18    affidavit that explains INSYS's vies of its own e-mails and

19    what constitutes its e-mails, right, and I have to say that the

20    declaration presents legal conclusions as factual statements.

21    I don't have any backup for this, as I would in many other

22    cases, that explains what's actually going on with the e-mails

23    here, and that goes -- I think you have said that we should not

24    look to Rule 16 in this case.

25         So then who has the burden here to say whose e-mails

1    they are?

2                MR. YEAGER:  We should not look to Rule 16 --

3                THE COURT:  That was in your sur-reply.

4                MR. YEAGER:  Right.  So the burden, your Honor, while

5    I believe the burden rests with the defendant, it's their

6    motion to --

7                THE COURT:  And how are they supposed to know -- I

8    mean, I guess you're trying -- you've made an argument that

9    these e-mails belong to the company, right?

10               MR. YEAGER:  Yes.

11               THE COURT:  So why shouldn't you bear the burden on

12   that?

13               MR. YEAGER:  Well, I think the only reason I say it's

14   their burden is because they're the ones seeking for a

15   protective order to quash the subpoena, and they're asserting

16   certain facts and the subpoena exists as it exists, your Honor.

17   They have a right to challenge it, but they have to be able to

18   meet the certain burden with regard to that.

19               I think, your Honor, this is substance over reality,

20   it really is, and, you know, John Kapoor is majority

21   shareholder of a closely-held corporation.  He owned 64 percent

22   of the company at the time that this happened.

23               THE COURT:  Right.  But if the company has policies

24   that say what constitutes corporate e-mails and that didn't

25   bind to him, then they're not corporate e-mails.

1          MR. YEAGER:  With regard to the way that corporations,

2     both EJ Financial and INSYS Therapeutics, have reacted to those

3     subpoenas, your Honor, that's not the position that either

4     corporation took.  The position that they took was that the

5     documents that we were subpoenaing, they had an obligation to

6     turn over.  INSYS Therapeutics turned over numerous documents

7     that were in their possession from John Kapoor, as did

8     EJ Financial, and they treated it as if the subpoena was valid

9     and was something that they had an obligation to comply with.

10    You know, we're simply here --

11         THE COURT:  So then I guess we go back with why didn't

12    you try to get these documents through INSYS.

13         MR. YEAGER:  Well, we did try to get the documents

14    through INSYS.  The Court's point is taken, that we could have

15    brought a Motion to Compel, but the reality is, again, it's

16    form over substance.  We know, because counsel has told us,

17    that INSYS no longer has the documents.  We know that John

18    Kapoor, while two active subpoenas were out, took them and gave

19    them to his attorney.

20         THE COURT:  What if I disagree that the -- or if it's

21    your burden.  I don't know, I haven't made up my mind, that's

22    why I ask the question, whose burden it is to prove that the

23    documents belong to INSYS.  But if I disagree that the

24    documents belong to INSYS, does the subpoena then become

25    improper?

1    MR. YEAGER:  May I have a second, your Honor?

2    THE COURT:  Yes.

3    (Pause.)

4    MR. YEAGER:  I don't believe the subpoena becomes

5    improper, your Honor.  The subpoena seeks the documents that

6    are taken from INSYS Therapeutics, that belong to -- that were

7    sent to John Kapoor, and at that point the defendant would have

8    to assert why he cannot turn them over.  Regardless of that,

9    whether the subpoena -- whether or not the INSYS declaration is

10   accurate or not, it remains a fact that they're very clearly

11   not the personal property of John Kapoor.  By the very

12   substance and reality of what we're talking about here, they're

13   information that we know were sent -- we have e-mails that were

14   sent to EJ Financial, there was a response sent back from

15   Nellie Oquendo, and the person that sent that response

16   indicated that they personally took the notes of John Kapoor

17   and filled them out at his direction, and gave direction to the

18   officers and employees of INSYS Therapeutics.

19        So the subpoena is accurate and valid.  We still need

20   to address whether or not the act of production would be an

21   issue, but I think it's still valid.

22        THE COURT:  So in terms of the active production, and

23   just to set the stage, I'm just going to quote from Hubble so

24   that we're all operating under the same language.  I know

25   everyone knows it, but just to help with the discussion.

