UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CRIMINAL NO. 16-10343-ADB |
| ) | |
| v. ) | |
| ) | |
| MICHAEL J. GURRY, et al ) | |
| ) | |
| Defendants. ) | |
| ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION
## TO LIMIT THE TESTIMONY OF DR. STEPHEN M. THOMAS

The United States of America, by its attorney, Andrew E. Lelling, United States Attorney for the District of Massachusetts, and the undersigned Assistant United States Attorneys, hereby oppose the Defendant's motion to limit the testimony of Dr. Stephen M. Thomas regarding certain subjects.

I.   BAKGROUND

The United States intends to call Dr. Stephen Thomas as an expert in the medical management of pain.  Dr. Thomas is a graduate of Stanford University Medical School.  He completed a residency in Anesthesiology at Johns Hopkins University, followed by a Fellowship in Pain Medicine and Regional Anesthesia at Johns Hopkins.  He served in the United States Air Force Medical Corp, during which time he was the founder and director of the Pain Management Service at Wright-Patterson United States Air Force Medical Center.  Dr. Thomas practiced pain management in Pittsburgh, Pennsylvania until 2014.   Since 2014, Dr. Thomas has worked as a pain management consult.  During that time he has been qualified as an expert in the field of pain management by multiple courts, including the Eastern District of Pennsylvania and the Middle District of Pennsylvania.

It is anticipated that Dr. Thomas will testify that in the course of treating patients for pain, physicians have a duty to (1) make reasoned and informed diagnoses of the medical conditions affecting each individual patient; and (2) formulate and implement an appropriate regimen of treatment for that individual based upon those diagnoses. This framework is not unique to the area of treating pain, but rather is used throughout the practice of medicine as the basic schema for the treatment of patients with any type of medical condition. If either of these two conditions are not met prior to the prescribing of controlled substances to a patient, the physician has violated the basic tenets of medical practice and is prescribing controlled substances outside the usual course of professional practice and not for a legitimate purpose.

II.     ARGUMENT

    A.     **Testimony about the relationship between bribery and medically Inappropriate prescriptions.**

Defendants seek to bar Dr. Thomas from testifying about the relationship between bribery and medically inappropriate prescriptions on the grounds that (1) this Court has "rejected the government's theory that every prescription written by a practitioner who accepts a kickback is outside the usual course of professional conduct," and (2) it is for the Court, not the government's expert, to instruct the jury on the fiduciary duty owed by doctors to their patients. Both contentions are misplaced.

First, in granting in part and denying in part Defendants' Motion in Limine No. 13, this Court stated that it was "disinclined to accept the legal premise that any prescriptions issued following a bribe are necessarily fraudulent, without regard to patient need or other factors relevant to the propriety of an individual prescription," but expressly stated that "the Government may argue its position again in connection with jury instructions." ECF Docket No. 719. Consistent

with the Court's instruction, the government will wait for jury instructions to revisit this issue, but wishes to note here that Defendants are incorrect in asserting that this question has been finally and conclusively resolved. A decision now, would essentially function as an order made pursuant to Rule 29.

Second, courts have held that it is appropriate for an expert witness to testify as to the "standard of care to which a doctor must adhere in order to prescribe properly a controlled substance," although not "about the legal meaning of [18 U.S.C.] §1306.04")" or whether a doctor's conduct was intentional or illegal. *United States v. Smith*, 573 F.3d 639, 653–55 (8th Cir. 2009); *see also United States v. Boccone*, 556 F. App'x 215, 225–27 (4th Cir. 2014) (unpublished) (holding that "an expert may testify that treatment was 'outside the bounds of ... professional medical practice,' or that 'treatment of certain patients was either illegitimate or inappropriate,'" but statement that "it is illegal" may have been inappropriate) (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)); *United States v. Schneider*, 704 F.3d 1287, 1294 (10th Cir. 2013) (finding that expert testimony using phrase "other than legitimate medical purposes" was appropriate); *United States v. Chube*, 538 F.3d 693, 696-97 (7th Cir. 2008) (affirming testimony of two experts that "the prescribing [by the defendant] 'was not done consistent with the usual standards of medical practice' and thus was not done with a 'legitimate medical purpose,' " and that prescriptions "were issued 'outside the scope of medical practice, not for legitimate purposes;' " experts did not testify "on the ultimate legal question whether [the defendants] knowingly violated the law," as they focused on whether the defendants in fact violated medical standards and thus did "not go so far as to offer an opinion on the Doctors' subjective intent"); *United States v. Bourlier*, 2011 WL 3837314, at *6 (N.D. Fla. Aug. 26, 2011) ("Testimony that Dr. Bourlier's conduct was outside the course of professional practice and not for legitimate medical purpose did

