UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Cr. No. 16-10343-ADB |
| ALEC BURLAKOFF, | |
| Defendant. | |

## DEFENDANT ALEC BURLAKOFF'S SENTENCING MEMORANDUM

The Defendant, Alec Burlakoff, submits this Memorandum with respect to the application of 18 U.S.C. § 3553(a) to the facts and circumstances of the offense of which he has been convicted.  For the reasons reflected in the Memorandum and to be discussed at the sentencing hearing, Mr. Burlakoff respectfully submits that a sentence of five years' probation, a $4,000 fine, a $100 special assessment for each count, and restitution to be determined by the Court is sufficient but not greater than necessary to achieve the purposes of sentencing.

### I.       Introduction

Alec Burlakoff is a dedicated husband and father who has built a loving and fulfilling home life for himself, his wife, and their children.  And as a basketball coach and guidance counselor with both a talent and a passion for working with young people, Mr. Burlakoff has helped dozens of adolescents navigate the difficult transition from childhood to adulthood.

In 2012, Mr. Burlakoff joined Insys Therapeutics as a regional sales manager and was quickly promoted to vice president of sales.  As Mr. Burlakoff will forever regret, he welcomed the high-pressure sales environment of the company and quickly adopted the win-at-all-costs mentality of the company and its founder, Dr. John Kapoor.

As a result, Mr. Burlakoff made the grave mistakes that led to his being charged with these crimes: he implemented a nationwide program whereby Insys would pay healthcare providers to write prescriptions of its only FDA-approved product—the fentanyl spray Subsys—chiefly via honoraria paid to the providers for purported speaking engagements.  As a result, some patients who did not need Subsys—or for whom it was not medically appropriate—were prescribed it anyway.

After being charged in the original Indictment, Mr. Burlakoff began to realize the harm his actions had caused to patients and to his family.  He decided to do the right thing by pleading guilty and cooperating with the government.  He testified for days in this trial and has helped state and federal authorities investigate and prosecute cases against Insys sales representatives and medical providers across the country.

But Mr. Burlakoff's remorse and cooperation with the government do not excuse what he did, and he fully recognizes and appreciates the seriousness and the wrongfulness of this conduct.  He accepts full responsibility not only for the conduct to which he pleaded guilty, but also for the severe consequences that his actions have had on patients, on his family, and on himself.

Above all, Mr. Burlakoff is a kind and ethical colleague, friend, and family man.  Over a dozen letters attesting to his devotion to his family, friends, and colleagues—appended to this memorandum as Exhibit A[1]—show that, whatever mistakes he has made, he should not be sentenced to time in prison and forced to leave his family and community.

As discussed more fully below, an appropriate sentence—one that is sufficient, but not greater than necessary—is five years' probation, a $4,000 fine, and a $100 special assessment for

---

[1] The home addresses of private parties and names of minor children have been redacted in the public ECF filing. Unredacted letters will be provided separately to the Probation Office and the U.S. Attorney's Office.

each count.  Such a sentence is a significant punishment, reflective of the seriousness of the crimes to which Mr. Burlakoff has pleaded guilty, but also acknowledges Mr. Burlakoff's true remorse for his actions and his extraordinary cooperation with the government's prosecution of this matter and other matters which helped ensure the convictions of the other defendants in this case and other members of the Insys conspiracy.

## II.     A Sentence of Five Years' Probation, a $4,000 Fine, and Restitution is a Sufficient But Not Greater than Necessary Sentence Under § 3553(a)

Following *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are "merely advisory, which means that a district court has considerable leeway to impose a sentence that falls outside the range suggested."  *United States v. Robinson*, 433 F.3d 31, 35 (1st Cir. 2005).  The guidelines "are still *generalizations* that can point to outcomes that may appear unreasonable to sentencing judges" and *Booker* allows courts "to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."  *United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006).  In crafting an appropriate sentence, the court must consider the factors set out in 18 U.S.C. § 3553(a) and impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing.  18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

### A.     The Nature and Circumstances of the Offense and History and Characteristics of the Defendant

#### 1.     The History and Characteristics of the Defendant

Mr. Burlakoff was born in 1974 in New York and moved to Florida as an adolescent.  His home life was difficult due to his own mental and physical health problems.  *See* Initial PSR ¶¶ 180, 183.  Mr. Burlakoff also suffered significant violence and abuse at home for much of his childhood.  *See* Initial PSR ¶ 167.

