UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 16-10343-ADB |
| | ) | |
| v. | ) | |
| | ) | |
| (1) MICHAEL L. BABICH | ) | |
| | ) | |
| (2) ALEC BURLAKOFF | ) | |
| | ) | |
| (3) MICHAEL J. GURRY | ) | |
| | ) | |
| (4) RICHARD M. SIMON | ) | |
| | ) | |
| (5) SUNRISE LEE | ) | |
| | ) | |
| (6) JOSEPH A. ROWAN | ) | |
| | ) | |
| (7) JOHN N. KAPOOR | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## UNITED STATES' CONSOLIDATED SENTENCING MEMORANDUM

<u>INTRODUCTION</u>

Sheer greed caused each of the defendants in this case not only to participate in a massive campaign of bribery and fraud, but to ignore the dangers of a drug that is 70 to 100 times more potent than morphine.  The criminal agreement at the heart of this case was driven by that greed, and it destroyed the health and safety of patients throughout the United States.  For that reason, and others discussed below, the government recommends the following sentences, adjusted for the each defendant's varying culpability and degree of cooperation:

| Defendant | Crime | Offense Level | GSR | Sentence Recommendation |
|---|---|---|---|---|
| John **KAPOOR** | 18 U.S.C. §1962(d) | 39 | 262-327 months | 180  months |
| Michael **GURRY** | 18 U.S.C. §1962(d) | 39 | 262-327 months | 132 months |
| Richard **SIMON** | 18 U.S.C. §1962(d) | 39 | 262-327 months | 132 months |
| Joseph **ROWAN** | 18 U.S.C. §1962(d) | 41++ | 324-405 months | 120 Months |
| Sunrise **LEE** | 18 U.S.C. §1962(d) | 39 | 262-327 months | 72 months |
| Michael **BABICH** | (1) 18 U.S.C. §371 (2) 18 U.S.C. §1341 | 36 | 188-235    months | 66 months |
| Alec **BURLAKOFF** | 18 U.S.C. §1962(d) | 36 | 188-235 months | 60 months |

1

<u>ARGUMENT</u>

I.    Each of the § 3553(a) Factors Compel a Meaningful Term of Incarceration

In fashioning an appropriate sentence, courts consider the nature and circumstances of the offense, as well as the history and characteristics of each defendant pursuant to 18 U.S.C. § 3553(a).  Each of the defendants are discussed further below and in separate supplemental memorandums filed for each individual; however, consideration of the nature and circumstances of the offense should influence the appropriate individual sentence in the same way.  The statutory factors relevant to consideration of the nature and circumstances of the offense include, the seriousness of the offense, the need for the sentence imposed to promote respect for the law and to constitute just punishment, general deterrence, and the importance of avoiding unwarranted sentencing disparities among similarly situated defendants.

A.  The Seriousness of the Offense

By mailing bribes to high volume prescribers, the defendants in this case facilitated fraud.[1]  The seriousness of their offense is demonstrated both by the context in which the scheme was committed and by the impact of the crime.[2]

---

[1] <u>Memorandum and Order on Defendants' Motions for Judgment of Acquittal and For a New Trial</u>, ECF No. 1028, at 29 ("Order").

[2] Following the Court's Order, several defendants have objected to the Court considering facts that they assert are related only to the dismissed predicate activity.  The Court, however, explicitly found that the bribes mailed to practitioners were related to the remaining predicate acts of mail and wire fraud.  Order at 29.  The Court also found that the bribes were intended to incentivize prescriptions from "high volume" prescribers.  <u>Id</u>.  Further, the Court found that prior authorization specialists did mislead insurers concerning off-label prescriptions that were in fact medically illegitimate.  <u>Id</u>. at 30 (citing the testimony of Gavin Awerbuch and Heather Alphonso).  The court found all these facts without finding that the government proved specific intent to commit Honest Services Fraud or to violate the C.S.A.  The bribes, therefore, are relevant conduct in this case, as are all facts related to those bribes including the identities and known conduct of high volume prescribers, and the impact of the bribes on patients.  <u>United</u>

2

1.   The Opioid Crisis

Throughout this case, the defendants have tried to minimize their role in the opioid crisis.[3]   This is a familiar tactic used by companies that sell opioids.  Indeed, before being ordered to pay the State of Oklahoma $572 million in October 2019, Johnson & Johnson asserted that all of its opioid products accounted for less than one percent of total opioid prescriptions in the United States.[4]  Likewise, in defending its marketing of oxycodone, Purdue Pharma has asserted that it was only responsible for 2% of all opioid prescriptions in the United States.[5]  The defendants' argument, like the tired arguments of major opioid manufacturers, is no better than asserting that 'everyone' is guilty.

---

States v. Eisom, 585 F.3d 552, 557 (1st Cir. 2009)(holding that relevant conduct includes anything with a sufficient nexus to the crime of offense: "part of a common course of conduct, scheme, or plan that includes the offense of conviction.").  Moreover, regardless of what is appropriate under the USSG, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

[3] At least twice during opening statements counsel for one of the defendants asserted that their client's conduct had nothing to do with the opioid epidemic.  01/28 Tr. 89:14 and 90:19-20. During cross examination of a government medical expert, the defendants sought to introduce evidence that Subsys only accounted for .03% of all opioids prescribed in the United States. 03/05 Tr.  92: 11-14.  The defendants' objections to their respective PSRs, which are nearly identical, also seek to minimize the role of Subsys in the Opioid Crisis.  See Objections and Comments to Presentence Report, Letter from Attorney Kosta S. Stojilkovic, dated October 22, 2019 (using language parroted by counsel for at least three other defendants, counsel for Kapoor asserts that Subsys was only responsible for a "tiny fraction" of the overall number of prescriptions for opioids written during the conspiracy).

[4] https://www.factsaboutourprescriptionopioids.com.

[5] Dina Gusovsky, Americans Consume Vast Majority of the World's Opioids, CNBC (Apr. 27, 2016, 9:13 AM), http://www.cnbc.com/2016/04/27/americans-consume-almost-allof-the-global-opioid-supply.html [https://perma.cc/CWP8-YPQV].

