## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

      v.

MICHAEL L. BABICH et al.,

      Defendants.

Criminal No.:  16-CR-10343-ADB

Leave To File Granted By Chambers

### DEFENDANTS' JOINT SUR-REPLY TO
### THE GOVERNMENT'S MOTION FOR RESTITUTION

Defendants have set forth their objections to the government's position in restitution in their joint response (Dkt. No. 1121).  Defendants will not reprise those objections here, but will be prepared to address them further at the February 4 hearing.  Given the bifurcation of restitution, Defendants will also not discuss in this sur-reply their alleged roles in the charged conspiracy or other factors relevant to potential apportionment.

Defendants limit this sur-reply to answering the points raised in the government's reply brief (Dkt. No. 1191) and the additional supporting materials in the exhibits thereto.  At the conclusion of this sur-reply, Defendants set out an updated, victim-by-victim assessment of the ceiling on potential restitution amounts on the record before the Court.

I.     **The Government Has Failed To Prove Its Restitution Request To A Preponderance Standard.**

The government begins its reply by running from its burden of proof.  It cites the First Circuit for the proposition that "a restitution award requires only a modicum of reliable evidence." Gov't Reply at 2 (citing *United States v. Naphaeng*, 906 F.3d 173, 179 (1st Cir. 2018)).  But the government omits the very next statement of that opinion:

> This is not to say that Congress "conceive[d] of restitution as being an entirely standardless proposition."  [*United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir.

> 1997)]. Mere guesswork will not suffice.  The government bears the burden of proving a victim's actual loss by preponderant evidence.  *See* 18 U.S.C. § 3664(e).  What is more, "a court may only order restitution for losses that have an adequate causal link to the defendant's criminal conduct."  [*United States v. Alphas*, 785 F.3d 775, 786 (1st Cir. 2015)].

*Id.*  Given the foregoing, *Naphaeng* should not be interpreted as a retreat from the preponderance standard.  Nor could it, given the relevant statutory language:  "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.  The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  18 U.S.C. § 3664(e).  Consistent with that language, the First Circuit has emphasized that the determination of restitution is not a cavalier exercise nor one where the Court can risk overshooting.  *See, e.g.*, *Naphaeng*, 906 F.3d at 179 (holding that courts must ensure restitution does "not . . . confer a windfall upon a victim") (citing *United States v. Cornier-Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004)); *United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir. 2008) (holding that courts must make a "reasonable determination of appropriate restitution" and that "rough approximation" is insufficient) (quoting *Vaknin*, 112 F.3d at 587).

These statements make clear what this Court already knows from its civil docket—that proving something to a preponderance standard is not a trifling matter.  It is the same standard that applies to the insurers in their civil actions against Insys and several of the Defendants.  Where the submissions on restitution fail to satisfy that standard, the insurers will have the opportunity to try again, in the context of orderly litigation designed to explore those issues rather than in a criminal case where the trial was devoted to a narrower set of issues.

Sometimes determination of a restitution amount may follow from the evidence at trial.  But this is not such a case.  The government's arguments to the contrary are misguided and contradictory.  On the one hand, the government argues that it "is not required to re-litigate the

2

months-long trial to adequately supports its restitution requests." Gov't Reply at 2. On the other hand, the government argues that its "trial strategy is irrelevant" and that "Defendants improperly attempt to limit the government's restitution request to only the restitution consistent with its narrow approach to proving the case at trial." *Id.* at 5. The government cannot have it both ways.

To be clear, Defendants are not arguing that restitution should be limited to the specific IRC calls that were discussed at trial. Indeed, the government could have (but did not) specify other non-trial evidence in its restitution motion to prove direct loss causation. As this Court knows, at trial the government did not remotely prove that *every* IRC call was materially fraudulent, or that doctors who were *not* allegedly bribed were writing medically illegitimate Subsys prescriptions. When the government selected the 40 or so IRC calls to play to the jury, it did not pick them at random or engage in statistically significant sampling; it picked the calls it thought would help prove the charged conspiracy. When Defendants pointed out that IRC policies changed over time, that not all calls were materially fraudulent, and that later versions of IRC talking points did not contains lies or misrepresentations, the government argued that it did not matter whether the IRC lied all the time or whether Subsys was prescribed in good faith by many doctors who were not allegedly bribed. *See, e.g.*, 2/28/2019 Tr. at 134:4–13 (AUSA Wyshak: "***There's no assertion here that every single time the IRC called an insurance company that there was fraud***." (emphasis added)).

Thus, for the jury to find participation in the charged conspiracy, it did not have to find that material fraud in the IRC extended to every (or nearly every) call, or that the insurance fraud implicated the prescriptions of every (or nearly every) Subsys prescriber nationwide. Nor was it asked to make any such findings. *See* 4/4/2019 Tr. at 37:13–14 (Court instructing jury that they need only find "*at least two* racketeering acts of the type or types alleged in the indictment"

(emphasis added)); Verdict Form, Dkt. No. 841 (May 2, 2019) (indicating jury finding of ">2" for racketeering acts).   Neither the trial record nor the jury's verdict support the government's argument that it has proven the assumptions underlying its broader restitution approach.