1          So, "By producing documents in compliance with a

2     subpoena, the witness would admit that the papers existed were

3     in his possession or control and were authentic.  If the

4     collection and production of the materials demanded by a

5     subpoena is tantamount to answering a series of interrogatories

6     asking a witness to disclose the existence and location of

7     particular documents fitting certain broad descriptions, then

8     the act of production is testimonial and implicates the Fifth

9     Amendment right against self-incrimination."

10         So in the two categories of documents that are

11    requested, the beginning of the first part that uses the phrase

12    "any and all nonprivileged documents."  So there's plenty of

13    caselaw that says that's inappropriate and may be particularly

14    so if we're looking at it under the Hubble context.

15         MR. YEAGER:  Yeah.

16         THE COURT:  Or what is the Government's position with

17    respect to that?

18         MR. YEAGER:  Well, I think to the extent that we're

19    talking about the e-mails, we can narrow it to that point, your

20    Honor.  I think if the language is too broad, then the Court

21    can clearly issue a ruling that narrows it appropriately under

22    Hubble.  I point it out because we say that in terms of active

23    production, you know, I've had conversations with a Division

24    Chief in our office and we're ready, open to the possibility of

25    active production immunity, your Honor.

1          THE COURT:  Alright.  And then so that's the first

2     category of documents.  The second category seems even more

3     problematic given the Hubble pronouncements, because there's no

4     indication that the Government knows what those documents are,

5     what was given to them.

6          MR. YEAGER:  I'm sorry, (inaudible) at the end, your

7     Honor.

8          THE COURT:  Sorry, that there's no indication the

9     Government knows what was actually given to the law firm.

10          MR. YEAGER:  Well, we don't know -- we can't give you

11     a list of every document that was given to the law firm, and

12     it's a possibility that EJ Financial's server deleted some of

13     those.  You know, we can't say for sure every single document

14     that's there.  But I don't think that the law requires that

15     level of specificity.  We can say for sure.  I mean, we would

16     have probable cause here to obtain these documents in a search

17     warrant.  We can say for sure that the documents were sent to

18     EJ Financial's address.  We know that the person whose

19     responsibility it was printed them out on a regular basis and

20     handed them to him, and then took his direction and responded

21     back.  We have e-mails that demonstrate that that happened from

22     Nellie Oquendo, signed by John Kapoor, in terms of the reality.

23     I don't think we need to offer more specificity than that, your

24     Honor.  I don't know any case that requires it.  I mean, it

25     would almost eviscerate the ability to subpoena documents at

1   that point.  You'd have to know the existence of every single

2   document before you saw it and that's not how subpoenas work.

3        I would say here that there's relevance here that goes

4   far beyond specific e-mails.  John Kapoor is very clear that

5   one of the defenses that he wants to use and one of the

6   concerns we have is that he's hiding documents.  There's a 1001

7   here concern, documents that demonstrate his regular control of

8   the company, his regular direction.  Not just to the commercial

9   aspect with regard to the board, but also to the sales reps

10  directly, and that's relevant as far as our investigation is

11  concerned.  I think the idea that we would have to enumerate

12  before we issue a subpoena every single e-mail that we want and

13  why we want it --

14       THE COURT:  I don't think that's what's required by

15  the law.  I think -- but I'm asking whether the second category

16  of documents is too vague to satisfy the Hubble standard.

17       MR. YEAGER:  Well, your Honor knows that when you

18  draft subpoenas, it's possible that they could be -- the

19  language could not be perfect.  I don't pretend that it is.

20  But, clearly, everyone knows the documents that we're talking

21  about and that's established by the testimony of Nellie Oquendo

22  and by the concessions of the defense, you know, that these

23  documents exist.  They're in, I think they said, files and

24  boxes.

25       So, you know, I just think the idea that specificity

1    means that -- it's a dangerous road to go down.  We're not

2    fishing here.  We're not just throwing out subpoenas.  Maybe

3    John Kapoor's lawyer has stuff.  We're doing it based upon

4    things that we've learned in our investigation and it's based

5    upon -- it's in good faith.