not constitute improper legal opinion.  Experts are permitted to testify regarding, and to disagree about, whether a defendant's conduct was within or outside of applicable medical standards."), *aff'd*, 518 F. App'x 848 (11th Cir. 2012) (unpublished); *Bek v. United States*, 2008 WL 5069329, at *2 (N.D. Ind. Nov. 24, 2008) ("Evidence was presented to the jury that Dr. Bek routinely issued the same series of prescriptions for all his patients, regardless of age, physical condition, and medical history.  The government's experts testified that this prescribing pattern wasn't within the scope of medical practice and was without legitimate medical purpose.").  As one district court has explained:

> An expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise under Federal Rule of Evidence 702.  As such, the Court will not allow Dr. Romanoff to testify that Defendant's conduct was "criminal" or "illegal," that he failed to meet the requirements of or violated the Controlled Substances Act or section 1306.04, or to provide other explicitly legal conclusions.  Nor shall Dr. Romanoff purport to explain to the jury the legal meaning of the Controlled Substances Act or section 1306.04.  *However, the Court finds that it is appropriate for Dr. Romanoff to testify as to the standard of care a health care professional such as Defendant must adhere to in order to properly prescribe oxycodone, and whether prescriptions issued by Defendant were made "for a legitimate medical purpose" and "in the usual course of his professional practice."*  Although tracking the regulatory language, such testimony is permissible because it does not use terms that have "separate, distinct and specialized meaning in the law different from that present in the vernacular."

*United States v. Robinson*, 255 F. Supp. 2d 199, 206-07 (D.D.C. 2017) (emphasis added, internal citations omitted).

Consistent with these principles, the government does not intend to elicit testimony from Dr. Thomas as to whether any physician violated the Controlled Substances Act or the legal meaning of 21 U.S.C. §1306.04.  It is appropriate and permissible, however, for the government to elicit testimony from Dr. Thomas as to the standard of care a health care professional must

4

adhere to in order to properly prescribe Subsys. Such testimony would neither "rewrite the law as to RICO predicates," as Defendants erroneously assert, nor supplant the Court's role in instructing the jury on the fiduciary duty owed by doctors to their patients under the honest services fraud statute and the Controlled Substances Act.

      **B.**      **Testimony about Medical Practices**

As stated above, the decision on how to instruct the jury rests with the Court. The testimony of Dr. Thomas will, in no way, interfere with that role. His opinions, like all expert opinions, are factual and as such may assist the jury in considering the case. It makes no difference that the defense disagrees with Dr. Thomas, or that they may offer some conflicting definition of the medical standards at issue. The Supreme Court has unequivocally held that if an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among conflicting views of different experts." *Kumbo Tire v. Carmichael*, 526 U.S. 137, 153 (1999).

      1. The alleged conspiracy

The Defendants have repeatedly ignored the long settled principle that a member of a conspiracy is responsible for the reasonably foreseeable acts of his co-conspirators and the consequences of those acts. As the United States has previously noted, the Modern Federal Jury Instructions state:

> A conspiracy is often referred to as a partnership in crime. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each member becomes an agent for the other conspirators in carrying out the conspiracy. Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of ***any*** member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed, under the law, to be the acts of all of the members, and all of the members are responsible for such acts, declarations, statements, and omissions.