After graduating from college and earning a master's degree in social work, Mr.

Burlakoff began serving as a guidance counselor for middle school children.  As his colleague

from those years, Jason Bates, writes:

> When we met, Alec was working as a junior high school guidance
> counselor and I was teaching and coaching basketball Alec has a
> lifelong passion for basketball and helped coach the middle school
> team. Everybody loved Alec. He was an enthusiastic, caring
> presence on campus. The kids looked up to him for mentorship and
> advice.
>
> Alec was devoted to the wellbeing of the kids and he always
> looked for ways he could be of service. Alec would tell me his
> dream of retiring to New York to set up a youth basketball camp.
> Aside from time with his beloved daughters, working with young
> people on the basketball court is Alec at his happiest and his best.

Exhibit A at 15.

Another close friend from childhood, Jason Dorf, writes:

> Your Honor, Alec's happiest times were when he was working
> with young kids, especially as a basketball coach. In the same way
> that he took me under his wing at camp, I see how good he is with
> underdog players and troubled kids. He has such a positive impact
> and knows just how to speak to these boys. Having been through
> so much, he understands their feelings and their struggles. From
> the bottom of my heart, I hope he finds his way back to a place
> where he can use his greatest gifts to help young kids. There is so
> much good in Alec and I know that he has many years ahead of
> him to be of service to others.

Exhibit A at 17.

Mr. Burlakoff made a career change and entered the pharmaceutical industry, eventually

joining Insys in 2012.  Insys was an extraordinarily high-pressure environment, with Dr. Kapoor

demanding more Subsys sales and more approved Subsys insurance claims, even when those

results were not achievable through lawful tactics.  Mr. Burlakoff let his drive and

competitiveness—which had served him so well as a coach—overcome his judgment.  Others

who remember him from this period, like his lifelong friend Dr. David Liporace, agree.  As Dr.

Liporace writes:

> Part of my medical practice focuses on substance abuse prevention.
> As an Internist, I see the deadly effects of opioids firsthand. I am in
> a difficult position as Alec's friend because I have strong negative
> feelings about his criminal conduct. It is clear to me that he was in
> denial about the terrible harm he was doing. He is intensely
> competitive and he lost perspective. He lacked the wisdom and
> good judgment to see that the damage was not worth any amount
> of money. That said, amongst family and friends, I can see his
> loving heart which makes this situation all the more painful.

Exhibit A at 11-12.

During his time at Insys, Mr. Burlakoff also faced the family tragedy of his brother, Ian,

murdering his own wife (Mr. Burlakoff's sister-in-law), and then threatening police officers with

a gun, causing them to shoot and kill him.  Initial PSR ¶ 172.  This shocking trauma took place in

October 2013, while Mr. Burlakoff was in the midst of the conspiracy at Insys.  Tellingly, Dr.

Kapoor ordered Mr. Burlakoff to return to work after only a matter of days of grieving and

helping his brother's family put their affairs in order.

After Ian's death, and despite having his own children to care for, Mr. Burlakoff went out

of his way to build a relationship with his niece, Ian's daughter.  As she writes:

> What many do not know, and have never asked me about is the
> way my father's death affected my life. With his passing, I was
> forced to go live with my birth mother who I had no relationship
> with. This time was extremely hard for me as I had to pack up
> everything and move to a place called '. . .' a place I never heard
> about with people I never knew. The one thing I had during this
> whole time was my Uncle. My Uncle came up to visit me a lot,
> during this time he took me out to lunch, he took me to universal,
> and we got to do a lot of different things. During that time I did not
> think of the impact it had on my life. It was the only thing that felt
> familiar in my now turned upside-down world.

Exhibit A at 28.

When he left Insys, Mr. Burlakoff returned to the education field as a basketball coach at Combine Academy in Charlotte, North Carolina.  He began once again connecting with students and helping them improving their lives.  As the president of Combine Academy, Jonah Baize, writes:

> Alec was an excellent mentor for the students on and off the court. In addition to coaching, Alec taught youth leadership skills, physical education, and elective sports courses. I saw him go above and beyond to help the most vulnerable students in our school. In one instance, we had a student whose mother struggled with alcohol and drug abuse. This young man started to show absences so Alec reached out to provide transportation and breakfast. Alec supported and guided this student and turned his life around.