In 2012, the first year of the conspiracy in this case, American physicians wrote approximately 256 million prescriptions for opioids.[6]  By 2015, the last year of the conspiracy, physicians wrote roughly 300 million opioid prescriptions, more than one for every adult in the United States.[7]  Whatever the defendants in this case claim to be a "tiny fraction," even a relatively small number of prescriptions were a huge number.  The defendants' crime – the conscious decisions they made to enrich themselves at the expense of patients, insurers and the American health care system writ large – unquestionably contributed to a crisis that has devastated our communities, our families, and our nation.

Equally important, the conspiracy in this case was formed, and carried out, in the midst of a national epidemic of opioid abuse.  When the defendants decided to bribe doctors to write prescriptions for a drug that is 70 to 100 times more potent than morphine, they did so in the context of the opioid crisis.  When the defendants lied to insurers, guaranteeing access to an incredibly potent drug that most patients could not otherwise afford, they did so in the context of the opioid crisis.  When the defendants identified, pursued, and paid high volume pill mill operators, they did so in the context of the opioid crisis.  When the defendants asked co-conspirator doctors to increase the dosages of Subsys in order to increase profits, they did so in the context of the opioid crisis.  Now, at sentencing, the context in which this crime was committed should not simply disappear.  When the Court sentences each of the defendants, it should do so after considering the seriousness of the crime in the somber context in which it was conceived and carried out.

---

[6] 03/05 Tr.  92: 11-14.
[7] Sarpatwari et al, "The Opioid Epidemic: Fixing a Broken Pharmaceutical Market," Harvard Law & Policy Review, Volume 11, 2017 at 464.

2.   The Bribes

The defendants paid millions of dollars to doctors in exchange for prescribing greater quantities and dosages of one of the most potent opioids available for sale in the United States. As described below, their crime involved the conscious and reckless risk of death or serious injury.

a.   Pill Mills

The success of the conspiracy began with how the defendants chose the speakers they would bribe.  Practitioners were ranked in groups based upon the number of opioid prescriptions that they wrote. [8]  The defendants then focused speaker program bribes on prescribers that wrote the largest volume of opioid prescriptions, e.g. "high decile" practitioners.[9]

While it may be true that drug manufacturers often target high prescribers in their respective markets, most drugs are not abusively prescribed by pill mill operators.   Several of the defendants in this case, including Kapoor, Burlakoff, Gurry, Simon, and Rowan, had extensive experience in the American health care market, and therefore knew that pill mill operators are a reality in the opioid industry. The threat of such doctors always existed; but as the scheme was carried out nationwide, Kapoor, Babich, Burlakoff, Simon, Rowan, and Lee explicitly chose to bribe doctors that they knew abusively prescribed opioids.   For instance, the defendants bribed Dr. Paul Madison, who ran a pill mill;[10] Dr. Mahmood Ahmad who was not able to dispense schedule II narcotics from his pharmacy and who was suspected of being under

---

[8] 03/01 Tr. 154:3-8.
[9] 03/01 Tr. 154: 9-11.
[10] 02/22 Tr. 49:3-13; Ex. 002; Ex. 003 (involving Kapoor, Babich, Burlakoff, and Lee).

investigation by the DEA;[11] Dr. Gavin Awerbuch, who was arrested and charged with the

illegal distribution of Subsys;[12] and Drs. Couch and Ruan, who wrote so many Subsys

prescriptions, a wholesaler cut off supplies of fentanyl products to their pharmacy and who

were ultimately arrested and charged with illegal distribution of Subsys.[13]

At trial, Burlakoff testified,

…being raised in pharmaceuticals, in pain management at Cephalon and Insys,
especially from coaching as far as targeting from Dr. Kapoor and Mike Babich,
pill mills for us meant dollar signs.  That's what we saw, dollar signs.  It was not
run the other way.  It was run to the pill mill.[14]

b.  Higher Dosages

The danger of the defendants' crime was not limited simply to the identity of the

physicians they chose to bribe.  The defendants knew that the higher the dose prescribed, the

longer the patient stayed on the drug, and the more money the company would make.[15]  So, the

defendants made it their mission not only to target pill mills, but to convince these doctors to

write prescriptions for higher dosages of Subsys.  For instance, in September 2012, with each of

the defendants copied, Burlakoff sent an email to the entire sales force warning that they would

receive an email "each and every time" a  prescriber in their territory wrote a prescription for the

lowest dosages of Subsys, e.g. prescriptions for 100 mcg or 200mcg."[16]  The email explained

that, "[t]he goal is to generate … Subsys patients whom believe in the safety and efficacy behind

---

[11] 02/22 Tr. 56:9-19 & Ex. 004 (involving Kapoor, Babich, Burlakoff, and Simon).
[12] 01/31 Tr. 104:15-17; 02/22 Tr. 56:23-57:2 (involving Kapoor, Babich, Burlakoff, and Lee).
[13] 02/22 Tr. 57:24-59:7 & Exs. 39 and 133 (involving Kapoor, Babich, Burlakoff, and Rowan);
United States v. John Patrick Couch et al, No. 13-R-00521, October 29, 2015 (S. D. Alabama).
[14] 03/05 Tr. 142: 2-7.
[15] Ex. 455; 02/22 Tr. 37:3-7.
[16] Ex. 445.

this product, hence these patients will continuously refill their months prescriptions indefinitely. This of course equates to residual income for you! …"[17]

By knowingly targeting pill mill doctors, and advocating higher dosages of Subsys, the defendants put innumerable patients' lives at risk.  This factor alone underscores the need for a significant sentence of incarceration in this case.

c.    The Patients

The impact of the conspiracy on the lives and health of patients was monumental; it is not speculative or hypothetical.  Dr. Gavin Awerbuch, the operator of a pain practice in Michigan explained at trial how his agreement with the defendants destroyed his ability to exercise independent medical judgement for patients suffering from chronic pain.[18]  Likewise, Heather Alfonso, a former Advanced Practice Registered Nurse in Connecticut, testified that, as a result of being bribed, she prescribed Subsys to her patients when she knew that it was medically unnecessary.[19]