Take one of the commercial insurers suing Insys and Defendants.  In a civil suit, the insurer could presumably rely on Insys's and Defendants' convictions to foreclose litigation of certain issues (subject, of course, to the outcome of Defendants' forthcoming appeals in this case).  But that reliance would not come close to proving the insurer's claimed damages.  Instead, the insurer would have the burden to prove, by a preponderance of the evidence, that it is reasonable to estimate that *all* IRC calls were materially fraudulent despite clear differences in language used by the IRC over time, by different IRC representatives, with increasingly more compliance personnel following receipt of the December 2013 subpoena.  The insurer would have the burden to prove, by a preponderance of the evidence, that it would not have reimbursed *any* portion of Subsys prescriptions written by doctors whom the government has not identified as co-conspirators.  The insurer would have to prove, by a preponderance of the evidence, what its coverage policies were, whether they changed over time, and how they were enforced, including as to off-label prescriptions.  The claims submitted here for restitution purposes are subject to the exact same burden, but neither the government nor the insurers have come close to proving them to a preponderance standard.

## II.     Restitution Should Be Limited To Claims Linked To The Allegedly Bribed Practitioners.

The government argues that Defendants are "ask[ing] this Court to draw an arbitrary line between the identified co-conspirator practitioners and reality."  Gov't Reply at 7.  Not so.  All Defendants are asking is for this Court to hold the government to the basis on which it achieved convictions, as required by the MVRA.

4

From the outset of this case, the government has argued that the alleged bribery and insurance fraud at Insys were intertwined parts of a single scheme. *See, e.g.*, SSI ¶ 30 ("The defendants *used the bribes and kickbacks to . . . fraudulently cause insurers to pay for new prescription*s, as well as for increases in dosages and units of new and existing prescriptions" (emphasis added)); ¶ 64 ("The defendants and their co-conspirators recognized that the potential for *profits generated by their bribes and kickbacks could not be fully realized unless insurers authorized payment for Subsys prescriptions*." (emphasis added)).  Those were the terms on which the government made its closing argument to the jury. *See, e.g.*, 4/4/2019 Tr. at 91:12–16 ("Look, *they realized in 2012 that paying doctors scripts wasn't enough*. It wasn't going to work. . . . *Insurance companies weren't going to pay for the script*."); *id.* at 93:3–9 ("Heather Alfonso testified that she was paid money.  And when she ran out of cancer patients, they told her, well, you can write off-label.  The IRC makes this happen.  It's how they eliminate their risk. . . . *They transfer the investment and the bribes into insurance, and they do it with deception*.")  And after the jury reached its verdict, as Defendants have already observed, those were the terms on which the Court upheld the two surviving predicate objects.  *See* Defs.' Response at 9–10.

Having charged the case and obtained and sustained convictions based on a link between bribery and insurance fraud, the government should not be permitted to expand the scope of restitution to conduct untethered to the allegedly bribed practitioners. *See, e.g.*, *Hughey v. United States*, 495 U.S. 411, 413 (1990) (district court may award restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction"); *United States v. Frith*, 461 F.3d 914, 916 (7th Cir. 2006) ("Restitution [unlike sentencing] must be based on the offense of conviction, not relevant conduct."); *United States v. Benns*, 740 F.3d 370, 377 (5th Cir. 2014) (same).  Thus, it is not arbitrary to hold the government to the position on which it tried this case.

As to the alleged bribery, the government has not even tried to establish it for practitioners beyond the eight alleged in the indictment and the additional five identified in the government's 28-day letter.  As the Court is aware, the identification of unindicted co-conspirators in 28-day letters involves a "big long list" that is "always over-inclusive."  5/13/16 Tr. at 105:17–22, 109:16–17, *United States v. Facteau*, Crim. No. 15-10076 (D. Mass.) (comments by the Court).  This identification serves as an outer limit on "all the people that *could* be considered co-conspirators." *Id.* at 109:21–24 (emphasis added); *see also* Order on Motions *In Limine* at 3, Dkt. No. 676 (Jan. 15, 2019).  The government only included the 13 allegedly bribed practitioners on that list.  In their response on restitution, Defendants argued that the government only offered evidence linking 10 of the 13 to the charged conspiracy.  On reply, the government points to the plea agreement of one of the remaining three—Dr. Frey—as reliable evidence.  *See* Gov't Reply at 6.  That is a fair point, and Defendants hereby amend their objection to encompass only Drs. Khanna and Roque.  But the big issue here is not whether the Court will look to claims related to 11 or 13 allegedly bribed practitioners; it is whether the Court will also look to the claims related to hundreds of other practitioners whom the government never identified as co-conspirators in this case.  The government has not argued, let alone proven, that all such practitioners were bribed—because they were not.  *See, e.g.*, SSI ¶ 27 ("The defendants did *not* attempt to bribe all practitioners who prescribed Subsys and other rapid-onset opioids." (emphasis added)).

### III.    The Government's Methodology Is Unproven And Illogical As Applied To Claims Beyond Those Linked To The Allegedly Bribed Practitioners.