6                THE COURT:  Thank you.

7                So from the defendant's perspective, who bears the

8    burden on showing whether these documents are personal or

9    corporate?

10               MR. STOJILKOVIC:  Your Honor, I submit that it is the

11   Government's burden.  They served a subpoena to John Kapoor

12   through us seeking documents, and that subpoena on its face

13   does not provide any support for the documents being INSYS

14   documents.  That is an argument they developed and advanced in

15   their opposition.  I think like any opposition argument, if

16   that's their reason why they win, then they have the burden of

17   persuading the Court on it.

18               THE COURT:  Anything else?

19               MR. YEAGER:  If I might just address a couple of

20   things.

21               THE COURT:  Just let me -- let me just hear from them

22   and I'll give you the final word.

23               MR. YEAGER:  Yes, your Honor.

24               THE COURT:  Yeah?

25               MR. STOJILKOVIC:  Your Honor, just three brief points

1    in response to what the Government presented.  You know, the --

2    I don't see a fair concern for 18 U.S.C. 1001 here.  These were

3    not -- again, as I say, these were not removed.  These were

4    documents in John Kapoor's personal possession and have been

5    from their generation.

6            But I also want to make one factual aspect clear.  EJF

7    did make a production, a substantial one.  INSYS made an even

8    more substantial production.  The Government, you know -- and

9    as the testimony that I think all parties rely on in

10   establishing the facts relevant to these documents shows, you

11   know, any handwritten documents were just kind of a mechanism.

12   But if there was an e-mail sent as a result of such handwritten

13   communications and send to INSYS staff, INSYS has it.  If it

14   was called for by Government subpoena, it was, I presume,

15   produced.  So the Government does not lack whatever proof, you

16   know, the facts bear about e-mails originating from our client

17   and going to INSYS employees.

18           The second point, if I may respond, I appreciate the

19   Government's offer on active production immunity, but our

20   client is a defendant awaiting a trial, and I just don't know

21   how that immunity would work if the Government says they want

22   to use these.  They don't see what residual immunity is there.

23           Third, I would agree with the Court that the second

24   category, the EJF document category, I don't know what that

25   means.  Counsel said everyone knows.  I think we all know what

1    Ms. Oquendo described, but that to me, you know, we are here

2    debating the propriety of it and of the Government's request

3    for it.  But that to me relates to the first category and I

4    don't know -- I read the Government's subpoena as including the

5    second category as a kind of belt and suspenders to make sure

6    they describe things in as many ways as possible.  But to the

7    extent it has any independent meaning, I certainly don't know

8    what it is.

9            THE COURT:  Mr. Yeager?

10           MR. YEAGER:  Yes, your Honor, just a few brief points.

11           First of all, you know, they brought the motion.  The

12   position they're taking is that they brought the motion, but we

13   have the burden, and I don't think that's a legitimate

14   position.  Secondly, if the Court is concerned about

15   specificity, and I certainly think that given the language

16   concerns the Court has, that there are ways to deal with that.

17   I certainly think if counsel -- if the Court wants to do an

18   in-camera review, I think that would be appropriate.  But I

19   think INSYS --

20           THE COURT:  So the problem -- this is where the delay

21   comes and there's a problem.  As I understand it, you all have

22   a trial date in January.  One, I'm not sure what I would be

23   reviewing it for.  It's not like it's a privilege case.  Then

24   two, we're running out of time.

25           MR. YEAGER:  Well, I think the one thing I would say

1    is that the assistance of INSYS counsel, I think, would be

2    necessary, and I think that might be able to narrow the work

3    that the Court would have to do.  So in terms of that, you

4    know, if they are their documents and we can provide additional

5    information to the Court regarding that, it may alleviate some

6    of the Court's concerns.

7            One other point about that, your Honor, in terms of

8    the timing, and I think it's very important.  When you talk

9    about diligence and you talk about other possibilities, this

10   office took a less aggressive approach than it had to.  With

11   regard to diligence, what they're asking this Court to do,

12   unequivocally, is to endorse their effort to move these

13   documents away from two valid subpoenas, and that's the motion

14   that's before -- that's the position that defense counsel has

15   taken.  They had two active subpoenas.  They took them, they

16   moved them to a place that they didn't think we could get them,

17   and they want you to endorse it.  And it's not okay.