5

L. Sand, *et al*., *Modern Federal Jury Instructions - Criminal*, Instruction 9-9 (2007) (emphasis added). "[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed." *United States v. Baines*, 812 F.2d 41, 42 (1st Cir. 1987). In the law of conspiracy, an act performed by one partner in furtherance of the conspiracy "is attributable to all." *Pinkerton v. United States*, 328 U.S. 640, 647 (1946).

Here, the criminal partnership is alleged to have been between the Defendants and others, including co-conspirator practitioners. Since the Court ruled on Defendants Motion in Limine # 13, the jury has received significant evidence of that partnership. For example, on September 17, 2012, the Insys Vice President of Sales sent an email to several Insys employees, including a sales rep named Casey Hanoch, Joseph Rowan, Sunrise Lee, Rich Simon, and Mike Babich. In the email, Burlakoff stated that Rich Simon,

> knows exactly what it is we need to have in place in order to solidify a successful program. As stated in my previous e-mail, it all starts with choosing the right LOCAL speaker. Your local speaker should be your 'business partner'. You do not work for him, nor does he work for you. You are partners in this endeavor, if your speaker does not see it this way.........( then it is time to identify another speaker).

Ex. 176. The C.E.O. of Insys, Michael Babich, testified that his understanding of exhibit 176 was that Insys speakers, "should write scripts in exchange for the honorarium that they would be receiving as speakers." Tr. 02/15/2019 at 29:5-8.

The jury has also received evidence (and will likely receive more) that the Defendants sought specific agreements with clinicians regarding the volume of Subsys prescriptions to be prescribed. Exhibit 224 is an email from Rich Simon to Alec Burlakoff, later forwarded with approval to Mike Babich on April 22, 2013. In the email, Simon instructs his sales reps,

> THIS IS TASK NUMBER ONE

6

> 1. I WANT EXAMPLES ON OUR NEXT CALL OF THE PLAN YOU HAVE CREATED WITH YOUR TOP CUSTOMERS TO GET A SPECIFIC NUMBER OF SCRIPTS PER WEEK THAT IS MUTUALLY AGREED TO AND AN OUTLINE OF HOW YOU WILL HOLD YOURSELVES AND YOUR CUSTOMERS TO THIS PLAN.

Ex. 224 at 2 (emphasis in original). Likewise, Dr. Mahmood Ahmad was engaged as a speaker for Insys after the Defendants received "a guarantee from Dr. Ahmad to have "more scripts than we can handle" once the pharmacy issue is resolved and begins to speak." Ex. 004.

Most importantly, the testimony of Dr. Awerbuch graphically demonstrates how his agreement with the Defendants destroyed his ability to exercise independent medical judgement for all of his patients suffering chronic pain:

> Q.… [C]an you describe for us why you chose those specific patients?
>
> A. I always have concern when I prescribe controlled medicines like narcotics that I'm going to be audited or that someone is going to come by, as happened in this case, and review my charts. And I wanted to try to make it look as legitimate as possible when I was prescribing this medication, and that's why I had patients fill out these consent forms and the off-label use forms. People signed them when they wanted pain pills. I really doubt that they read it thoroughly, but they signed it. I liked to have those in the chart as part of like a facade.
>     The reason I picked these particular patients - I mean, I did have legitimate pain patients that did need the pain medications, but there's a significant number that really didn't need it. I wanted to have patients that if someone reviewed the chart it looked like it would be medically necessary, that these were patients who had chronic pain; that they were failing certain medicines, they had failed other treatments.
>     But even though they had chronic pain, these were patients that didn't need strong opioids like Subsys. They did need pain management, except like [Patient Name Redacted] who her pain was psychological, but I certainly didn't need to write a medicine like Subsys for them. But they did - you know, if you look at their chart, it looks like they are legitimate pain patients. But in my own heart, I know that it was inappropriate to prescribe Subsys to them.
>
> Q. Are you telling us you looked at the patient files and figured out which ones you could create a paper trail for to cover your ass?