Exhibit A at 20.

Similarly, Alexandra Peoples—a parent of one of Alec's students—writes about how Mr. Burlakoff helped her son feel "like his life was getting back on track."

> Coach Burlakoff started working with [my son] and immediately understood the behavior and health problems. Coach Burlakoff had social work training and a gift for coaching basketball. He took [my son's] phone calls outside of work hours and kept in touch with me via phone and text. When my son needed to vent his anger, Coach Burlakoff allowed him to express his strong feelings safely. They developed a mutual respect for each other. [My son] knew that Coach Burlakoff was on his side and as a result I started to see a child that I knew prior to the accident.

Exhibit A at 1.

Mr. Burlakoff has also worked hard to understand and atone for the crimes he committed while he worked at Insys.  Justin Paperny—who runs a business dedicated to helping those in the criminal justice system come to terms with their actions and return to productive lives—has observed firsthand Mr. Burlakoff's genuine contrition and remorse.  As Mr. Paperny writes:

> He was clear from our first call that he was under investigation for bad choices he made while working as an executive at Insys Pharmaceutical Company. While he could not get into all of the details, he made clear he was in this predicament because of his

> shortsighted and bad choices. He repeated again and again that he
> alone was to blame and that there was nothing he could say to
> justify or excuse his actions.
>
> From my first call with Alec, I appreciated his willingness to
> accept responsibility. Rather than blame others, he owned the
> reality that significant consequences would follow his poor
> choices. On that call he wondered if reconciliation with his
> victims, family and community could ever be possible, and if it
> were possible, what would it look like.

Exhibit A at 22.

Finally, Mr. Burlakoff emphasizes his family above all the other things in his life. His

oldest daughter's moving letter to the Court makes plain how much his family means to him, and

how much he means to his family:

> Anyone who knows my dad and our family will tell you that the
> relationship my father and I have with each other is unlike any
> other. He is my rock. I cannot even express to you how strongly I
> love him, and just like I know he would do anything for me, I
> would give up anything and everything I have if it would help him.
> We are a team.

Exhibit A at 8.

Mr. Burlakoff's commitment to his colleagues, his community, and his family comes

through in these and many similar letters submitted to the Court.

2.      The Nature and Circumstances of the Offense

In 2012, Mr. Burlakoff began working for Insys and joined the conspiracy. The Court

heard weeks of evidence about the conspiracy and Mr. Burlakoff's role in it, including several

days of testimony from Mr. Burlakoff himself. The Court recently summarized the trial evidence

in detail, relying on Mr. Burlakoff as one of the four trial witnesses whose trial testimony was

"most relevant" to the Court's distillation of the evidence. ECF No. 1028, at 5 n.3.

For consideration of an appropriate sentence for Mr. Burlakoff, the most important events

are the ones that happened after the offense was committed. Upon recognizing his criminal

conduct and deciding to plead guilty, Mr. Burlakoff began full-scale cooperation with the government.  That cooperation helped the government bring not only the defendants in this case to justice, but materially aided investigations and prosecutions of providers and other Insys personnel around the country.  There is no better evidence of Mr. Burlakoff's real regret and remorse at his actions than his decision not only to admit them and plead guilty without a plea agreement, but his even more difficult decision to testify at the trial of his friends and former colleagues.

Additionally, Mr. Burlakoff also disagrees with some aspects of the sentencing analysis in the Initial PSR—namely the calculations of loss and drug quantity and the appropriate enhancement for Mr. Burlakoff's role in the offense—which are discussed briefly below as well.

      a.  Mr. Burlakoff Substantially Assisted the Government's Prosecution of this Case

The Court had the opportunity to see Mr. Burlakoff's cooperation in this matter firsthand at trial.  Mr. Burlakoff testified on seven separate trial days, offering key testimony about each of the trial defendants.  The Court's recent memorandum opinion on post-trial motions not only identifies Mr. Burlakoff's testimony as one of the four "most relevant" for the Court's factual recitation, ECF No. 1028, at 5 n.3, but it also repeatedly cites Mr. Burlakoff's testimony to establish critical facts about the Insys conspiracy and each of the trial defendants' role in the conspiracy, *see*, *e.g.*, ECF No. 1028, at 7 n.38, 31-32 n.86, 33, 35, 36 n.90, 63-64, 63 n.101, 78-79 n.111.  Mr. Burlakoff's testimony on its own plainly constitutes substantial assistance to the government's prosecution of this case.