The most compelling testimony regarding the impact of this crime, however, came from the patients of bribed doctors.  Alicia Hinesley, a patient of Mahmood Ahmad, testified that when she took Subsys, it rendered her unable to work or take care of her family.[20]  Michele Kamzyuk Dilisio, a patient of Heather Alphonso, testified that Subsys caused her severe fatigue and garbled speech.[21]   Sara Dawes, also a patient of Alfonso, spent most of her time in bed,

---

[17] Ex. 445.
[18] 01/31 Tr. 183:18-185:9.
[19] 02/11 Tr. 122:19-123:18.
[20] 03/28 Tr. 193:24-25.
[21] 03/28 Tr. 137:17-21.

unable to function.[22]    Patients also suffered significant cognitive impairment.  Paul Lara, a patient of Dr. Judson Somerville, testified that Subsys took his pain away, but made him feel like he wasn't "all there."[23]  Mr. Lara, who was prescribed the highest dose of Subsys, suffered significant hallucinations after he started taking the drug.[24]  Betty Carrera, also a patient of Somerville, also suffered from hallucinations and was unable to function as a normal human being.[25]

In addition, the prescriptions written by the co-conspirators had a long term impact on the health of patients.  When Alfonso was arrested, Michele Kamzyuk Dilisio was abruptly taken off of Subsys, and as a result, suffered from severe withdrawal.[26]  The same was true of Ms. Dawes[27]and Ms. Carrera.[28]  Cathy Avers, a patient of co-conspirator Dr. Paul Madison, became addicted to Subsys while taking the medication.[29]  Like others, when she stopped taking the drug, she suffered withdrawal symptoms.[30]  Woodrow Chestang, a patient of Xiulu Ruan, also became addicted and suffered hallucinations, nausea, and fever during withdrawal.[31]  To this day, Mr. Chestang takes Suboxone to manage his addiction.[32]

The defendants have repeatedly criticized this prosecution as overcharged; a cynical, politically driven excuse to address the opioid crisis in the United States.  The trial record in this

---

[22] 03/21 Tr. 78:13-19.
[23] 03/20 Tr. 158:1-2.
[24] 03/20 Tr. 165:23-166:17.
[25] 03/21 Tr. 192: 1-25.
[26] 03/28 Tr. 147:22-148:1.
[27] 03/21 Tr. 80:15-16.
[28] 03/21 Tr. 193:4-16.
[29] 03/20 Tr. 136:2-14.
[30] 03/20 Tr. 137:5-138:2.
[31] 03/22 Tr. 56:11-19, 59: 16-25; and 60:17-19.
[32] 03/22 Tr. 60:19-61:6.

case demonstrates the opposite.  This crime caused substantial, real, and lasting harm to the patients of bribed doctors.  For that reason, it merits a substantial sentence of incarceration for each defendant.

3.   The Fraud On Insurers

The defendants engaged in a massive insurance fraud scheme by opening and operating a call-center from which they lied to insurers on a daily basis to ensure payment for Subsys.  In particular, they lied about the reason doctors were prescribing Subsys – claiming it was for breakthrough cancer pain when it wasn't.  For example, IRC call center operator Kim Fordham testified:

> Q. Tell the jury, please, when you go to work on a daily or weekly basis, how often would you see and be asked to work on files for patients who were other than breakthrough cancer pain in cancer patients?
>
> A. I had more charts that were just regular breakthrough pain and back diagnosis. I rarely saw a cancer pain patient.
>
> Q. And for the non-cancer pain patients, I believe you testified that you did, basically, what you had to do to get those approved by the insurance companies, right?
>
> A. Yes.
>
> Q. And that included lying?
>
> A. Yes.
>
> Q. On a daily basis?
>
> A. Yes.[33]

---

[33] 02/11 Trial 67:8-21

By any reasonable estimate,[34] the defendants' scheme caused an overwhelming amount of loss to both insurers and patients.

      a.   Insurer Loss

A number of patient victims in this case have asserted that they are entitled to restitution for co-pays, lost wages, and ongoing medical treatment.[35]  Because most of the patients were and are insured; however, much of the out-of-pocket expenses caused by this crime were incurred by public and private third-party payors.[36]  To date, the United States has received restitution claims from 7 different commercial insurers, which combined, assert that they are entitled to restitution in excess of $169,650,045.02.[37]  Further, as the Court heard at trial, Medicare regulations do not permit or authorize payment for the off-label use of Subsys.[38]  Yet, an analysis of Medicare claims data demonstrates that Medicare paid $167,605,192 for off-label

---

[34] For the purposes of sentencing, "[t]he court need only make a reasonable estimate of the loss." USSG § 2B1.1, cmt. n.3. It is settled law that, calculating reasonable loss, "is more an art than a science. Courts can, and frequently do, deal with rough estimates." United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995). Further, "[i]ntended loss does not have to be determined with precision; the court needs only to make a reasonable estimate in light of the available information." U.S. v. Thurston, 358 F.3d 51, 69 (1st Cir. 2004); U.S. v. Leja, 490 F.Supp.2d 83 (D. Mass. 2007) (same).

[35] In light of the number of patients and insurers potentially impacted by the conspiracy in this case, as well as the complexity of the crime, the government requested and obtained authorization to use alternative victim notification procedures  18 U.S.C. § 3771(d)(2).  See ECF 139.  In addition to victims identified throughout the course of its investigation, the United States has also used press releases and a website, run by the Federal Bureau of Investigation and authorized by court order, to attempt to identify individuals and insurers victimized by this crime.  While the response to the website has been modest, the patients that have come forward have revealed the profound impact of this crime.

[36] 02/25 Tr. 76:23-77:1; 03/22 Tr. 86:1-12.

[37] See United States Motion For Restitution Pursuant To The Mandatory Restitution Act, ECF 1035.

[38] 03/28 Tr. 38:24-39: 11.