Even if the Court were inclined to consider restitution for purported losses beyond the prescriptions from the allegedly bribed practitioners, the government has failed to prove such additional losses to any evidentiary standard.  Defendants offered specific examples why it is

wrong to assume that every call from the IRC contained material fraud.[1]  *See* Defs.' Response at 10–15.  All the government does in response is to point to testimony from Elizabeth Gurrieri and Lindsey Meyer that IRC representatives lied on "almost every" and "most" calls.  *See* Gov't Reply at 8–9.  This kind of nonspecific testimony fails to meet the government's burden.  Rather, as Defendants showed in their response brief, the same witnesses and others called by the government acknowledged that the IRC rules and policies changed throughout the charged conspiracy period, and that employees who continued to lie were reprimanded and even fired.  The details matter here, because neither Insys nor anyone else has an obligation to affirmatively disclose every potentially relevant fact to insurance companies.  *See, e.g.*, Order, Dkt. No. 719 (Feb. 4, 2019) (the government "may not seek testimony . . . concerning the materiality of any undisclosed bribes, payments, or kickbacks").  Thus, it matters whether an IRC representative said she was calling "from" the doctors office (a lie) or "on behalf of" the doctor (the truth, for every doctor that opted in to the IRC).  And it matters whether the IRC representative lied that a patient had cancer (as happened in a number of IRC calls played at trial) or if the question was never asked (as happened in a number of other IRC calls produced to Defendants by the government).

The government and the insurers have chosen not to grapple with these and other complexities.  Instead, they treat every IRC call as materially fraudulent because it does not *affirmatively state* that the call is from Insys and does not *affirmatively state* for all off-label patients that the patient was not being treated for cancer pain.  That position does not match the

---

[1] At trial, the Court observed that a practitioner's receipt of a kickback does not render all subsequent prescriptions medically unnecessary, or all IRC-related claims fraudulent.  *See* 2/4/2019 Tr. 17:25–19:17 ("I just don't agree with the theory that every prescription that follows a kickback is bogus. . . . I think it was more like, would you have wanted to know if the prescription wasn't medically necessary. . . . And in terms of the IRC, not every prescription that necessarily went through there is evidence of a crime.").

real world.  As Defendants pointed out in their response, reimbursement call centers exist in the

industry, and there is no reason to accept that insurers reject every call that comes from them.  *See*

Defs.' Response at 11–12.  And, while the government evidence adduced at trial that policies on

off-label TIRF prescriptions of certain Medicare Part D plans could be strict,[2][3] it did not show the

same with respect to commercial insurers, and the limited evidence that came in on that issue was

---

[2] The two witnesses called by the government at trial had no personal knowledge about off-label coverage decisions at other Medicare Part D plans not serviced by SilverScript or OptumRx.  They likewise acknowledged that even their Medicare Part D plans at times knowingly covered off-label Subsys use.  *See* 3/28/2019 Tr. at 90:8–11 (Clayton Boquet) (**Q.** "From 2012 to 2015, you're aware that Optum approved, on numerous occasions, off-label use of various TIRFs?  **A.** Yes").  *See* Jack Hoadley et al, *Medicare Part D: A First Look at Plan Offerings in 2014*, https://tinyurl.com/t7gx3xn (last visited Feb. 1, 2020) (summarizing CMS data regarding Medicare Part D plans that "[i]n 2014, a total of 1,169 PDPs will be offered nationwide, up by 13 percent from the 1,031 PDPs offered in 2013").  Publicly available information provides other examples of Medicare Part D and Advantage plans that covered off-label Subsys use during the charged conspiracy period.  *See, e.g.*, Blue Cross of Idaho Medicare Advantage Part D Prescription Drug Coverage, 2012 Prior Authorization Detail at 83 (May 5, 2012), https://tinyurl.com/u3trnuw (covered uses for seven oral transmucosal fentanyl drugs, including Subsys, is valid for "[a]ll FDA-approved indications not otherwise excluded from Part D. Plus breakthrough chronic (non-cancer) pain"); *see also* Community Health Plan of Washington Medicare Advantage Plan 2012 Prior Authorization Criteria at 83 (Mar. 21, 2012), https://tinyurl.com/r5xtsc9 (same).

[3] The issue of which off-label uses of Subsys Medicare Part D plans could reimburse based on relevant support in compendia and other factors is a complicated legal and factual matter, individualized to patients and claims, and not well-suited to a broad restitution award.  The government offers no legal analysis why Medicare Part D would not cover medically appropriate use of Subsys off-label.  In a similar case in this district, Judge Young evaluated whether a listing in one of the compendia justified Medicare Part D reimbursement for an off-label use of a product for non-cancer related nausea, when a case study for a cancer patient was cited in the compendium.  *See Tangney v. Burwell*, 186 F. Supp. 3d 45, 47, 57 (D. Mass. 2016) (holding that the patient "is receiving palliative care, like the patient in the underlying [cancer] case study, the similarity of their symptoms should control")  Judge Young reversed the Medicare appellate body that denied coverage for the off-label, non-cancer related use.  *Id.*  Complicating this issue further, courts are divided about whether support in the compendia is even required for Medicare Part D plans to reimburse off-label uses.  *Compare Tangney v. Burwell*, 186 F. Supp. 3d 45 (D. Mass. 2016) (looking to compendia to determine "medically accepted indication") *with Layzer v. Leavitt*, 770 F. Supp. 2d 579 (S.D.N.Y. 2011) (construing the Medicare statute's inclusion of coverage for prescriptions "for a medically accepted indication" as not requiring a compendia listing).

to the contrary.  *See* Defs.' Response at 20–21 & n. 36.  For these reasons, a one-size-fits-all approach of estimating losses, premised on the material falsity of every IRC call, does not work.