18           You know, the caselaw, I think, is very clearly on our

19   side.  I would ask you to take a very close look at the

20   omissions and the citations in defense counsel's brief because

21   they leave out a lot of very valid information that the Court

22   should know.  They tell this Court that Ms. Oquendo did not

23   assert that she dealt with INSYS materials.  They left that

24   directly out with an ellipsis.

25           They did not tell the Court that Judge Collings has

1    specifically ruled opposite to one of the cases that they cite,

2    as well as the fact that there's a Circuit Court split on the

3    very issue.  You know, this is important not just for this

4    case, but for coming cases.  Defendants can't just move

5    documents around at their convenience to avoid production, and

6    I would ask the Court to take a hard look at that.

7             THE COURT:  Thank you.  Just one moment.

8             (Pause.)

9             THE COURT:  Alright.  I'll take it under advisement.

10            MR. YEAGER:  Your Honor, may I just ask for one thing?

11            THE COURT:  Yes.

12            MR. YEAGER:  If the Court is feeling that because of

13   the timing, you know, and whether we're going to appeal or not

14   appeal, if the Court's feeling is that we did not meet our

15   burden, I would ask for an opportunity to supplement our

16   briefing so that we can expedite the matter.

17            THE COURT:  Thank you.

18            THE CLERK:  All rise.  This Court is in recess.

19            MR. STOJILKOVIC:  Your Honor, I apologize to --

20            THE COURT:  Are we on?

21            THE CLERK:  We're on the record.

22            THE COURT:  Okay.

23            MR. STOJILKOVIC:  I apologize.  I will be very brief.

24   But there are -- there is, I think, a couple of just status

25   matters on the case involving all the defendants.  I don't

1    think it will take a lot of time, but if I may just raise with

2    the Court.

3            One, we have one area, I think the remaining kind of

4    unresolved area in the agency discovery which was FDA materials

5    related to off-label prescription of TIRFs, I think the parties

6    have fully developed their position, and I have, just by way of

7    update, one thing.  We did obtain a waiver from INSYS relating

8    to INSYS's own application to expand the label.  That's not the

9    full universe of documents we seek, but that is something that

10   the Government indicated to us the FDA would provide so long as

11   INSYS signed off, and they have.  Mr. Lazarus and I have been

12   in communication about it and what I understand is that the FDA

13   is now willing to provide those materials, subject to a

14   protective order, that is identical to the one we entered on

15   the DEA discovery with an additional sentence or reflection,

16   that by producing these documents, the FDA does not waive its

17   deliberative privilege, but that we are allowed to use the

18   documents at trial and show them to our witnesses in trial

19   prep.

20           If that is the case, I think the parties will have a

21   proposed protective order for the Court.  I don't know that

22   that moots our wider request for FDA documents based on TIRF

23   and off-label use, but I don't know what's in the production.

24   If the Government indicates that they can get it to us quickly,

25   I think that would be in everyone's interest.

1          MR. LAZARUS:  May I address that briefly, your Honor?

2          THE COURT:  Yes.

3          MR. LAZARUS:  We have been going back and forth on a

4     possible agency protective order.  We spoke right before we

5     came in to court and I think we found common ground.  So with

6     the Court's permission, I can file a proposed protective order

7     consistent with that by the end of the day tomorrow.

8          I've been in touch very regularly with FDA counsel.

9     As the Court has heard in our pleadings, they've spent over a

10    hundred hours responding to defense requests.  They've had ten

11    to twelve employees working on them.  It's at the point now

12    where there's what I've been told, but haven't seen, about 4 to

13    600 pages of INSYS-related documents that are responsive to the

14    waiver.  That would include internal agency deliberative

15    process, which, again, I haven't seen, but I've been led to

16    believe, may go to the heart of the broader questions that

17    counsel has put to the Court in terms of the FDA's knowledge of

18    off-label use of TIRF and rapid-onset opioids.