>A. No. I did this really on most patients. But the ones - yeah, if I prescribed Subsys. If someone didn't have documentation of pain in the chart, I couldn't prescribe it, I wouldn't prescribe it. But I tried to find patients who had documentation of pain. And like I said, even though they didn't need a medicine like Subsys, if someone else looked at the chart, it would look like it was legitimate. So right, I tried to cover my ass.

Tr. 01/31/2019 at 183:18-185:9.

The testimony, recounts two important facts, which together, demonstrate the government's theory. First, Awerbuch treated patients who were candidates for Subsys differently than his other patients. Second, patients were prescribed Subsys, not because they needed the drug, but because, after reviewing files, Awerbuch determined that the patient's medical history would permit him to prescribe the drug while "looking legitimate."

Awerbuch's actions as a co-conspirator, while grotesque, demonstrate that he was not engaged in the *legitimate* practice of medicine. This was true when he prescribed Subsys to patients that did not need it. It is also true, that even when he reviewed the patient files of potential candidates for Subsys, he was not practicing medicine. The act of evaluating the patient file for the purpose of finding a patient with chronic pain that would look legitimate, had nothing to do with exercising medical judgement on behalf of the patient.

2. The Medical Standards

It is anticipated that Dr. Thomas will testify that the standard of care for patients with pain, are established by several accepted sources including the Model Policy for the Use of Controlled Substances for the Treatment of Pain, as adopted by the Federation of State Medical Boards of the United States in 2004 and 2013; Universal Precautions in Pain Medicine: A Rational Approach to the Treatment of Chronic; and the Centers for Disease Control, Guideline for Prescribing Opioids for Chronic Pain, March 18, 2016. The framework, or process involved prior to prescribing a controlled substance, requires several steps each of which must occur prior

to a decision to prescribe a controlled substance. Further, that the label, the potency of the drug, and the dangers of abuse and addiction inform the medical judgement of a doctor practicing in the ordinary course of medical treatment prior to the patient specific decision to prescribe a particular drug. Therefore, agreement to be bribed prior to or during the process renders subsequent medical judgement outside the ordinary course of legitimate medical practice.

Expert testimony from a physician is commonly used to establish the relevant standard of care in cases involving allegations that physicians have acted outside the legitimate course of medical practice. See Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994). The government asserts that in this case, it was a reasonably foreseeable that an agreement to pay doctors for prescriptions would result in doctors acting outside the legitimate course of medical practice. To be clear, a lay jury is more than capable of making that factual assessment. The testimony of Dr. Thomas is a simple factual link that will enable the jury to evaluate the evidence in this case.

In their Motion and Memorandum of Law to Exclude Patient Testimony (Dkt.# 645), the Defendants cited *United States v. Binder*, 26 F. Supp. 3d 656, 662, 665 (E.D. Mich. 2014). In *Binder* a District Court judge held that in the absence of expert testimony about medical standards, and where the conduct at issue was not sufficiently outside the norm to appear obviously so to a layperson, patient testimony was not enough on its own to sustain a conviction for prescribing painkillers "outside the course of professional medical practice and for no legitimate medical purpose." *Id*. at 658. The District Court in *Binder* found that patient testimony alone – in that case – was insufficient to convict that defendant.

To be clear, while the defense did not cite it for this purpose, *Binder* stands for the proposition that writing a prescription in return for payment is a fact that a lay jury can consider in determining that a prescription was written outside the course of medical treatment. *Binder*, 26

F. Supp.3d at 662 (citing *United States v. Varma*, 691 F.2d 460, 464 n.2 (10th Cir. 1982)). The testimony of Dr. Thomas is intended to aid the jury in that factual assessment.