Moreover, only a few short months after Mr. Burlakoff agreed to plead guilty and cooperate, an even more senior Insys executive—former CEO Michael Babich—agreed to do the same.  Without Mr. Burlakoff's decision to plead guilty and testify against his codefendants—

including Mr. Babich—Mr. Babich likely would have never pled guilty and proceeded to trial.

Instead, both Mr. Burlakoff and Mr. Babich testified for the government and gave detailed, in-

the-room testimony that provided the jury the necessary evidence to convict Dr. Kapoor and the

other trial defendants.

> b.  Mr. Burlakoff Substantially Assisted Many Other Prosecutions of
>     Providers and Insys Representatives Around the Country

As the government already represented to this Court, Mr. Burlakoff has assisted in

investigations of providers and Insys employees being conducted by United States Attorneys

Offices in at least eight districts, as well as by certain other Department of Justice components

and certain state authorities.  As Mr. Burlakoff expects the government's anticipated motion

under U.S.S.G. § 5K1.1 to detail, Mr. Burlakoff's assistance in these investigations has been

extremely valuable and resulted in meaningful advancement of the investigations toward

successful conclusions.

> c.  Mr. Burlakoff's Relevant Conduct For Sentencing Purposes Excludes
>     Conduct He Testified About At Trial

Pursuant to Mr. Burlakoff's cooperation agreement, both the government and Mr.

Burlakoff contend that the relevant conduct that may be considered for purposes of calculating

Mr. Burlakoff's guideline range is highly constrained.  For one thing, U.S.S.G. § 1B1.8(a)

applies here to foreclose reliance on Mr. Burlakoff's trial testimony and other information

provided pursuant to his cooperation agreement, except in certain circumstances.  Moreover,

under the specific terms of Mr. Burlakoff's cooperation agreement, the government has obligated

itself to take the position before this Court that Mr. Burlakoff's trial testimony and other

information provided pursuant to his cooperation agreement should not be considered at

sentencing, regardless of whether one of the U.S.S.G. § 1B1.8(b) exceptions applies.

The Probation Office has—understandably—prepared similar offense conduct submissions for all the defendants in this matter, including those who proceeded to trial.  While that approach is often permissible, in these circumstances it results in substantial offense conduct submitted to the Court in the Initial PSR that cannot properly be considered for purposes of Mr. Burlakoff's sentencing and that, even if it *could* be considered, the government and Mr. Burlakoff agree *should* not be considered.

   d.   The Initial PSR's Loss And Drug Quantity Analyses Are Flawed

Although Mr. Burlakoff agrees with the Probation Office's loss calculation and drug quantity methodologies insofar as they are both based on the estimated value and weight of medically unnecessary Subsys prescriptions, Mr. Burlakoff disputes certain aspects of the loss and drug quantity estimates.

First, the loss calculation and drug quantity estimates cover too long a time period.  The estimates cover the period from Subsys' launch date in March 2012 to the end of 2015.  They therefore hold Mr. Burlakoff—who joined Insys in June 2012—responsible for allegedly fraudulent Subsys prescriptions written before he was ever employed at Insys and joined the conspiracy.  Moreover, the Initial PSR notes that the use of speaker programs did not begin until at least August 2012, and it is undisputed that many of the 13 co-conspirator prescribers did not become speakers until months afterwards.  The value and weight of prescriptions written by any given provider cannot be considered until after the time that provider began receiving bribes in the form of speaker program honoraria.  The government has not met its burden to prove the loss amounts and drug quantity based on medically unnecessary Subsys prescriptions using these criteria.