Subsys prescriptions during the course of the conspiracy.[39]   Payments for more than 80 percent

of those prescriptions, which totaled roughly $135,000,000, were wrongly obtained by the IRC.[40]

Ignoring long settled precedent that the Court need only make a reasonable estimate of

the loss and that loss calculations are often imprecise,[41] some of the defendants seek lower

sentences by denying proof of loss.  The fate of Insys Therapeutics contradicts such claims.  The

enterprise in this criminal scheme, plagued by lawsuits from insurers, municipalities, and

individual patients, as well as a settlement with the United States, declared bankruptcy exactly

*because* of the loss generated by this crime.[42]  Insys, a publicly traded company, which in the

past obtained a market value worth billions,[43] cannot pay its debt to the victims of this crime

because it was used as the enterprise through which the defendants bribed doctors and defrauded

insurers.

> b.   Unquantifiable loss to patients

In addition to the quantifiable restitution requested by insurers (and some patients) in this

case, other patients also suffered substantial, but often unquantifiable financial loss.  As this

Court observed, "the evidence presented at trial shows how Insys' fixation on increasing the

---

[39] Declaration of Michael J. Petron at ¶14.

[40] PSR at ¶120.

[41] USSG § 2B1.1, cmt. n.3 (For the purposes of sentencing, "[t]he court need only make a reasonable estimate of the loss."); United States v. Thurston, 358 F.3d 51, 69 (1st Cir. 2004)("[T]he court needs only to make a reasonable estimate in light of the available information."); United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995)(holding that calculating reasonable loss, "is more an art than a science. Courts can, and frequently do, deal with rough estimates."); United States v. Leja, 490 F.Supp.2d 83 (D. Mass. 2007) (same).

[42] Disclosure Statement For Second Amended Joint Chapter 11 Plan Of Liquidation Proposed By Insys Therapeutics, Inc. And Its Affiliated Debtors, In re Insys Therapeutics, Inc., No. 19-11292 (Bankr. D. Del.) at §§ 1.3, 1.4, and 4.1.

[43] 02/21 Tr. 215:7-11 (total value in terms of market cap was "$3 billion at some points").

number and dosage of Subsys prescriptions combined with prescribers' interest in increased

speaker payments, ultimately harmed an untold number of patients."[44]  Equally important, the

Court heard testimony at trial, that insurers were given false information about patient diagnoses

and treatment history for a tremendous portion of all Subsys prescriptions.[45]  It is not possible to

determine the impact that the false information disseminated in this case will have on the future

costs of health care for many patients victimized by the defendants' deception.   The record is

clear, however, that many insurers still possess false information regarding patients' history of

cancer, dysphagia or difficulty swallowing, as well as tried and failed medications.[46]  In a world

where information can very seriously impact costs and availability of coverage for health and life

insurance, the implications of the defendants' crime are daunting.

There are, of course, other financial losses caused by this crime, impossible to calculate

but profoundly damaging.  Some of that loss is described in victim impact statements provided to

the Court: a patient from South Carolina whose children had to rely upon other caregivers for the

parenting that she was unable to give, who understandably has lost trust in the medical

community, and will continue to struggle with finding and accepting quality medical care;[47]  a

former patient that received Subsys, who suffers from addiction and other significant health

issues, who asks, "[h]ow can you put a price on your own life?";[48]   or the former patient of

Gavin Awerbuch, who became addicted to Subsys, but is unable to recall her life while she was

---

[44] ECF No. 1028 at 21.
[45] 02/22 Tr. 190:15-13.
[46] 02/22 Tr. 190:15-13.
[47] September 9, 2019 Letter from "SC."
[48] June 19, 2019 Email from "SD."

on the drug,[49] The loss described by these patients cannot be calculated, but in many ways is more staggering than the millions of dollars lost by Medicare and by the private insurers victimized by this crime.

Put simply, no matter how it is calculated, the conspiracy for which the defendants have been convicted caused overwhelming financial and other losses for insurers and patients.

B.  The Need to Promote Respect for the Law and Provide Just Punishment.

The defendants in this case conspired to cheat a health care system built entirely upon trust.  American patients depend upon their doctors "more or less completely, to provide them with honest medical services in their best interests."[50]  Likewise, "health care providers occupy a position of trust with respect to the insurers [that] they bill …"[51]  The bribes paid in this case betrayed that trust; while the lies told to insurers manipulated and exploited that trust.  The willingness of the defendants to pay bribes to doctors that prescribe a schedule II narcotic demonstrates a profound disrespect for the law.  The recorded lies to insurers, told over and over, about cancer that did not exist, about difficulty swallowing that never occurred, and about the failure of medications that were never tried and actually might still work, all document an astonishing disrespect for the law.

And despite the destruction they were leaving in their wake, the defendants continued the conspiracy for years, responding to increasing scrutiny with blatant audacity.  Three years into

---

[49] Undated Letter from "KS."

[50] United States v. Nayak, 769 F.3d 978, 984 (7th Circ. 2014).

[51] United States v. Garcia, 432 Fed. Appx. 318, *8 (5th Circ. 2011) (applying enhancement to owner of medical equipment company who defrauded Medicare); see United States v. Sicher, 576 F.3d 64, 71-73 (1st Cir. 2009) (applying enhancement to employee of charitable foundation for children's medical care who committed health care program theft and other crimes).

13

the conspiracy, after employees had objected to the defendants' schemes,[52] after the federal

government served a subpoena on the company,[53] after the New York Times published a

devastating expose,[54] after Gavin Awerbuch[55] and Heather Alfonso[56] had both been charged,

John Kapoor, Mike Babich, Alec Burlakoff, Rich Simon, and Joe Rowan sat in an auditorium

with the entire Insys sales force, watching, as an employee pretending to be a life-size version of

the maximum dose of Subsys, danced to the refrain, " If you want to be great, listen to my voice.

You can be great, but it's your choice.  I love titration, and it's not a problem."[57]

The defendants of course, didn't really love titration.  What they loved was making

money from doctors who wrote prescriptions for Subsys at the highest, most profitable doses.

The video, called, "Great by Choice," reflects a crime without moral limits, without concern for

the law, or the patients the law was intended to protect.  With each sentence imposed in this case,

the Court should employ the full power of the bench to command respect for the framework of

laws designed to protect the trust that is the bulwark of the American health care system.