As a result, the government has offered no reliable way to determine how many of the total universe of IRC calls resulted in insurer losses.  "[T]he controlling metric for an award of restitution pursuant to the MVRA in every case is actual loss suffered; nothing more, nothing less." *United States v. Ferdman*, 779 F.3d 1129, 1139 (10th Cir. 2015); *see also United States v. Fair*, 699 F.3d 508, 516 (D.C. Cir. 2012) (award "must reflect the actual, provable loss suffered by the victim").  Even crediting the testimony of the government's witnesses, the government is offering the Court, at best, loose and unproven estimates of material fraud.  That is precisely the kind of "rough justice [that is] not permitted" under the MVRA.  *United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013) (citing *United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir. 2008)).

The First Circuit has instructed that, in evaluating whether a restitution award is based on reliable evidence, courts should "[take] into account the barriers to a more exact calculation" including, for example, "the lack of organized records."  *Naphaeng*, 906 F.3d at 182.  But the government has never argued that such barriers exist here—with good reason.  The government's approach at trial—playing IRC calls and comparing them to the underlying records—shows that it has access to the kind of evidence that could have been used to meet its burden, however difficult. *See* Defs.' Response at 27–28.  For example, the government could have undertaken a random statistical sample in order to permit scientifically defensible extrapolations about the broader universe of IRC calls.  It chose not to do so.  If that option were too burdensome, the government could have fallen back on the methodology it described as "***conservative[,] reliable***" and employed for sentencing, 1/13/20 Restitution and Forfeiture Hr'g Tr. at 36:10 (statement by AUSA Lazarus) (emphasis added), and left any additional claims to ongoing civil proceedings, *see, e.g.*, *United*

*States v. Gallant*, 537 F.3d 1202, 1254 (10th Cir. 2008) (acknowledging "existence of pending civil litigation may in some cases be relevant" under 18 U.S.C. § 3663A(c)(3)(B)).  The problem with the government's broader approach to restitution is that lacks both features—it is neither conservative ***nor reliable***.

The main reason, as Defendants have already explained, is that applying the same set of assumptions to Subsys prescriptions written by allegedly bribed practitioners to all Subsys prescriptions nationwide does not make sense.  To reiterate just a few examples:

(1)     The government argued at trial that the IRC fraud was a means for Insys to cash in on the medical bribery scheme; that argument does not apply to unbribed doctors, where any purported IRC fraud would constitute a separate and distinct criminal scheme from the alleged bribery.

(2)     The government argued at trial that Insys bribed "whales," or large volume TIRF prescribers.  It is reasonable to assume that such prescribers would, by virtue of their prescription load and the nature of their alleged relationship with Insys, utilize the IRC at a higher rate.  It is not reasonable to assume the exact same IRC usage rate for all Subsys prescribers nationwide.

(3)     The Court threw out the CSA and HSF verdicts but held that Defendants could be seen as reckless or careless in pushing for Subsys prescriptions from the allegedly bribed prescribers.  *See* Mem. & Order at 18, Dkt. No. 1028 (Nov. 26, 2019) ("Post-Trial Order").  Assuming that prescriptions by allegedly bribed practitioners were medically illegitimate, and therefore would not have been covered by insurers, is different than assuming the same for practitioners who were not bribed.

None of this is to say that Defendants are opposed to the use of any and all assumptions in calculating restitution. No assumption is perfect—for instance, it is also inaccurate to assume that every off-label Subsys prescription by the allegedly bribed practitioners was inappropriate and would not have been covered by insurers. Yet Defendants are not resisting the government's methodology to provide a ceiling as applied to the allegedly bribed practitioners, because some degree of approximation is permitted by First Circuit case law.[4] What Defendants are resisting is the assumption that Subsys prescriptions by a good faith, unbribed practitioner—say, Dr. Lisa Stearns—caused the same proportional insurance losses relative to her overall Subsys prescription count as did Drs. Couch and Ruan, who were convicted of violating the CSA. That assumption does not make sense, yet the government and the insurers have not offered any other method of estimating losses untethered to the allegedly bribed practitioners.

## IV.      The Government's Remaining Contentions Lack Merit.

The government argues (Reply at 5) that corporate pleas that disclaimed restitution as too difficult to calculate are irrelevant here. But the government does not attempt to distinguish those cases, other than to say each case "presents its own unique facts [and] circumstances, which are considered when reaching resolution of those cases (for example, by plea agreement)." *Id.*

The government's response is insufficient. Here, it argues that restitution is mandatory and asks the Court to accept its back-of-the-envelope calculations despite the clear issues in the

---

[4] The government's IRC methodology should set a ceiling for loss linked to the allegedly bribed practitioners, subject to any further reductions the Court may deem appropriate. For example, in lieu of an 80.9% IRC use rate for the allegedly bribed practitioners, the Court might apply the difference between the IRC approval rates of the Insys pilot program and the approval rates of the outside, third part vendor that Insys replaced. *See* Babich Mot. for Proposed Alternative Loss Methodology at 7–8, Dkt. No. 1126 (Jan. 6, 2020). While even that measure benefits the government by not accounting for legitimate reasons for the different approval rates, it is more tailored than using a gross opt-in rate for the allegedly bribed practitioners.

government's methodology and the substantial risk of insurer windfalls.  In each of the other cases, the government agreed not to seek restitution at all, even though each case implicated large healthcare fraud schemes.  Moreover, the cited cases show that the government has reduced to boilerplate plea agreement language that obviates the determination of restitution as too complex. *See* Defs.' Response at 2.  Would anyone who has followed this briefing and argument not say the same of some of the issues presented here?