19         So my proposal is FDA has assured me they can produce

20    these documents as quickly as possible, they're gathered, once

21    the protective order is in place, with the Court's permission,

22    I can get you the order tomorrow and I can commit to having

23    them in the hands of counsel by a week from tomorrow, if not

24    earlier.  I would propose, once counsel has had an opportunity

25    to review them, he can let us know and we can revisit whether

1    or not any of the issues are still ripe, your Honor.

2         THE COURT:  So as I understand what's on my plate is,

3    I will get an order, I will sign the order, you're going to

4    produce the documents, defense counsel will review the

5    documents.  So I'm going to hold off on any further action with

6    respect to FDA production until I hear from someone.

7         MR. LAZARUS:  That would be our request, your Honor.

8         THE COURT:  Okay.  Anything else?

9         MR. STOJILKOVIC:  Two more points, one from me and one

10   from Ms. Wilkinson.  The last thing from me, your Honor, the

11   Government did produce a privilege log that had one DA document

12   on it.  It's a three-page document and the Government has

13   indicated they are not opposed to in-camera review.  So we have

14   requested that review and the Government is willing to provide

15   that to your Honor.  I haven't see it, so I don't know.  I can

16   assist the Court with it, but I don't understand it to be a

17   lengthy review.

18        MR. LAZARUS:  Your Honor, it's a three-page

19   memorandum.  One page is the cc's for who received the

20   memorandum.  So whatever the Court's preference is, we would

21   ask for an in-camera review of that, as we offered to counsel.

22        THE COURT:  And I'll need to know the basis on which

23   you withheld it so I don't have to guess.  Yes.

24        MR. LAZARUS:  If I may, I assumed that the Court would

25   want more background information.  So if I may, we only learned

1  on Tuesday that counsel would like us to seek this review, and

2  then we had all of our Motions in Limine and jury instructions

3  due yesterday.  So with the Court's permission, if I could have

4  until next Wednesday to get the Court a pleading explaining the

5  basis for withholding the document.

6          THE COURT:  Is that a pleading that you will share

7  with the other side, or how are you to intending to --

8          MR. LAZARUS:  I'd like an opportunity to discuss that

9  with agency counsel, if I may.

10          THE COURT:  Okay.  Obviously, it's better if you can

11  share as much as possible for the basis without, obviously,

12  violating whatever basis that you're holding it on, but that

13  would be helpful.  Then you can just deliver it to Mr. York.

14          MR. LAZARUS:  Thank you, your Honor.  And we agree

15  that it should be public to the extent possible.

16          THE COURT:  Okay.

17          MS. WILKINSON:  Your Honor, I just want to raise or

18  follow up on an issue you mentioned about time is running out.

19  I think you may be aware that we filed a BOP appeal with Judge

20  Burroughs and I wanted to explain that a bit, because when we

21  had been speaking to the Government this week, you know, for

22  the first time they've acknowledged that they are going to

23  introduce evidence about patient harm.  I'm sure you recall

24  that when they were opposing our request for a Bill of

25  Particulars, they said they weren't required to prove any

1    patient harm, which, of course, is true.

2         So we've started to receive some 302s, but when we

3    asked them for information and Mr. Lazarus was kind enough to

4    provide it, he said some these patients are not subject to the

5    phone calls, that they have recorded phone calls they have

6    given us, they're not those patients, that we don't have all

7    the meaningful medical records.  As you might imagine, even for

8    one patient, these patients have hundreds, sometimes thousands,

9    of pages that need to be reviewed by a medical expert for us to

10   explain to us why this patient may or may not have needed the

11   medication, or what the other factors were.  We've seen that,

12   you know, the Government has told us they haven't produced all

13   that information to us.

14        So we're going to have all of that coming in.  I'm

15   sure they're going to try and produce it as soon as they can.

16   But we're very concerned about this continuous discovery, as

17   well as any other delay with documents.  That was one of the

18   facts that we learned between when you made your decision and

19   we decided to file the appeal.

20        THE COURT:  I take no offense from any appeal from my

21   decision.  I'm one person and others may disagree with my

22   ruling.  So there's no explanation necessary.  Thank you.

23

24        (The hearing was concluded.)

25

C E R T I F I C A T I O N

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 32 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

December 9, 2018

Date