  **C.**  **Testimony about off –label use**

The Defendants have asserted that there are no facts suggesting that any defendant intended for Subsys to be prescribed without the practitioner following standard protocols. Defendants, however, ignore settled precedent that permits a finder of fact to rely on evidence of a tacit agreement that "may be inferred from the 'defendants' words or actions and the interdependence of activities and persons involved.'" *United States v. Martin*, 228 F.3d 1, 11 (1st Cir. 2000) (citations omitted). The Defendants assertion is not supported by the facts and law described above, but it also fails because of what each of the Defendants knew (a) about the conduct of prospective co-conspirator clinicians, and (b) about off-label prescribing.

The jury has received evidence that the Defendants targeted outlier prescribers of opioids, called "high decile prescribers." Further, the jury has received evidence that, in carrying out the directive to bribe doctors, the Defendants targeted a number of outlier doctors suspected of inappropriate prescribing. For example, on several occasions, Babich received an email from a sales rep in the Chicago area informing him that Dr. Paul Madison ran a "shady pill mill." Ex. 002. The Defendants knew that Dr. Mahmood Ahmad, a targeted prescriber was suspected of being under investigation, and had lost the ability to receive schedule II opioids at his pharmacy. Likewise, Dr. Xiulu Ruan and Dr. John Couch, also had encountered difficulty receiving schedule II opioids at their pharmacy in Mobile Alabama. Each of these doctors was bribed by the Defendants after they learned of the allegations of inappropriate prescribing. Each of these matters was discussed with John Kapoor.

Dr. Thomas accepts that off-label prescribing is legal. His opinion is that the decision to prescribe off label, must be made pursuant to the standard of care. Employees of pharmaceutical companies are not capable of making this determination. There is evidence that each of the Defendants knew this, and as such there is evidence that by bribing practitioners to write prescriptions for Subsy, or by requiring them to write dosages greater than 200mcg, it was reasonably foreseeable that co-conspirator practitioners would write the drug without the practitioner following standard protocols. This is particularly true where the Defendants knew that certain doctors had been accused of inappropriate prescribing. It is also true where the Defendants chose to financially reward sales reps for obtaining prescriptions for the highest doses of Subsys, without consideration of patient need.

Last, the Defendants argument that Dr. Thomas should be constrained from discussing off label prescribing strains credulity. The Defendants asked Gavin Awerbuch about off-label prescribing. Tr. 01/31/2018 at 131:7-14. The Defendants asked Matt Napoletano about off-label prescribing. Tr. 02/06/22019 at 321-32. They asked Mike Babich about off-label prescribing. Tr. 02/15/2019 at 211. The Defendants even asked Elizabeth Gurrieri, the Director of the IRC, about off-label prescribing. Tr. 02/26/2019 at 212. Suddenly, they assert that there is a great danger that the government's expert offering testimony about the very same topic would somehow be inflammatory for the jury.

Respectfully, the Court should permit the proffered testimony of Dr. Thomas.

### III. CONCLUSION

WHEREFORE, the United States respectfully requests the Motion be denied.

                                                            ANDREW E. LELLING
                                                            United States Attorney

Dated: March 1, 2019      By:    /s/ *K. Nathaniel Yeager*
                                                            K. NATHANIEL YEAGER (BBO # 630992)
                                                            DAVID G. LAZARUS (BBO #624907 )
                                                            FRED WYSHAK, JR. (BBO #535940)
                                                            Assistant U.S. Attorneys
                                                            One Courthouse Way, Ste. 9200
                                                            Boston, MA 02210
                                                           (617) 748-3100
                                                           david.lazarus2@usdoj.gov
                                                           nathaniel.yeager@usdoj.gov
                                                           fred.wyshak@usdoj.gov

**Certificate of Service**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                         /s/ *K. Nathaniel Yeager*

Dated: March 1, 2019         Assistant U.S. Attorney