Second, although Mr. Burlakoff agrees that the value and weight of medically unnecessary Subsys prescriptions should form the basis of the loss and drug quantity

calculations, the estimates in the Initial PSR presuppose that all Subsys prescriptions for off-label conditions are not medically necessary. The right of practitioners to prescribe off-label products is protected by federal law, and it requires more than the fact that any given prescription was off-label to show that any given prescription was not medically necessary. No such showing has been made to date as to more than a relatively small group of patients whose cases were specifically presented at trial. The government has similarly not met its burden to prove the loss amounts and drug quantity based on medically unnecessary Subsys prescriptions using these criteria.

          e.   The Evidence Does Not Support a Four-Level Enhancement for Mr. Burlakoff's Role

The evidence presented at trial does not warrant a four-level enhancement for Mr. Burlakoff. That enhancement is most appropriate for the one individual who is the undisputed leader of the conspiracy. *See*, *e.g.*, *United States v. Aboshady*, No. 1:16-cr-10278-NMG, ECF No. 334 at 16 (D. Mass. Feb. 6, 2019) (declining to apply four-level enhancement where overall conspiracy "clearly [had] a leader" that was another individual). Here, the undisputed leader of Insys—and the overall conspiracy—was Dr. Kapoor. No one else merits the full four-level enhancement for the leader of the conspiracy under U.S.S.G. § 3B1.1(a).

Admittedly, Mr. Burlakoff did supervise others involved in the criminal activity at Insys, which involved more than five participants. Application of the three-level enhancement under U.S.S.G. § 3B1.1(b) is therefore appropriate.

**B.**    **The Sentencing Guidelines**

For the reasons discussed above, prior to any downward departures or variances, the sentencing guideline range is 8-14 months. The guideline range is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §§ 2B1.1(a)(2), 2E1.1) | 6 |
| Specific Offense Characteristics (U.S.S.G. § 2B1.1(b)(1)(D)) | 0[2] |
| Specific Offense Characteristics (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | 2 |
| Adjustment for Role in the Offense (U.S.S.G. § 3B1.1(b)) | 3 |
| Total Offense Level (Count Group 1): | 11 |
| | |
| Base Offense Level (U.S.S.G. §§ 2D1.1(a)(5), 2D1.1(c)(5)) | 12[3] |
| Total Offense Level (Count Group 2): | 12 |
| | |
| Adjustment for Multiple Counts (U.S.S.G. § 3D1.4) | 2 |
| Combined Adjusted Offense Level: | 14 |
| | |
| Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a), 3E1.1(b)) | -3 |
| | |
| Total Offense Level | 11 |

As discussed above, Mr. Burlakoff has no criminal history, so his Criminal History Category is I. An offense level of 11 with a criminal history category of I results in a guidelines range of 8-14 months.

## C.    Just Punishment and Deterrence

The recommended sentence of five years' probation, a $4,000 fine, a $100 special assessment for each count, and restitution to be determined by the Court is a severe sentence that will provide adequate deterrence and promote respect for the law. The First Circuit has recognized that deterrence does not necessarily equate to incarceration, even in economic crimes cases where the loss is in the millions of dollars. *See generally United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) (affirming sentences of six months home confinement and 3 years of

---

[2] As discussed in Section II.A.2.c-d, *supra*, the government has not met its burden to establish the loss amount based on medically unnecessary Subsys prescriptions written while Mr. Burlakoff was employed at Insys and without reference to evidence excluded by U.S.S.G. § 1B1.8(a) or by the terms of Mr. Burlakoff's cooperation agreement. Mr. Burlakoff therefore contends the appropriate loss amount for guidelines purposes is $0.

[3] As discussed in Section II.A.2.c-d, *supra*, the government has not met its burden to establish the drug quantity based on medically unnecessary Subsys prescriptions written while Mr. Burlakoff was employed at Insys and without reference to evidence excluded by U.S.S.G. § 1B1.8(a) or by the terms of Mr. Burlakoff's cooperation agreement. Mr. Burlakoff therefore contends the appropriate drug quantity for guidelines purposes is the less than 4 grams of fentanyl provision found in U.S.S.G. § 2D1.1(c)(14).

probation despite GSR of 87-108 months).  Judge Stearns' remarks at the sentencing hearing in

*Prosperi* are equally applicable to this case:

> I think it is very difficult at times, for those of us who are judges or
> prosecutors or lawyers, to put ourselves in the shoes of a person
> with no prior experience with the criminal justice system who finds
> himself or herself accused of a crime.  I do not think, sometimes,
> we fully recognize the anguish and the penalty and the burden that
> persons face when called into account, as these men are, for the
> wrong that they committed.