C.  Deterrence

The defendants in this case chose to commit this crime for one reason: money.  Before

Insys went bankrupt, before the convictions in this case, the company and each of the defendants

made millions of dollars from this crime.[58]

---

[52] 02/01 Tr.  143:3-24.
[53] 01/30 Tr. 79:23-80:22 & Ex. 688.
[54] Katie Thomas, "Doubts Raised About Off-Label Use of Subsys, a Strong Painkiller," The New York Times, May 13, 2014.
[55] 01/31 Tr. 71:9112; United States v. Gavin Awerbuch, 14-MJ-30216, ECF 1, May 2, 2016 (E.D. Michigan).
[56] 02/11 Tr. 180:1-183:16 & Ex. 1906.
[57] Ex. 471 ("Great By Choice").
[58] Ex. 575 and Exs. 2384-2387.

Pharmaceutical companies, and the people who work for pharmaceutical companies, do not make money unless two things happen: (1) doctors write prescriptions for their product, and (2) insurers pay for those prescriptions.  In this case, using company resources, the defendants bought the former, and lied to the latter.  Comparing the conduct of the defendants, and the results of that conduct, to the efforts of the entire opioid industry, demonstrates both the unique perversion of this crime, as well as the profound importance of deterring similar conduct in the future.

The bribes that were paid by the defendants, were paid using the cover of the Insys speaker program.  In 2014, the second year of the conspiracy, just one company, Insys Therapeutics, accounted for 50% of all non-research payments made by companies that market opioids in the United States to physicians who prescribed opioids under Medicare Part D.[59]  One year after spending as much money as every other opioid company combined, total sales made Subsys one of the top five most profitable opioid products in the United States.[60]  Sales of Subsys in 2015 actually compared with products manufactured by some of the largest pharmaceutical corporations in the world, including Johnson & Johnson, Mylan, and Depomed.[61]

When the defendants bribed their co-conspirator physicians to write prescriptions for Subsys, they bought the customers for their drug.  When the defendants lied to insurers, they manipulated the entities that paid for those prescriptions.   Other pharmaceutical companies (and

---

[59] Hadland SE, Cerdá M, Marshall BDL. "Author reply: Pharmaceutical marketing of opioid products to physicians and subsequent opioid prescribing." JAMA Internal Medicine, May 2018, at E2.
[60] Dina Gusovsky, Americans Consume Vast Majority of the World's Opioids, CNBC (Apr. 27, 2016, 9:13 AM).
[61] Id.

their executives) – who also pay doctors for speaking about their products – are watching what happens to the defendants in this case.  This Court should send a strong message to those companies and individuals by sentencing each of these defendants to significant terms of incarceration.

   D.  Avoiding Unwarranted Disparities Among Defendants Found Guilty of Similar Conduct

   It is settled law that the Court must avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" and the Court should be especially mindful of "national disparities."[62]  The Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration, even where those crimes are a defendant's first offense.  The legislative history of the Sentencing Reform Act of 1984 indicates that one of the Act's goals was to rectify the serious problem that white-collar offenders were not being adequately punished.[63]

   Necessarily, the Court's analysis must begin with an examination of the conduct of conviction for these defendants.  And this Court must consider all relevant conduct – even the conduct that forms the factual basis of the CSA and Honest Services predicates dismissed by the Court's Memorandum and Order on Defendants' Motions for Judgment of Acquittal and For a New Trial.[64]  Then, the Court must look to national sentences for other first-time offenders convicted of similar conduct.

---

[62] *See* 18 U.S.C. § 3553(a)(6) (emphasis added) and United States v. Reverol-Rivera, 778 F.3d 363, 366 (1st Cir. 2015) (the analysis "is primarily concerned with national disparities.").
[63] *See* S. REP. NO. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses.").
[64] *See* ECF No. 1028 (dismissing CSA and Honest Services Fraud predicate activities).

Here, the operative conduct encompasses a massive, nationwide, protracted, and aggressive bribery scheme intended to enable and increase profits from insurance fraud *and* a massive, nationwide, protracted, and sophisticated scheme to provide insurers with false and misleading information by way of the company's call center.  Either type of conduct, standing alone, would merit significant terms of incarceration.  The combination of these two types of criminal conduct demand lengthy prison terms.  The United States Sentencing Commission has recognized that "the principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability."[65]

    1.   Nationwide Application of the Fraud Guidelines – USSG § 2B1.

To be sure, a number of co-conspirators in this crime have been sentenced in districts throughout the United States.  Each of those conspirators, however, were sentenced for their role in the district in which they were charged.  None were sentenced for participating in a nationwide conspiracy; and none were held accountable for the loss calculation attributable to each of the defendants indicted in this case.[66]  As such, in addition to considering the sentences

---

[65] USSG § 1B1.3 (Relevant Conduct), Application Note 1 (Sentencing Accountability and Criminal Liability); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

[66] The crimes charged and the sentences given vary greatly.  United States v. Xiulu Ruan and John Couch, 15-Cr-00088 (S.D. Alabama, doctors charged with violating RICO, 21 and 20 years respectively), United States v. Christopher Clough, 17-cr-37-01-JL (D. N.H., physician's assistant charged with violating the Anti-Kickback Statute, 4 years); United States v. Jerrold Rosenberg, (D. R.I., doctor charged with Health Care Fraud and violating the Anti-Kickback Statute, 51 months).  In addition, several former Insys employees have been sentenced after cooperating in in multiple cases.  United States v. Karen Hill, 17-CR00139 (S.D. Alabama, district manager charged with violating the Anti-Kickback Statute, probation); United States v. Natalie Perhacs, 16-Cr-00024 (S.D. Alabama, sales rep charged with violating the Anti-Kickback Statute, probation); United States v. Heather Alphonso, 15-Cr-111 (D. Conn.,

of co-conspirators in other districts, the court should also look to defendants sentenced in different cases for similar crimes.