The fact that those other cases were resolved by plea agreement is wholly irrelevant.  The MVRA is as mandatory on the government as it is on the Court.  Surely, the government is not suggesting that it negotiated away victim recovery rights in those cases in exchange for corporate guilty pleas.  Defendants take the plea agreements at face value when they represent that restitution was too complex to determine.  And here, outside of the claims tied to the allegedly bribed practitioners, the government has not given the Court any colorable basis to estimate losses.  Either the government has simply chosen not to develop targeted assumptions or use statistically significant sampling, or those issues really are more complex than the time and circumstances here permit.  Either way, the Court should reject the government's broader restitution position.

The government's observation (Reply at 6) that restitution will be offset by civil recoveries is also beside the point.  The issue here is not whether restitution and potential civil recoveries will offset.  The issue is that the government and insurers have failed to prove their broader restitution requests by a preponderance of the evidence.  That is why the Court should limit the restitution to claims related to the allegedly bribed practitioners, which would tie the restitution award here to the government's theory at trial.  If the insurers—or any other victims—are not satisfied by this approach, they have the option to pursue additional recoveries in civil litigation.  What the law

does not allow them to do is to avoid the burden of proving losses by a preponderance of the evidence by packaging them as restitution claims. *See* § 3664(e).

The government's contention (Reply at 10) that "it is simply not true that the IRC stopped lying in 2014" attacks a straw man. Defendants are not claiming that the IRC stopped lying in 2014. Defendants are claiming, based on undisputed evidence and testimony from the government's own witnesses, that IRC policies changed in 2014 to curb bad practices. Clearly, the new policies did not eliminate all lies from the IRC. But the government's restitution position assumes, for the entire length of the charged conspiracy—through the end of 2015—that the IRC lied, and lied materially, every single time. That is an unproven assumption that completely disregards the many changes to the IRC that occurred during the charged conspiracy.

The government also argues (Reply at 13) that restitution—at least with respect to Medicare—need not be offset either by the value of Subsys or an alternative pain treatment that each insurer was required to provide for sick patients. Refusing to consider offsets is another unjustified assumption that is the norm in analogous civil and criminal contexts.[5]  Surely, it is reasonable to ask what insurers would have covered as to the Subsys prescriptions written by practitioners who were not allegedly bribed, or what they would have covered in an alternative treatment. While the government notes a factual dispute at trial as to whether Defendants' conduct was limited to the TIRF switch-strategy, there is no dispute that a TIRF switch strategy was a *key*

---

[5] The government's assertion that accounting for the value of Subsys (or an alternative) received as part of loss calculation is "inconsistent with the law" ignores this familiar rule in analogous contexts, including the False Claims Act, *see* Defs.' Response at 18 n.27 and accompanying text, citing cases, and in the Sentencing Guidelines loss application notes, *see* U.S.S.G. § 2B1.1 App. Note 3E (noting the requirement to offset loss by the value of the product provided, providing a food stamp example in the government entitlement program context). *Cf.* App. Note (F)(viii) (while inapplicable because the government declined to charge a healthcare fraud offense and, as the Court held, "and now must live with that decision," Post-Trial Order at 82, even that note recognizes that applicability of the loss offset principle in the sentencing context).

*part of* Insys's plans and conduct.  And the switch strategy implies that insurers would have been presented with at least *some* additional claims for other TIRFs absent the Subsys prescriptions. Lastly, the government's objection to offset is limited to Medicare, yet none of the commercial insurers have attempted to offset their claims.  The better approach is to limit restitution to the claims linked to the allegedly bribed practitioners, and to use the same methodology for Medicare and commercial insurers.

### V.       The Commercial Insurers Have Failed To Prove Their Broader Claims.

Defendants' position with respect to the government's Medicare claims applies with equal force to the commercial insurers.  As one insurer itself recognizes, any losses occurred because Insys *first* "pa[id] providers improper kick-backs to prescribe Subsys" and *then* "intentionally and surreptitiously manipulat[ed] [the insurer's] pre-authorization process."  Horizon Mem. at 3–4 (Gov't Reply, Ex. 11).  Thus, as with Medicare's claim, the commercial insurers claims should, at most, be limited to calls involving the 13 allegedly bribed practitioners.