*Prosperi*, 686 F.3d at 48 (noting that the burdens of the criminal process on the particular

defendants would provide adequate specific deterrence).

Mr. Burlakoff comes before this Court with no prior experience with the criminal justice

system.  As discussed at length in the letters submitted by his colleagues, friends, and family

members, he has already had to face his community, admit that he has pleaded guilty to the

crimes charged in the Second Superseding Indictment, and address their shock and disbelief at

the situation he now finds himself in.  And Mr. Burlakoff's cooperation with the government—

including seven days on the witness stand in this case—further required him to testify in detail

about his involvement in the criminal activity at Insys and admit his wrongdoing before a large

audience.  Moreover, the substantial press coverage and social media attention in this case

magnified each such admission many times over.  Accordingly, the "anguish and the penalty and

the burden" here have already been significant.

Moreover, the outpouring of support from Mr. Burlakoff's community—reflected in the

many letters from colleagues, longtime friends, and family—demonstrates that, after leaving the

long shadow of Insys, Mr. Burlakoff has made significant efforts to rebuild his life and atone for

his wrongful conduct.  A lengthy prison sentence is not necessary to deter Mr. Burlakoff from

any future criminal conduct, nor is it necessary to protect the public.

### D.     The Kinds of Sentences Available

The Court has at its disposal a myriad of sentencing options in framing a just sentence for Mr. Burlakoff, including probation combined with other measures the Court may deem appropriate, such as home confinement or community service.  A sentence of five years' probation—combined with any measures like home confinement or community service that the Court sees fit to impose—will best achieve the goals of sentencing by imposing a significant, but no greater than necessary, punishment on Mr. Burlakoff that will permit him to continue to be active in the lives of his friends and family.

### E.     Grounds For Departure/Variance

Even if the Court determines the applicable guideline range to be as advanced by the Probation Office and the government, Mr. Burlakoff's recommended non-incarceration sentence is still appropriate here for three compelling, substantial bases for this Court to depart downward from the guidelines range.  Taken together, they warrant a downward departure from any guidelines range to a sentence without prison time, such as the one Mr. Burlakoff recommends.

First, as discussed in detail above, Mr. Burlakoff substantially assisted the prosecution of this case and several others being pursued by various state and federal authorities around the country.  The government has said that it anticipates—and Mr. Burlakoff also anticipates—that the government will file a formal motion under U.S.S.G. § 5K1.1 asking that the Court depart downward as a result of this extensive cooperation.  Even in the absence of such a formal motion, Mr. Burlakoff respectfully submits that his cooperation is extraordinarily relevant conduct warranting a departure here.

Second, even if the Court determines that the government has proven appreciable loss and drug quantity here, a downward departure is warranted to mitigate the unduly harsh application of the loss and drug quantity calculations.  Numerous courts have observed that the

intended loss calculation artificially, and often arbitrarily, drives the total offense level and corresponding prison time upward.  The heavy emphasis on the concept of financial loss in determining punishment for economic crimes has justifiably been criticized for years.  *See, e.g.*, *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (the "Guidelines place undue weight on the amount of loss involved in the fraud" given that often "the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.").

Accordingly, Application Note 20(C) to § 2B1.1 provides that where the offense level determined under U.S.S.G. § 2B1.1 "substantially overstates the seriousness of the offense" a downward departure may be warranted.  So it is here.  As discussed above, the calculation of loss by the Probation Office overstates Mr. Burlakoff's conduct here.  If the Court determines that the Initial PSR's loss calculation is appropriate, then Mr. Burlakoff respectfully submits that a departure is warranted to correct for the substantial overstatement that such a loss calculation would work on his guidelines analysis.  Moreover, although no commentary similar to Application Note 20(C) exists with respect to the drug quantity amount, the underlying rationale of using a departure from the guidelines range to mitigate substantial overstatement of the seriousness of the offense applies here.