A review of the annual empirical sentencing data collected by the United States Sentencing Commission establishes that the defendants are among the most egregious fraudsters in the United States.[67]  Between 2013 and 2017, the USSG was applied nationally to 352,867 defendants.[68]  Of those, Section 2B1.1 was applied to 38,386 defendants.[69]  According to the 2013-2017 data, the Defendants are uniquely situated:

- **The loss caused by these Defendants is in the <u>top 4% of all fraud loss calculations</u> – these Defendants are responsible for more loss than 96% of other federal fraud defendants.[70]**

- **Only 273 fraud defendants, <u>less than 1%</u>, scored points based on the conscious risk they caused to others.[71]**

- **Only 10.6% of all fraud defendants sentenced during 2013-2017, were designated leaders, supervisors, or managers of any type.[72]**

---

advanced practice nurse charged with violating the Anti-Kickback Statute, probation); <u>United States v. Natalie Levine</u>, 17-Cr-147 (D. Conn., sales rep charged with violating the Anti-Kickback Statute, home confinement and probation); <u>Gavin Awerbuch</u>, 16-Cr-20636 (E.D. Michigan, doctor charged with Health Care Fraud (unrelated to Insys) and Illegal Distribution of Subsys, 2 years);

[67] *See* 2014-2017 annual Guideline Application Frequencies reports, available at https://www.ussc.gov/research/data-reports/guideline (last visited December 2, 2019).

[68] *See* 2014-2017 annual Guideline Application Frequencies reports, available at https://www.ussc.gov/research/data-reports/guideline (last visited December 2, 2019).

[69] *Id*.

[70] Between 2013 and 2017, 38,386 federal defendants were sentenced pursuant to Section 2B1.1. *Id*.  Of those more than 38,000 defendants, only a mere 1,522, <u>or 4%</u>, of all federal fraud defendants were held accountable to a loss equal to or higher than these defendants pursuant to Section 2B1.1(B)(1)(k).  *Id*.

[71] Only 273 other Defendants during that time period acted in as dangerous a fashion as these Defendants while executing their scheme.

[72] Nearly 90% of all fraudsters did not serve as leaders – as did these Defendants.  Of all federal defendants sentenced during the time period, 352,867, only 5.3% were leaders, managers, or supervisors of any type.

Finally, according to the United States Sentencing Commission, in 2017 the median health care fraud loss was $1,086,205 – a far cry below the staggering loss in this case.[73][74]   In that same time period, the average prison sentence for health care fraud – relying upon a fraction of the loss in this case – was 36 months.

2.   Examples of specific fraud sentences

The following is a brief sampling of national sentences driven by the USSG § 2B1.1 fraud loss table in cases with comparable[75] facts:

| Case | Charge(s) | Loss | Sentence |
|------|-----------|------|----------|
| *US v. Khaled Elbeblawy*, 15-cr-20820 (S.D. FL) | Elbeblawy orchestrated a $57 million Medicare fraud and kickback scheme and was convicted at trial of conspiracy to commit health care fraud and wire fraud, and conspiracy to defraud the United States and pay health care kickbacks. | $57 million+ | 240 months |
| *US v. Nicholas Borgesano*, 8:16-cr-353 (M.D. FL) | Defendant pled guilty and received statutory maximum sentence for leadership of fraud scheme involving submission of fraudulent claims for prescription medication and for payment of bribes and kickbacks to obtain patient PII. | $100 million+ | 180 months (stat max) |

---

[73] See United States Sentencing Commission report *What Does Federal Economic Crime Really Look Like*, January 30, 2019, available at https://www.ussc.gov/research/research-reports/what-does-federal-economic-crime-really-look-like (last visited December 2, 2019).
[74] The $17 million loss figure is a conservative estimate and only relies upon Medicare fraud loss.  In fact, the Defendants' conspiracy also caused tremendous loss to commercial payors.
[75] The crimes described below involve healthcare based fraud with similar conduct, however, some of the defendants conduct in this case was unprecedented.

19

| Case | Charge(s) | Loss | Sentence |
|---|---|---|---|
| *US v. Millicent Traylor,* **2:16-cr-20437 (E.D. MI.)** | Defendant, a medical school graduate, convicted at trial for her role as a leader of scheme to defraud Medicare by billing, or causing billing, for services that were medically unnecessary, not provided, obtained through kickbacks and bribes, or otherwise not reimbursable.  Defendant obtained patient PII to use for false billing and also wrote prescriptions under another doctor's name for medically unnecessary opioids. | $8.9 million | 135 months |
| *US v. Nesly Loute,* **2:15-cr-99 (M.D. FL)** | Defendant convicted at trial of Conspiracy to Commit Mail Fraud for his role as leader of insurance fraud scheme utilizing fraudulent claims to insurance companies for chiropractic treatment based upon staged motor vehicle accidents, patients obtained through illegal cash inducements, and through the use of fraudulently operated chiropractic clinics. | $2.4 million | 168 months |
| *US v. Mercy O. Ainabe,* **4:17-cr-412 (S.D. TX)** | Defendant convicted of conspiracy to commit health care fraud, substantive health care fraud, and conspiracy to pay kickbacks, counts for her role acting as a patient recruiter – recruiting patients from group homes to be used in furtherance of false billing scheme. | $3.6 million | 108 months |

II.  Individual Sentencing Recommendations

    A.  Calculating the Appropriate GSR

        As described above, there are several aspects of the guidelines that apply equally to each

individual.  Calculation of the base offense level, including specific offense characteristics,

should result in the same adjusted based offense level for each defendant.  Likewise, while each

defendant had different responsibilities – which will be discussed in separate memoranda – each played a significant role in organizing and leading a nationwide conspiracy.

1.   The Base Offense Level

The government concurs with the PSR's calculation that, pursuant to USSG § 2E1.1, the defendants' base offense level should be determined by the guideline for fraud related crimes found at USSG § 2B1.1 (see Appendix A for violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343).  Pursuant to § 2B1.1, the base offense level for the defendants, adjusted for specific offense characteristics, is 35.  The appropriate specific offense characteristics include: (a) the amount of loss, (b) the number of victims, (c) the risk of death or serious bodily injury, and (d) bankruptcy.

a.   The Loss Calculation

The jury found that each of the 5 defendants agreed to commit two or more acts of mail and wire fraud.[76]   Likewise, Babich and Burlakoff pled guilty to facts supporting the same finding.  For the purposes of sentencing, therefore, the government's method for calculating loss is limited to the loss caused by the insurance fraud committed through the IRC.