Beyond these general observations, Defendants specifically object to the following aspects and defects in the commercial insurer submissions on restitution:

- **Aetna (Mot. Ex. 3, Reply Ex. 12):** Although Aetna now provides a declaration asserting that the company determined that 1,894 of the claims it paid out "did not have a cancer diagnosis" (Diaz Decl. ¶ 17), it offers no evidence that the IRC actually misrepresented these patient's diagnoses.  Instead, Aetna simply assumes that every patient for whom it could not, in its own records, locate a cancer diagnosis must be associated with a fraudulent claim by the IRC.  *See* Diaz Decl. ¶ 15.  Aetna did not review calls or other records to determine the actual nature of representations made by the IRC.  More fundamentally, although Aetna avers that it would only approve on-label prescriptions (Diaz Decl. ¶ 11), its own policy document shows that those criteria apply to only "some plans" and repeatedly notes that "exception[s]" may apply

(Diaz Decl., Ex. A at 3, 5, 7).  On this record, Aetna is not entitled to any restitution beyond the claims linked to the allegedly bribed practitioners.

- **Anthem (Mot. Ex. 4, Reply Ex. 7):[6]** Although Anthem has provided an expert report to support its claim of fraudulent calls, that report makes clear that the expert *did not listen to any IRC calls* but only evaluated Anthem's *own records*.  *See* Shimek Rep. at 6–9.  It is not possible to conclude, simply because Anthem's own records indicate that a call was made from a "doctor's office" that an IRC representative represented as much.  (For example, the representative may have truthfully stated that she was calling *on behalf* of the doctor.)  With respect to its policies and practices concerning off-label prescriptions and prior authorization requests by third parties, although Anthem has included *excerpts* of materials and deposition favorable to its position, it has not provided a full set of these materials to Defendants.  Finally, Anthem does not break out claims for to the 13 alleged bribed practitioners.  On this record, Anthem is not entitled to any restitution.  Anthem acknowledges it is in pending civil litigation with Insys, and that proceeding is a more suitable forum for resolution of its unproven claim.

- **Caremark (Mot. Ex. 6, Reply Ex. 10):** Caremark's updated declaration does not cure the infirmities in its original submission.  Caremark continues to assume, without reliable evidence, that every single Subsys prescription submitted by the IRC was materially fraudulent.  Caremark does not appear to have evaluated the IRC calls or materials, and cannot describe the nature of the alleged misrepresentations.  On this record, Caremark is not entitled to any restitution beyond the claims linked to the allegedly bribed practitioners.

---

[6] Defendant Rowan's counsel does not join the portions of this brief addressing Anthem and takes no position as to Anthem's claims.

- **Cigna (Mot. Ex. 5):**  Cigna did not provide any updated materials in response to Defendants' response.  On this record, Cigna is not entitled to any restitution beyond the claims linked to the allegedly bribed practitioners.

- **Horizon (Mot. Ex. 8, Reply Ex. 11):**  Although it has supplemented its request, Horizon still has not disclosed any coverage policies.  Instead, Horizon simply says that its demand for restitution is limited to claims involving patients "who did not have a cancer diagnosis *or* had questionable prior authorization requests."  Horizon Mem. at 5, 7.  Horizon does not explain what a "questionable" request means, nor does it provide any specifics about the nature of the alleged misrepresentations on IRC calls.  Horizon also persists in its argument that "there can simply be no legitimate explanation or justification" for off-label prescriptions of Subsys (*id.* at 7), even though this Court instructed the jury that off-label prescriptions of Subsys were not inherently illegal and the government concedes as much.  On this record, Horizon is not entitled to any restitution beyond the claims linked to the allegedly bribed practitioners.

- **SilverScript (Mot. Ex. 7, Reply Ex. 9):**  As before, SilverScript's updated declaration appears to track Caremark's.  Thus, and for the same reasons, SilverScript is not entitled to any restitution beyond the claims linked to the allegedly bribed practitioners.

- **United (Mot. Ex. 9, Reply Ex. 8):**  United indicates that it "will adopt" the same calculation adjustments employed by the government for Medicare.  Gov't Reply Ex. 8 at 2–3.  Although United now provides a declaration regarding its coverage policies (but not the polices themselves), it has not provided any reliable evidence to support its assumption that *all* IRC-related calls included misrepresentations of a cancer diagnosis.  Accordingly, United is not entitled to any restitution beyond the claims linked to the allegedly bribed practitioners.

16

## VI.     Patient Claims Should Be Limited to Direct Financial Losses.

The government initially limited its request for restitution on behalf of individual patients to "the amount of actual out-of-pocket copay costs related to Subsys." Gov't Mot. at 6. That reasonable approach—which Defendants did not contest—reflected the statutory requirement a victim's loss cannot be "too attenuated" from the conduct with which a defendant stands convicted. Gov't Mot. at 4 (quoting *United States v. Vaknin*, 112 F.3d 579, 590 (1st Cir. 1997)); 18 U.S.C. § 3663A(a)(2) (imposing requirement of "direct[] and proximate[]" harm). The requirement "is more restrictive than a requirement of factual cause alone," *Paroline v. United States*, 572 U.S. 434, 446 (2014), meaning that "restitution can only include losses *directly* resulting from a defendant's offense," *United States v. Sablan*, 92 F.3d 865, 870 (9th Cir. 1996) (emphasis added).