Finally, Mr. Burlakoff respectfully submits that the Court should consider imposing a sentence other than a sentence of imprisonment for a "nonviolent first offender" like Mr. Burlakoff.  A "nonviolent first offender" is defined as a "defendant who has no prior convictions . . . and who did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense of conviction."  *See* U.S.S.G. § 5C1.1.  It is undisputed that Mr. Burlakoff qualifies as a "nonviolent first offender."  Accordingly, regardless

of whether § 5C1.1 formally applies based on the outcome of the Court's guidelines calculation,

Mr. Burlakoff respectfully submits that the Court should consider this position of the Sentencing

Commission in fashioning an appropriate sentence for him.

### F.    Avoiding Sentencing Disparities

In determining an appropriate sentence, the Court should take into account "the need to

avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Here, a number of other individuals

have cooperated with the government's investigation and received non-incarceration sentences:

- In *United States v. Karen Hill*, Case No. 1:17-cr-139-CG (S.D. Ala.), Ms. Hill pleaded guilty to a one-count information charging conspiracy to violate the Anti-Kickback Statute.  Judge Callie V.S. Granade sentenced Ms. Hill to five years' probation, with the first six months to be served as home confinement.  *See United States v. Karen Hill*, Case No. 1:17-cr-139-CG, ECF No. 25 (S.D. Ala. June 4, 2019).

- In *United States v. Natalie Levine*, Case No. 3:17-cr-147-JBA (D. Conn.), Ms. Levine pleaded guilty to a one-count information charging conspiracy to violate the Anti-Kickback Statute.  Judge Janet B. Arterton sentenced Ms. Levine to five years' probation, with the first six months to be served as home confinement.  *See United States v. Natalie Levine*, Case No. 3:17-cr-147-JBA, ECF No. 57 (D. Conn. July 1, 2019).

- In *United States v. Natalie Perhacs*, Case No. 1:16-cr-24-CG (S.D. Ala.), Ms. Perhacs pleaded guilty to a one-count information charging conspiracy to violate the Anti-Kickback Statute.  Judge Callie V.S. Granade sentenced Ms. Perhacs to five years' probation, with the first six months to be served as home confinement. *See United States v. Natalie Perhacs*, Case No. 1:16-cr-24-CG, ECF No. 28 (S.D. Ala. Apr. 24, 2018).

- In *United States v. Heather Alfonso*, Case No. 3:15-cr-111-JBA (D. Conn.), Ms. Alfonso pleaded guilty to a one-count information charging conspiracy to violate the Anti-Kickback Statute.  Judge Janet B. Arterton sentenced Ms. Afonso to three years' probation. *See* Press Release, United States Attorney's Office, District of Connecticut, *APRN Who Received Kickbacks from Insys Therapeutics for Prescribing Fentanyl Spray is Sentenced* (Nov. 26, 2019), *available at* https://www.justice.gov/usao-ct/pr/aprn-who-received-kickbacks-insys-therapeutics-prescribing-fentanyl-spray-sentenced.

Although all of these individuals cooperated with the government and provided valuable assistance, none of them provided the kind of cooperation that Mr. Burlakoff did.  Mr. Burlakoff, by virtue of his senior position, provided live, in-the-room testimony implicating all of the Insys executives who went to trial in this matter.  Moreover, by virtue of his national sales responsibilities, Mr. Burlakoff was able to assist in investigations of Insys sales representatives and medical providers by state and federal authorities around the country.  It would create unwarranted disparities for Mr. Burlakoff to face time in prison when other, similarly situated individuals who cooperated with the government received probation sentences.

## III.   Conclusion

For the foregoing reasons, Mr. Burlakoff respectfully submits that the Court impose a sentence of five years' probation, a $4,000 fine, a $100 special assessment for each count, and restitution to be determined by the Court.

Respectfully submitted,

/s/ *Joshua N. Ruby*
Peter E. Gelhaar (BBO# 188310)
George W. Vien (BBO# 547411)
Joshua N. Ruby (BBO# 679113)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
peg@dcglaw.com
gwv@dcglaw.com
pkl@dcglaw.com
jnr@dcglaw.com

Dated: December 18, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 18, 2019.

<u>/s/ <i>Joshua N. Ruby</i></u>
Joshua N. Ruby