Whatever method the Court uses to calculate the loss, the calculation should generate a GSR that is near or exceeds the 20-year statutory maximum for racketeering conspiracy.  As described further below, the loss calculation should, at a minimum,[77] increase the guideline

---

[76] Jury Verdict Form (ECF 841) at 2.

[77] The United States reserves the right to seek restitution in excess of the calculated loss amount. See United States v. Keller, 236 F. App'x 274, 276 (9th Cir. 2007) (holding that because courts are granted wide latitude in granting restitution, a district court did not err when the loss calculation was lower than the restitution amount); see also United States v. Huff, 609 F.3d 1240, 1247 (11th Cir. 2010)(tracking similar Circuit Court precedent).

calculation by 20 levels pursuant to § 2B1.1(b)(1)(K).[78]   If the Court, however, were also to use restitution claims made by private insurers, the sentencing guideline would increase by 26 levels.[79]   If the Court were to calculate loss using all restitution claims, which at this time total $306 million, the sentencing guideline would increase by 28 levels.[80]   Regardless of the method used to calculate loss, the calculation need only be a reasonable estimate of loss.[81]

The government loss calculation is as follows:

First, in its 28-day discovery letter, the government identified 13 co-conspirator practitioners.   During the course of the conspiracy, Medicare paid $32,444,964 for Subsys prescriptions written by these prescribers.[82]

Second, the Subsys label states that the drug is "indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[83]   Medicare

---

[78] For the purposes of sentencing pursuant to USSG § 2B1.1, the loss calculation need only be a reasonable estimate.

[79] As described above, the United States has received restitution claims from 7 different commercial insurers, which combined, assert that they are entitled to restitution in excess of $169,650,045.  Pursuant to USSG § 2B1.1 (b)(1)(N) a loss grater than $150,000,000 but less than $250,000,000 would cause the guideline range to increase by 26 levels.

[80] Pursuant to USSG § 2B1.1 (b)(1)(O) a calculated loss greater than $250,000,000 but less than $550,000,00 would cause the guideline range to increase by 28 levels.

[81] USSG § 2B1.1, cmt. n.3; United States v. Thurston, 358 F.3d 51, 69 (1st Cir. 2004)("[T]he court needs only to make a reasonable estimate in light of the available information."); United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995)(holding that calculating reasonable loss, "is more an art than a science. Courts can, and frequently do, deal with rough estimates."); United States v. Leja, 490 F.Supp.2d 83 (D. Mass. 2007) (same); see United States v. Ezukanma, 756 F. App'x 360, 373 (5th Cir. 2018).

[82] Declaration of Michael J. Petron at ¶7.  If the Court were to limit the calculation to the ten prescribers suggested by counsel for John Kapoor, the total paid by Medicare was $29,815,585. Id. at n.4.

[83] Ex. 481 (USAO-MA-0000524)(emphasis added).

regulations do not permit or authorize payment for the off-label use of any medication.[84]
Medicare paid between $144,698,055 and $169,058,169 for Subsys prescriptions in which the
recipient beneficiary had no history of a principal diagnosis of cancer during the year prior to
receiving Subsys.[85]  For the purposes of the calculation, those prescriptions are considered "off
label."   When limiting this same analysis to the 13 co-conspirators, Medicare paid between
$20,329,848 and $24,009,524 for off-label Subsys prescriptions.[86]   Even if the Court were to
accept the objection of Defendant John Kapoor, and limit the loss to the ten prescribers he
identifies, Medicare paid between 19,042,996 and $22,518,591 for off-label Subsys
prescriptions.[87]

Third, at trial, the jury heard evidence that approximately 80.9% of Subsys prescribers
used the IRC to obtain prior authorization for their patients.[88]  Calculating a loss that considers
only (a) 80.9% of (b) off-label (non-cancer) Medicare claims for (c) just the co-conspirator
doctors still results in an estimated loss of between $16,446,847 and $19,423,704.90.

This range of loss falls squarely with § 2 B1.1(b)(1)(K), a loss greater than $9,500,000,
but less than $25,000,000.  Accordingly, the loss calculation should, at a minimum,[89] increase
the guideline calculation by 20 levels pursuant to § 2B1.1(b)(1)(K).

---

[84] 03/28 Tr. 38:24-39: 11.
[85] Declaration of Michael J. Petron at ¶6.
[86] Declaration of Michael J. Petron at ¶6.
[87] Declaration of Michael J. Petron at ¶11 & n. 9 and ¶12 & n.10.
[88] PSR at ¶120.
[89] The United States reserves the right to seek restitution in excess of the calculated loss amount.
See United States v. Keller, 236 F. App'x 274, 276 (9th Cir. 2007) (holding that because courts
are granted wide latitude in granting restitution, a district court did not err when the loss
calculation was lower than the restitution amount); see also United States v. Huff, 609 F.3d
1240, 1247 (11th Cir. 2010)(tracking similar Circuit Court precedent).

b. The Number of Victims

The government concurs with the PSR's inclusion of a 2-level increase pursuant to § 2B1.1(b)(2)(A)(i) because the crime involved 10 or more victims.  As such, the guideline calculation should increase by 2 levels pursuant to § 2B1.1(b)(2).

c.  Substantial Risk of Death or Serious Bodily Injury

The crime for which the defendants were convicted created a profound risk of substantial injury for patients.  The dangers associated with Subsys were not a mystery.  Like each of its competitors, Subsys contained fentanyl, and as such was designated as a schedule II controlled substance.[90]  Further, the FDA was so concerned about the risks associated with the drug, that it placed Subsys and its competitors in the agency's "Risk Evaluation and Mitigation" ("REMs") program.[91]  In addition to the safeguards imposed on the sale of schedule II narcotics, the REMs program required, among other things, that Subsys could only be dispensed to an outpatient when the prescriber, the patient, and the pharmacy dispensing each prescription had been educated about the risks associated with the drug.[92]  It was with this knowledge that the defendants pursued pill mill operators, bribed doctors, and sought to increase the dosages of prescriptions for Subsys.