The government's reply brief abandons this approach and steps the government back to the role of a disinterested third party. Thus, the government simply attaches, without taking a position on, additional patient requests seeking recovery beyond direct financial losses, such as lost wages,[7] the "pecuniary value of companionship, advice, guidance, and support,"[8] and estimated future costs associated with addiction treatment.[9] Such losses are impermissible "consequential" harms that do "not flow directly and immediately from the act of the [defendant], but only from some of the consequences or results of such act." *United States v. Corey*, 77 F. App'x 7, 9–10 (1st Cir. 2003) (citation omitted). Consider, for example, that parents of a Subsys patient are seeking restitution for alleged harms to them.[10] A former Subsys patient is seeking restitution that includes

---

[7] *See* Gov't Reply, Ex. 2 (Victim ID No. 5431212).

[8] *See* Gov't Reply, Ex. 3 (Victim ID No. 6192691).

[9] *See* Gov't Reply, Ex. 4 (Victim ID No. 5431204).

[10] *See* Gov't Reply, Ex. 3 (Victim ID No. 6192691).

lost wages for her husband.[11]  Defendants do not question the difficult circumstances that produced

such claims, but third party claims are not direct harms and are not recoverable in restitution.

There are some additional problems with the supplemental requests.  One claim is from an

individual seeking restitution for severe dental problems.  This patient provided a doctor's letter

indicating her dental problems began in "the early 2000's"—14 years before she began taking

Subsys—until this discrepancy was brought to her attention, at which point her doctor provided a

new letter that that was identical except for tracing the problems to "2014."[12]  *See* Gov't Reply

at 3 n.1.  Two other claims—each exceeding $1 million—are predicated on harms flowing from

medical malpractice by practitioners who the government has never alleged were bribed, and

whose allegedly deficient medical care thus was not "in the course of the scheme, conspiracy, or

pattern" with which Defendants stand convicted.  18 U.S.C. § 3663A(a)(2).[13]

Defendants do not deny or minimize the tragic circumstances faced by some Subsys

patients.  But Congress "d[id] not authorize a district court to order restitution to all individuals

harmed by a defendant's criminal conduct."  *United States v. Blake*, 81 F.3d 498, 506 (4th Cir.

1996); *see also United States v. Caramadre*, 2013 WL 7138106, at *1 n.2 (D.R.I. Nov. 6, 2013)

(noting "terminally-ill people and their families" who were "acknowledged victims" of fraud did

not suffer direct losses), *aff'd*, 807 F.3d 359 (1st Cir. 2015); *In re Doe*, 264 Fed. Appx. 260, 263-

264 (4th Cir. 2007) (finding "chain of causation" between defendant's misbranding of OxyContin

---

[11] *See* Gov't Reply, Ex. 2 (Victim ID No. 5431212).

[12] Gov't Reply, Ex. 1 (Victim ID Number 6002800).  Moreover, there is no reliable evidence that
Subsys causes dental problems.  To the contrary, the Court heard undisputed evidence at trial that
Subsys is preferable to Actiq and generic fentanyl lozenges precisely because it does *not* cause
dental caries, unlike these drugs. *See, e.g.*, 1/31/2019 Tr. at 121:3–8 (Dr. Awerbuch).

[13] *See* Gov't Reply, Ex. 3 (Victim ID Number 6192691) (treatment by Dr. Vivienne Matalon) &
Ex. 4 (Victim ID Number 5431204) (treatment by Dr. William Tham).

and consumer's addiction "too attenuated" to support restitution).  This does not mean these individuals are without recourse to other actors, including their physicians, or in civil actions.  But it does mean, as the government recognized in its original position, that Defendants are not proper parties for restitution for these kinds of losses.

### VII.    Summary and Conclusion

With respect to Medicare and the commercial insurers, the two charts below provide a ceiling of the relevant restitution numbers using an approach linked to the allegedly bribed practitioners.  If the Court were to track the 11 uncontested practitioners, the total Medicare and commercial insurer amount is not more than $31,449,446.  If the Court were to track all 13 practitioners, the total Medicare and commercial insurer amount is not more than $33,465,598.

| Insurer | Restitution Limited to 11 Bribed Practitioners | | |
|---|---|---|---|
| | Total for 11 HCP | 80.9% IRC Usage | 73% Non-Cancer |
| *Medicare** | $   28,200,159 | $   22,813,929 | $   16,654,168 |
| Aetna† | $   1,193,479 | $   965,525 | $   704,833 |
| Anthem | Not provided | Not provided | Not provided |
| Caremark‡ | $   14,746,923 | $   11,930,261 | $   8,709,090 |
| Cigna | $   1,793,249 | $   1,450,738 | $   1,059,039 |
| Horizon | $   94,767 | $   76,666 | $   55,966 |
| SilverScript‡ | $   3,149,167 | $   2,547,676 | $   1,859,803 |
| United | $   4,151,187 | $   3,358,310 | $   2,451,566 |
| *Commercial Total* | $   25,128,771 | $   20,329,175 | $   14,840,298 |
| **Overall Total** | $   53,328,930 | $   43,143,104 | $   31,494,466 |

---

* Medicare: The total for 11 HCP was determined by taking the total for 13 HCP in the PSR, less amounts for Drs. Khanna and Roque in the Petron declaration, Ex. 3.

† Aetna: Total figures for the 11 HCP and 13 HCP were obtained from the per-HCP payment figures provided in Aetna's initial submission.