Accordingly, the guideline calculation should increase by 2 levels pursuant to § 2B1.1(b)(16)(A) because the crime involved a conscious or reckless substantial risk of death or serious bodily injury.

d. Bankruptcy

---

[90] Ex. 481.
[91] Ex. 481 (5.10).
[92] Ex. 481(5.10).

Insys Therapeutics, Inc., the enterprise through which the defendants agreed to commit mail and wire fraud, became a publicly traded company in May, 2013.[93]  In launching the public offering, eight months after the conspiracy had begun, Kapoor and his co-conspirators bragged to prospective investors about the success of Subsys sales.[94]  By 2014, just one year later, and at the height of the conspiracy, the total value of Insys stock reached approximately $3 billion.[95]  After the scheme became public, however, the company was not able to recover, ultimately filing for bankruptcy in 2019.[96]  As the pleadings make clear, Insys, a publicly traded corporation, declared bankruptcy because of the Defendants' criminal conduct.[97]  As such, the guideline calculation should increase by 4 levels pursuant to § 2B1.1(b)(17)(B)(I).

2.   Role in the Conspiracy

Despite their different responsibilities, each of the defendants were organizer and leaders of a crime that involved five or more participants.  Kapoor hired and then over the course of the conspiracy, *promoted* Alec Burlakoff,[98] Mike Gurry,[99] Rich Simon,[100] Joe Rowan[101] and Sunrise Lee.[102]

---

[93] Ex. 575.
[94] Ex. 575 (USAO-MA-0021201-02).
[95] 02/21 Tr. 215:7-11 (total value in terms of market cap was "$3 billion at some points").
[96] In re Insys Therapeutics, Inc., No. 19-11292 (Bankr. D. Del.).
[97] Disclosure Statement For Second Amended Joint Chapter 11 Plan Of Liquidation Proposed By Insys Therapeutics, Inc. And Its Affiliated Debtors, In re Insys Therapeutics, Inc., No. 19-11292 (Bankr. D. Del.) at §§ 1.3, 1.4, and 4.1.
[98] 02/13 Tr.11:12-12:16; 03/01 Tr.  132:13-15; 149: 10-17; 01/30 Tr. 45:20 & Ex. 1488.
[99] 02/21 Tr. 89:12-13; 02/14 Tr. 70:20-24.
[100] 03/01 Tr. at 191:13-25; 02/21 Tr. 168:4-10.
[101] 02/13 Tr. 46:1-47:2; 03/01 Tr. 192:23-25; Ex. 299.
[102]  03/01 Tr. at 191:13-25; Ex. 299.

Evidence at trial established that Kapoor organized strategy on a daily basis using a morning meeting, referred to as the "8:30 call."[103]  Likewise, as C.E.O. and V.P. of Sales, Babich and Burlakoff attended the 8:30 call,[104] participated in hiring decisions,[105] and coordinated the strategies to bribe co-conspirator practitioners nationwide.[106]

While Simon did not always work at corporate headquarters, as National Director of Sales, he attended the 8:30 call by phone,[107] and directly supervised three regional sales directors (including Sunrise Lee and Joe Rowan) and nine sales districts.[108]  As the conspiracy profited and the sales force grew, Simon would come to manage two regional sales directors, Rowan and Lee, and 25 different sales districts nationwide.[109]

Gurry, who worked at corporate headquarters, also attended the 8:30 call.  As V.P. of Managed Markets, Gurry managed the IRC.  As such he required dozens of call center employees to carry out the strategies used to defraud insurers.[110]

Last, while Sunrise Lee and Joe Rowan did not work at Insys headquarters, as regional directors, each was responsible for managing at least a third of the company's sales force.[111]

---

[103] 02/13 Tr. 50:19-22; 85:15-21; 03/05 Tr. 232:20-233:5; 02/14 Tr. 86: 2-14; 03/05 Tr. 227:17-24.
[104] 02/13 Tr. 106:19-23; 03/05 Tr. 120:11-19, 122:9-17.
[105] 02/13 Tr.11:12-12:16; 46:1-47:2; 03/01 Tr. 191:13-25; 192:23-25; Ex. 299
[106] 2/13 Tr. 35:13-20; 03/05 Tr. 185:7-17; Ex. 207.
[107] 02/13 Tr. 106:19-23; 03/05 Tr. 120:11-19, 122:9-17.
[108] Ex. 2339; 03/07 Tr. 226:16-20.
[109] Ex. 2208.
[110] 02/14 Tr. 86: 8-14 & Ex. 421; 91:1-92:4; 107:25-108:6; 03/05 Tr. 231:4-233:9.
[111] Ex. 299.

The jury received a large volume of evidence regarding their efforts to lead and organize the conspiracy throughout the United States.[112]

As such, the guideline calculation for each defendant should increase by 4 levels pursuant to § USSG § 3B1.1(a).

III. Conclusion

For all of these reasons, and for the reasons set forth in the PSR, the United States respectfully requests that the Court sentence each of the defendants as described above.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Dated: December 18, 2019            by:    /s/ K. Nathaniel Yeager
                                           K. NATHANIEL YEAGER (BBO # 630992)
                                           DAVID G. LAZARUS (BBO #624907)
                                           FRED WYSHAK, JR. (BBO #535940)

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                    /s/ K. Nathaniel Yeager
Dated: December 18, 2019            Assistant U.S. Attorney

---

[112] Ex. 11 (Burlakoff and Simon lauding Rowan's efforts as a sales manager); 03/13 Tr. 250: 6-14 (Oliver Gauthier discussing bribes with his boss, Joe Rowan); 03/19 Tr. 176:24-178:5 (Richard Horrocks discussing Lee's instructions to him regarding how to lead/organize co-conspirator doctors); Ex. 2263 (Employee evaluation written by Lee refusing to give a sales rep credit for reaching an agreement with a bribed doctor).