‡ Caremark and SilverScript provided total figures for 10 HCP and 13 HCP, without further breakdowns on a per-HCP basis.  Accordingly, it was not possible to add Dr. Frey to their 10 HCP total to obtain an 11 HCP total based on the data provided.

19

| Insurer | Restitution Limited to 13 Bribed Practitioners | | |
| | Total for 13 HCP | 80.9% IRC Usage | 73% Non-Cancer |
|---|---|---|---|
| *Medicare* | $ 30,232,895 | $ 24,458,412 | $ 17,854,641 |
| Aetna | $ 1,193,479 | $ 965,525 | $ 704,833 |
| Anthem | Not provided | Not provided | Not provided |
| Caremark | $ 15,072,543 | $ 12,193,688 | $ 8,901,392 |
| Cigna | $ 1,838,768 | $ 1,487,563 | $ 1,085,921 |
| Horizon | $ 94,767 | $ 76,666 | $ 55,966 |
| SilverScript | $ 3,320,804 | $ 2,686,530 | $ 1,961,167 |
| United | $ 4,913,350 | $ 3,974,900 | $ 2,901,677 |
| *Commercial Total* | $ 26,433,711 | $ 21,384,872 | $ 15,610,957 |
| **Overall Total** | $ 56,666,606 | $ 45,843,284 | $ 33,465,598 |

With respect to patients, the chart below chronicles all submitted claims, broken down by victim identification number.  Defendants do not object to the uncontested claims.  Should the Court overrule Defendants' objections to the remaining claims, those additional values are also shown below, to the best of Defendants' ability to calculate them based on the materials submitted.

| Individual | Mot. Ex. | Reply Ex. | Uncontested | Disputed | Total Claim |
|---|---|---|---|---|---|
| 5431204[*] | | 4 | N/A | $ 1,357,748 | $ 1,357,748 |
| 5431207 | 1F | | $ 3,041 | | $ 3,041 |
| 5431212 | 1A | 2 | $ 1,815 | $ 41,025 | $ 42,840 |
| 5431216 | 1E | | $ 2,006 | | $ 2,006 |
| 5632738 | 1B | | $ 1,140 | | $ 1,140 |
| 6002800 | | 1 | N/A | $ 48,816 | $ 48,816 |
| 6002801 | 1C | | $ 1,231 | | $ 1,231 |
| 6002802 | 1D | | $ 965 | | $ 965 |
| 6192691[†] | | 3 | N/A | $ 3,063,799 | $ 3,063,799 |
| **Total** | | | $ 10,198 | $ 4,511,388 | $ 4,521,586 |

[*] This individual has presented two potential claim options, the first ranging from $622,156 to $622,381 and the second from $1,340,706 to $1,357,748.

[†] These individuals have not specified a precise claim, although Defendants understand they make seek a maximum amount exceeding $3 million.

Dated: February 3, 2020

Respectfully submitted,

/s/ J. Sedwick Sollers III
J. Sedwick Sollers III (admitted *pro hac vice*)
Mark A. Jensen (admitted *pro hac vice*)
Daniel C. Sale (admitted *pro hac vice*)
Lucas M. Fields (admitted *pro hac vice*)
King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
Phone: (202) 626-5612
E-mail: WSollers@kslaw.com

William H. Kettlewell (BBO No. 270320)
Hogan Lovells
100 High St., 20th Floor
Boston, MA 02110
Telephone: (617) 371-1005
Email: bill.kettlewell@hoganlovells.com
*Attorneys for Michael L. Babich*

/s/ Peter Gelhaar
George W. Vien (BBO# 547741)
gwv@dcglaw.com
Peter E. Gelhaar (BBO# 188310)
peg@dcglaw.com
Joshua N. Ruby (BBO #679113)
Donnelly, Conroy & Gelhaar, LLP
260 Frankline Street, Suite 1600
Boston, MA 02110
Telephone: (617) 720-2880
*Attorneys for Alec Burlakoff*

/s/ Tracy A. Miner
Tracy A. Miner (BBO# 547137)
tminer@mosllp.com
Megan Siddall (BBO# 568979)
msiddall@mosllp.com
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02210
Telephone: (617) 273-8421
*Attorneys for Michael Gurry*

/s/ Peter C. Horstmann
Peter C. Horstmann (BBO# 556377)
pete@horstmannlaw.com
Law Offices of Peter Charles Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980
*Attorney for Sunrise Lee*

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra Gliga (BBO# 694959)
alexandra.gliga@whitecase.com
White & Case LLP
75 State Street
Boston, MA 02109
Telephone: (617) 939-9310
*Attorneys for Joseph Rowan*

/s/ William Fick
William W. Fick, Esq. (BBO # 650562)
wfick@fickmarx.com
Daniel N. Marx, Esq. (BBO # 674523)
dmars@fickmarx.com
Fick and Marx, LLP
24 Federal Street, 4th Floor
Boston, MA 02110
Telephone: (857) 321-8360
*Attorneys for Richard Simon*

/s/ Kosta S. Stojilkovic
Beth A. Wilkinson (*admitted pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Wilkinson Walsh LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)

aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
*Attorneys for Dr. John Kapoor*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

/s/ Kosta S. Stojilkovic
Kosta S. Stojilkovic
Counsel for Dr. John Kapoor